UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA, 441 4th St., N.W.,
Washington, D.C. 20001,

Plaintiff,

v.

EXXON MOBIL CORP., 5959 Las Colinas Blvd.,
Irving, TX 75039, EXXONMOBIL OIL
CORPORATION, 5959 Las Colinas Blvd., Irving,
TX 75039, ROYAL DUTCH SHELL PLC, Carvel
van Bylandtlaan 16, 2596 HR The Hague, The
Netherlands, SHELL OIL COMPANY, 150 N.
Dairy Ashford, Houston, TX 77079, BP P.L.C.,
1 St. James's Square, London, SW1Y4PD,
BP AMERICA INC., 501 Westlake Park Blvd.,
Houston, TX 77079, CHEVRON CORPORATION,
6001 Bollinger Canyon Road, San Ramon, CA,
CHEVRON U.S.A. INC., 6001 Bollinger Canyon
Rd., San Ramon, CA 94583,

Defendants.

Civil Action No. _____

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendants Exxon Mobil Corporation and ExxonMobil

Oil Corporation (collectively, "ExxonMobil"), hereby remove this action, currently pending in the

Superior Court of the District of Columbia, to the United States District Court for the District of

Columbia pursuant to 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1441(a), 1442(a), and 1453(b), and 43

U.S.C. § 1349(b)(1). To the extent any part of Plaintiff's causes of action can be construed as non-

federal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because

they form part of the same case or controversy as those causes of action over which the Court has

original jurisdiction.  All other defendants that have been properly joined and served, or purported to be served (collectively, "Defendants"), have consented to this Notice of Removal.[1]

While characterized as a consumer-protection action brought under municipal law, this lawsuit by the District of Columbia, acting through its attorney general (the "Attorney General"), instead seeks to wade into complex areas of federal statutory, regulatory, and constitutional regulation on climate change, and to substitute the District of Columbia's judgment for that of longstanding decisions by the federal government about national and international energy policy and environmental protection.  A suit of this nature should be heard by a federal court.

## TIMELINESS OF REMOVAL

1.  Plaintiff filed this action against Defendants on June 25, 2020, in the District of Columbia Superior Court as Civil Action No. 2020 CA 002892 B.  No Defendant was served prior to June 26, 2020.

2.  This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

3.  The Attorney General brought this action to limit and ultimately end Defendants' production of fossil fuels because of their connection to climate change.  The origins of this lawsuit demonstrate the intent to regulate worldwide greenhouse gas emissions—a task assigned

---

[1] Consenting Defendants are Royal Dutch Shell PLC and Shell Oil Company (collectively, "Shell"); Chevron Corporation and Chevron U.S.A. Inc. (collectively, "Chevron"); and BP p.l.c., and BP America Inc. (collectively, "BP").  By filing or consenting to this Notice of Removal, Defendants do not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process.  *See, e.g.*, *Rivera* v. *Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615-16 (E.D. Pa. 2011).

exclusively to the federal government in our constitutional system.  In early 2016, a coalition of state attorneys general, including the Attorney General, entered into a "Climate Change Coalition Common Interest Agreement" in furtherance of their shared interest in "limiting climate change" and "ensuring the dissemination of *accurate* information about climate change."  Ex.[2] 1 at 1 (emphasis added).[3]  Those state and local government officials—approximately 20 in number—called themselves the "Green 20," to reflect their commitment to a progressive climate change agenda.

4.      On March 29, 2016, the Green 20 held a press conference, entitled "AGs United for Clean Power," with at least one representative of the Attorney General in attendance.  Ex. 2 at 1.  Noting the perceived "gridlock in Washington," the New York Attorney General promoted "collective efforts to deal with the problem of climate change" and urged his colleagues to "step into this [legislative] breach" through the "creative[]" and "aggressive[]" use of their respective offices to target the fossil fuel industry.  *Id.* at 1, 3.[4]

5.      The AGs United for Clean Power press conference was the product of a strategy of climate activists and plaintiff's lawyers developed years earlier.  Its outlines emerged during a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies" held in La Jolla, California in June 2012.  Ex. 4 at 1.  The workshop attendees discussed using law enforcement

---

[2] "Ex." refers to an Exhibit attached to this Notice of Removal.

[3] The parties to the Climate Change Coalition Common Interest Agreement included the state attorneys general of California, Connecticut, Delaware, the District of Columbia, Iowa, Illinois, Maryland, Massachusetts, Maine, Minnesota, New Mexico, New York, Oregon, Rhode Island, Virginia, Vermont, Washington, and the U.S. Virgin Islands.  *See* Ex. 2 at 1.

[4] This press conference drew criticism from thirteen other state attorneys general, who viewed the intentions expressed by the attorney general coalition as an attempt to "[u]s[e] law enforcement authority to resolve a public policy debate."  Ex. 3 at 3.

powers and civil litigation to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." *Id.* at 27.  Some participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation in converting to renewable energy." *Id.* at 27-28.  The attendees concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light" that could be used to coerce companies to change their positions on climate and energy policy. *Id.* at 11.  They also saw civil litigation as a vehicle for accomplishing their goals, with one commentator observing, "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties." *Id.* at 13.

6.      Prior to the AGs United for Clean Power press conference, the attorneys general met with climate activists who had participated in the La Jolla conference.[5]  One of those activists had recently attended a meeting at the Rockefeller Family Fund offices to discuss a so-called "Exxon campaign" to undermine ExxonMobil's ability to conduct business.  The campaign's goals included "delegitimiz[ing] [ExxonMobil] as a political actor," "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and "driv[ing] divestment from Exxon."  Ex. 6 at 1.

7.      Over the next several years, the states associated with the Green 20 filed lawsuits against ExxonMobil and other energy companies named in this lawsuit, all with the goal of limiting—if not ceasing—Defendants' production and sales of fossil fuels, including by stifling

---

[5] These presentations were not only closed to the public; the attorneys general also affirmatively directed the participants to conceal their participation.  *See* Ex. 5 at 1 ("My ask is if you speak to the reporter, to not confirm that you attended or otherwise discussed the event.").

speech on political issues and questions.[6]  The first of these lawsuits, brought by the New York Attorney General, went to trial on October 22, 2019, and concluded with a defense verdict for ExxonMobil.  Justice Ostrager, who presided over the trial, found the State's allegations to be "without merit," and its complaint to be "hyperbolic" and the "result of an ill-conceived initiative of the Office of the Attorney General."  *People* v. *Exxon Mobil Corp.*, Civ. No. 18-45044, 2019 WL 6795771, at *2, *24 (N.Y. Sup. Ct. Dec. 10, 2019).

8.     Several municipalities, also intending to shape the nation's energy policy, have joined in the effort to file lawsuits against energy companies.[7]  A trial court in Texas concluded that climate activists had mounted a "crusade" against ExxonMobil "aimed to chill and suppress ExxonMobil's speech through legal actions & related campaigns."  *City of San Francisco* v. *Exxon Mobil Corp.*, Civ. No. 18-106, 2020 WL 3969558, at *3, *8 (Tex. App. June 18, 2020) (internal quotation marks omitted).  A Texas appellate court likewise expressed dismay about California municipalities' "[l]awfare," which it considered "an ugly tool by which to seek the environmental

---

[6] *See State* v. *Am. Petrol. Inst.*, Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).

[7] *See City of New York* v. *BP p.l.c.*, Civ. No. 18-182 (S.D.N.Y. Jan. 9, 2018); *City & County of Honolulu* v. *Sunoco LP*, Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Counsel of Baltimore* v. *BP p.l.c.*, Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, Civ. No. 18-11859 (Wash. Super. Ct. May 9, 2018); *Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.), Inc.*, Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City of San Francisco* v. *BP p.l.c.*, Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, Civ. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017).

policy changes the California Parties desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do."  *Id.* at *20.

9.     More recently, Bloomberg Philanthropies funded the creation of a State Energy & Environmental Impact Center (the "Impact Center") to assist in litigation to shape national energy policy.  *See* Juliet Eilperin, *NYU Law Launches New Center to Help State AGs Fight Environmental Rollbacks*, Wash. Post (Aug. 16, 2017).  The Impact Center urges state attorneys general to bring climate change lawsuits and provides them resources on the condition that the participating attorneys general do so.  *See* Ex. 7 at 1-3.  Among its initiatives, the Impact Center embeds Special Assistant Attorneys General ("SAAG") within attorneys-general offices that agree to "advanc[e] progressive clean energy, climate change, and environmental legal positions."  *Id.* 3.  The Impact Center pays the SAAGs' salaries and benefits.  *See id.* at 2.

10.     When, in June 2020, the Attorney General filed its Complaint in this action, its allegations echoed the strategies announced at the AGs United for Clean Power press conference, the objectives of the Impact Center, and the assertions made in lawsuits brought by the attorneys general of New York, Massachusetts, Rhode Island, and Minnesota.  Indeed, the Complaint's signature block includes a SAAG selected, embedded, and compensated by the Impact Center.  *See* Compl. at 78.  It also includes counsel from Sher Edling LLP, *see id.* at 78-79, which reportedly received grants worth $1.75 million from Resources Legacy Fund, a San Francisco-based non-profit organization that advocates for climate policies aimed at curbing the production and sale of fossil fuels.  *See* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://eidclimate.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.

11.     Thus, although brought in the name of the District of Columbia, the Complaint is actually the product of special interest groups and plaintiffs' lawyers.  It has been filed to influence national energy policy and the United States' international position on climate change, and to seek discovery to be used outside the litigation.  In a word, the Complaint is a political act, not a legal one.

12.     The Complaint does little to mask the core purpose of the Attorney General's lawsuit—namely, to force reductions in fossil fuel production and sales—all under the guise of municipal consumer protection laws.   For example, the Complaint alleges that "*none* of Defendants' fossil fuel products are 'green' or 'clean'; they all pollute and ultimately warm the planet."  Compl. ¶ 8 (emphasis added).  According to the Complaint, "Defendants' deception" was "detriment[al]" to "DC consumers and the public generally" because it allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of Defendants' fossil fuel products."  *Id.* ¶ 2 (emphasis added).   Indeed, the Complaint asserts that "the development, production, refining, and consumer use of [Defendants'] fossil fuel products— including gasoline and motor oil—emit large volumes of greenhouse gases, which cause global climate change."  *Id.* ¶ 71; *see also id.* ¶ 106 ("Defendants' fossil fuel products are the primary driver of global warming."); ¶ 149 (asserting that "current levels of fossil fuel use—even purportedly 'cleaner' or more efficient products—represent a direct threat to District residents and the environment").  The only solution, in the Attorney General's view, is to cease reliance on fossil fuels.  *Id.* ¶ 52 ("[T]he continued use of fossil fuel products contributes to severe environmental and health threats at significant economic cost."); ¶ 31 ("[T]here is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out." (internal quotation marks omitted)).

13.     These allegations make clear that the fundamental issue raised in the Complaint is not the accuracy of representations made in advertisements about the nature of the products being sold, but whether Defendants' products should be sold *at all*.  *See, e.g.*, *id.* ¶¶ 87-88 (challenging Defendants' "commitment to sustainable development" based on their alleged "expansion of fossil fuel production"); ¶ 101 (challenging Defendants' alleged decisions to "continue[] to ramp up fossil fuel production globally and invest in new fossil fuel development—including in tar sands crude and shale gas fracking, some of the most carbon-intensive extraction projects—and to plan for unabated oil and gas exploitation indefinitely into the future").  This lawsuit is intended to force Defendants to significantly reduce, if not cease, their fossil fuel activities altogether, in an effort to curb global greenhouse gas emissions.

14.     The Complaint's allegations of harm further demonstrate the inextricable relationship between Plaintiff's claims and the production and sale of fossil fuels.  According to the Complaint, Defendants' alleged deception was harmful because it caused consumers to use more fossil fuels, which in turn contributed to greenhouse gas emissions and climate change.  *See, e.g.*, Compl. ¶ 6 (listing "effects of a warming planet from massive fossil fuel combustion"); ¶ 65 (asserting that deception was "an effort to maintain consumer demand for [Defendants'] fossil fuel products"); ¶¶ 89-97 (further describing effects of carbon emissions and climate change); ¶ 161 (describing "[c]onsumer use of fossil fuel products" as "a significant contributor to climate change"); ¶ 168 (asserting that, if consumers were informed about fossil fuels and climate change, "people might purchase less fossil fuel products").

15.     Those allegations show that the alleged consumer harms at issue are the effects of climate change, not the $2.40 per gallon the person paid for gasoline at the pump.  The allegations also demonstrate that this lawsuit's objective is to reduce fossil-fuel use, and thereby discourage

its production.  Indeed, the Complaint alleges that "Defendants' deception" was "detriment[al]" to "DC consumers and the public generally" because it allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and *sale* of Defendants' fossil fuel products."  *Id.* ¶ 2 (emphasis added).

16.     The global production, promotion, and sale of oil and gas products and global greenhouse gas emissions, produced when billions of consumers around the world use these products, are central to this case.  Plaintiff's claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households.  Defendants' production of a dependable, affordable energy supply is the backbone of the American economy.  Defendants' products power our national defense and military; drive production and innovation; keep our homes, offices, hospitals, and other essential facilities illuminated, powered, heated, and ventilated; transport workers and tourists across the nation; and form the materials from which innumerable consumer, technological, and medical devices are fashioned.  The District of Columbia is itself a prodigious consumer and user of fossil fuels.

17.     The Complaint seeks to hold Defendants liable for the consequences of longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of outer continental shelf lands, mineral extraction on federal lands (which have produced billions of dollars for the federal government), and the negotiation of international agreements bearing on the issue of climate change.  Many of the Defendants have leases and contracts with the federal government to develop and extract minerals

from federal lands, and have acted under the direction of federal officers to produce and sell fuel and associated products to the federal government for the nation's defense.

18.     The Complaint improperly attempts to apply the District of Columbia's municipal law to interstate and, indeed, international activity.  The policy decisions surrounding the use of fossil fuels and the threat of climate change "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations."  *Juliana* v. *United States*, 947 F.3d 1159, 1172 (9th Cir. 2020) (internal quotation marks and citations omitted). "[A]ny effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government.  *Id.* at 1171.  This lawsuit thus implicates bedrock divisions of federal-state responsibility, and the claims fall squarely on the federal side.  The domestic aspects of this case are governed by the Clean Air Act and Environmental Protection Agency ("EPA") regulations, and the international aspects of the case are governed by the Foreign Commerce Clause and the foreign affairs powers of the federal government.  The production and sale of fossil fuels is lawful throughout the world and many countries encourage the production of oil and gas within their borders—often going to great lengths to do so.  As the United States has noted in a brief filed in a similar climate change action: "Where, as here, the Cities seek to project state law into the jurisdiction of other nations, the potential is particularly great . . . for interference with United States foreign policy."  Brief for the United States, *City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (2020) (No. 18-16663), 2019 WL 2250196, at *15.

19.     In sum, the Complaint intrudes on the federal political branches' exclusive authority to address important issues of national and international policy.  The balance between the use of fossil fuels and reduction of greenhouse gas emissions is an interstate and international

issue, and the Attorney General's claims directly implicating this issue can be addressed only on a national level by the federal courts.  Accordingly, the Complaint should be heard in this federal forum.

## GROUNDS FOR REMOVAL

20.    A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  This Court has original jurisdiction over this action on multiple grounds.[8]  *First*, this case raises disputed and substantial federal questions arising under federal statutes, federal regulations, and international treaties dealing directly with the balance between the use of fossil fuels and the reduction of greenhouse gas emissions, warranting the exercise of federal jurisdiction under *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005).  *Second*, these claims, which concern both transboundary pollution and the navigable waters of the United States, necessarily arise under federal common law.  *Third*, Plaintiff's claims arise out of federal enclaves, including enclaves within the District of Columbia.  *See* U.S. Const., art. I, § 8, cl. 17. *Fourth*, the Federal Officer Removal Statute, 28 U.S.C. § 1442, authorizes removal because many of the activities for which this action seeks to hold Defendants liable were taken at federal direction.  *Fifth*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out

---

[8]  Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331.  *See Wis. Dept. of Corr.* v. *Schactz*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendant may remove the case from state to federal court." (citing 28 U.S.C. § 1441(a))); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 (4th ed. Apr. 2020 Update) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1). *Sixth*, in the alternative, this suit is effectively a class action, brought under District of Columbia law, on behalf of District of Columbia consumers, thereby creating removal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). *Seventh*, the Attorney General brings this suit on behalf of D.C. citizens, who are the real parties in interest, creating removal jurisdiction on the basis of diversity of citizenship, 28 U.S.C. § 1332(a).[9]

## I.     This Action Raises Disputed and Substantial Federal Issues

21.     This suit, which purports to allege only claims under D.C. municipal law, nonetheless "arises under" federal law, warranting federal question jurisdiction, because the claims advanced (i) "necessarily raise a stated federal issue," (ii) that is "actually disputed and substantial," and (iii) that "a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."   *Grable*, 545 U.S. at 314. Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312-13 (internal quotation marks and citations omitted).

22.     The substantial and disputed federal issues necessarily raised in this action are readily apparent based on the context in and purposes for which this suit has been brought, *see supra* ¶¶ 3-19, and the allegations Plaintiff has chosen to advance.  While the Complaint alleges

---

[9] If Plaintiff challenges this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds beyond their specific articulations in this Notice.

violations of local consumer protection law, this case is not at its core a consumer protection action but instead an attempt to circumvent federal control of environmental policy under the Clean Air Act and EPA actions that directly regulate greenhouse gas emissions.

23.     The federal government has already addressed—and is currently addressing— climate change through domestic statutes and regulations and international agreements.  This action, by seeking to undermine and supplant these preexisting federal efforts, raises several federal issues.  *See District of Columbia* v. *Group Hospitalization & Med. Servs., Inc.*, 576 F. Supp. 2d 51, 54-57 (D.D.C. 2008).

24.     *First*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see American Electric Power Co.* v. *Connecticut* (*"AEP"*), 564 U.S. 419, 426-47 (2011).  Plaintiff seeks to have a jury in Superior Court in the District of Columbia reweigh the factors considered by the EPA in its analysis.[10]

25.     The federal government "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and

_____

[10] The EPA regulates both stationary and mobile sources of greenhouse gases on a national basis. *See* 40 C.F.R. § 60.1 *et seq.* (standards of performance for new stationary sources); *id.* § 85.501 *et seq.* (control of air pollution from mobile sources).  The EPA has pending rulemakings addressing the emission of greenhouse gases from numerous sources.  *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310-01 (Sept. 27, 2019) (EPA proposed rule establishing national program for fuel economy and greenhouse gas regulation); Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review, 84 Fed. Reg. 50,244 (Sept. 24, 2019) (EPA proposed rule addressing methane emissions).  This lawsuit would allow a state court to balance exactly the same competing interests at issue in those rulemakings and come to potentially different results.

overseas projects, and leases for fuel extraction on federal land." *Juliana*, 947 F.3d at 1167.  These federal statutes and regulations demonstrate that Congress has already weighed the costs and benefits of fossil fuels, and permitted their sale because, among other things, affordable energy is critical for economic stability and growth. *See, e.g.*, 42 U.S.C. § 15927(b) (declaring it the "policy of the United States that . . . oil shale, tar sands, and other unconventional fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports"); *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1023 (N.D. Cal. 2018) ("[O]ur industrial revolution and the development of our modern world has literally been fueled by oil and coal.  Without those fuels, virtually all of our monumental progress would have been impossible."), *vacated on other grounds*, 960 F.3d 570 (9th Cir. 2020).

26.     The Attorney General's request that a District of Columbia municipal court substitute its judgment for that of Congress and the EPA on these issues—and impose significant penalties, damages, and injunctive relief based on the Attorney General's assertion that a different balance should be struck, *see* Compl. § XII—constitutes a "collateral attack" on an "entire [federal] regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.—E.* v. *Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotation marks omitted).  Removal is not only appropriate, but essential, in such circumstances. *See, e.g.*, *Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009); *Bryan* v. *BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429-30 (4th Cir. 2004); *Hill* v. *BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).  Thus, the balance struck by Congress, the EPA, and the President between the sometimes competing interest of economic and national security against reducing greenhouse gas emissions is a necessary part of

14

Plaintiff's claims.  That issue—whether the federal response to climate change is adequate—is an issue that obviously should be decided by a federal court.

27.     *Second*, the United States' international climate change policy has, for decades, sought to balance environmental policy with economic development.

28.     In 1959, President Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security."  Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, *as amended by* Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).  The import system was "mandatory and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."  Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959).   President Eisenhower further explained United States foreign and domestic policy: "Petroleum, wherever it may be produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id.*

29.     After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least 90 days of net oil imports.  *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271.  The United States meets part of its obligation through government-owned stocks held in the U.S.

Strategic Petroleum Reserve. *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Policy Dev. Grp.,

National Energy Policy 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

30.     In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an

international commitment to reduce greenhouse gas emissions, the Senate resolved that the nation

should not be a signatory to any protocol that "would result in serious harm to the economy" or

fail to regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong., 1st Sess. (1997).

And President Obama issued a series of directives in May 2011, "which included additional lease

sales, certain offshore lease extensions, and steps to streamline permitting, all towards the

President's goal of expanding safe and responsible domestic oil and gas production . . . as part of

his long-term plan to reduce our reliance on foreign oil." Press Release, Office of the Press

Secretary, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13,

2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-

holds-major-gulf-mexico-oil-and-gas-lease-sale.

31.     More recently, President Trump cited foreign-affairs implications in his decision to

withdraw from the Paris Agreement, which was based in large part on the current Administration's

conclusion that that treaty did not properly strike the balance between environmental and national

economic and security concerns. *See* The White House, Statement by President Trump on the

Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-

statements/statement-president-trump-paris-climate-accord/. A different Administration may take

a different view. Under the Attorney General's view, however, a jury in a state court could decide

for itself how to strike the balance among competing policy imperatives. Plaintiff's claims thus

infringe on the federal government's environmental, trade, and energy policies that require the

United States to speak with one voice in coordinating with other nations. *See United States* v.

*Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

32.     The very existence and purpose of this lawsuit conflicts with the United States' position on the international front.  The United States has consistently opposed the "establishment of sovereign liability and compensation schemes" to address climate change on the international level.  Brief for the United States, *City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (9th Cir. 2020) (No. 18-16663), 2019 WL 2250196, at *17 (citing Todd Stern, Special Envoy for Climate Change, Special       Briefing       (Oct.       28,       2015),       https://2009-2017.state.gov/s/climate/releases/2015/248980.htm).

33.     This lawsuit contradicts that position by creating a retroactive "liability and compensation scheme" for alleged injuries due to the past production and use of fossil fuels. Foreign governments may react to this lawsuit by adopting their own theories of retroactive liability and compensation, contrary to the foreign policy of the United States.  Thus, this lawsuit also constitutes a collateral attack on the foreign policy of the United States regarding the proper way to address the issue of climate change.

34.     By improperly asking a court to weigh in on precisely those issues, this case would "implicate countless foreign governments and their laws and policies."  *City of New York* v. *BP p.l.c.*, 325 F. Supp. 3d 466, 475 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188 (2d Cir. argued Nov. 22, 2019).  Indeed, the Complaint accuses Defendants of being complicit in attempting to "disrupt international efforts to negotiate any treaty curbing greenhouse gas emissions," Compl. ¶ 64, an allegation that will require a court to pass judgment on the political branches' decision-making in the realm of foreign affairs.  Accordingly, the exercise of federal jurisdiction is both appropriate and necessary.  *See Republic of Philippines* v. *Marcos*, 806 F.2d 344, 352 (2d Cir.

1986) (exercising federal jurisdiction where "plaintiff's claims . . . will directly and significantly affect American foreign relations"); *see, e.g.*, *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413 (2003) (holding that claims implicating the "exercise of state power that touches on foreign relations" in a significant way "must yield to the National Government's policy"); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down a Massachusetts law barring state entities from transacting with companies doing business in Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy").

35.     *Third*, Plaintiff also alleges a causation theory that depends on proof that federal policymakers were misled and would have adopted different energy and climate policies absent the alleged misrepresentations.   According to the Complaint, the Global Climate Science Communications Team "continued Defendants' efforts to deceive the public about the dangers of fossil fuel use" by "[d]evelop[ing] and implement[ing] a direct outreach program to inform and educate members of Congress . . . about uncertainties in climate science" to "begin to erect a barrier against further efforts to impose Kyoto-like measures in the future."   Compl. ¶ 64 (internal quotation marks omitted); *see also id.* ¶ 20(d) (noting that one of the stated purposes of the American Petroleum Institute is "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas industry" (alteration incorporated)).   It is well settled that claims that a defendant has engaged in fraud on the federal government arise under federal law.   *See Buckman Co.* v. *Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Pet Quarters*, 559 F.3d at 779 (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Kemp* v. *Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on

federal agencies have never come within the 'historic police powers of the States.'"); *Bader Farms, Inc.* v. *Monsanto Co.*, Civ. No. 16-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of [the Animal and Plant Health Inspection Service's] decision to deregulate the new seeds."). Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 495 (1987).

36. *Fourth,* the Complaint's reliance on injuries allegedly suffered by way of navigable waters, *see, e.g.*, Compl. ¶¶ 6, 30, 37, 39, 41-48, 61, 92, 94, 96, provides an additional basis for the exercise of federal jurisdiction under *Grable*, *supra*. Congress has given the U.S. Army Corps of Engineers jurisdiction to regulate the navigable waters of the United States. To adjudicate Plaintiff's claims, this Court will need to evaluate whether sea level rise can amount to a cognizable injury and whether the remedy the Complaint seeks is consistent with federal law. *See* 33 U.S.C. § 403; *see also id.* § 426i. That, in turn, will require the Court to interpret an extensive web of federal statutes and regulations, *see, e.g.*, 33 C.F.R. § 320.4(a)(1)-(2), and to evaluate whether the Corps has exercised its authority over navigable waters reasonably over the past several decades, *see, e.g.*, U.S. Army Corps of Eng'rs, Eng'g Circular 1105-2-186, Planning Guidance on the Incorporation of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989) (providing "guidance for incorporating the effects of possible changes in relative sea level in Corps of Engineers feasibility studies").

37. *Fifth*, as explained below, moreover, federal common law *exclusively* governs Plaintiff's claims because they implicate three areas which our constitutional design does not allow state or municipal law to control: transboundary pollution, navigable waters, and foreign

relations. *See infra* ¶¶ 41-55. But even if there were some viable state law component to these claims (which there is not), federal common law would still govern at least some aspects of them, and the aspects necessarily governed by federal common law would justify removal under *Grable*, since a claim "raise[s] substantial questions of federal law by implicating the federal common law." *Torres* v. *S. Peru Copper Corp.*, 113 F.3d 540, 542 (5th Cir. 1997) (upholding removal of claims raising foreign relations issues); *see also Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607 (4th Cir. 2002) (a claim in an area where "federal common law *alone* governs" "necessarily depends on resolution of a substantial question of federal law"); *Newton* v. *Cap. Assur. Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (a claim that requires applying "principles of federal common law . . . satisfies § 1331 by raising a substantial federal question").

38.     The federal questions raised here are substantial. This action sits at the intersection of federal energy and environmental regulations, which implicate foreign policy and national security considerations. The substantiality inquiry is satisfied when the federal issues in a case concern even *one* of these subjects. *See, e.g.*, *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (issues relating to the state secrets privilege); *Grynberg Prod. Corp.* v. *British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) (issues relating to allocation of international mineral resources).

39.     For the same reason, the exercise of federal jurisdiction is fully consistent with principles of federalism—federal courts are the traditional and appropriate fora for litigation regarding the intersection of national energy and environmental law, and foreign policy. *See Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007) (explaining that the "sovereign prerogatives" to force reductions in greenhouse gas emissions "are now lodged in the [f]ederal [g]overnment").

40.     This action, a thinly veiled effort to regulate fossil fuel production and greenhouse gas emissions, raises several substantial and disputed federal issues concerning domestic and international energy and environmental policy.  It belongs in federal court.

## II.     The Complaint Arises under Federal Common Law

41.     Section 1331 also supplies this Court with jurisdiction over this suit because its clams necessarily arise under federal common law.  *See Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (recognizing original federal jurisdiction over "claims founded upon federal common law").  While the Attorney General presents its claims as being brought under municipal law, courts have long recognized that claims may arise under federal common law regardless of whether plaintiff purports to plead federal law claims.  *See United States* v. *Standard Oil Co.*, 332 U.S. 301, 307 (1947) (holding that certain claims asserted under state law must be governed by federal common law because they involved "matters essentially of federal character"); *see, e.g., Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997).  This action implicates three "uniquely federal interests" that demand the application of federal common law: (i) transboundary pollution, (ii) the navigable waters of the United States, and (iii) international affairs and commerce.

42.     Although "[t]here is no federal general common law," *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as 'federal common law,'" *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Standard Oil*, 332 U.S. at 308).  In particular, federal common law governs areas implicating "uniquely federal interests," *see, e.g.*, *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504-07 (1988), such as where the issue is, by nature, "within the national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue.  *AEP*, 564 U.S. at 421-22 (internal quotation marks and

citation omitted).  These interests are also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.  "[I]f federal common law exists, it is because state law cannot be used." *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 314 n.7 (1981).  In these areas, "the entire body of state law . . . is replaced by federal rules." *Boyle*, 487 U.S. at 508.

### Transboundary Pollution

43.     The United States Supreme Court has long recognized that "[e]nvironmental protection is undoubtedly an area within national legislative power" for which "federal courts may . . . fashion federal common law." *AEP*, 564 U.S. at 421 (internal quotation marks and citation omitted); *see also Illinois* v. *City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."). Thus, federal common law is to be applied to "transboundary pollution suits," *Native Village of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see, e.g.*, *Ouellette*, 479 U.S. at 487-88; *Missouri* v. *Illinois*, 200 U.S. 496, 517-21 (1906), including suits asserting claims rooted in the effects of global greenhouse gas emissions.

44.     This is because, as the Supreme Court has held for more than a century, "[e]ach state stands on the same level with all the rest," no state "can impose its own legislation on one of the others." *Kansas* v. *Colorado*, 206 U.S. 46, 97 (1907).  Because the District of Columbia cannot impose its law on the production, sale, and use of fossil fuels in the 50 States, some of which may disagree with the District's dim view of fossil fuels, this action must arise under federal common law.  *See* Brief for the United States, *Milwaukee II*, 451 U.S. 304 (1981) (No. 79-408), 1980 WL 339512, at *18 ("[A state cannot] generally enforce its own law beyond its borders.  Yet, its sovereign rights ought not be circumscribed by the law of its neighbor state, which may be

inadequate.   Accordingly, federal law must perforce serve as a basis for resolving interstate pollution disputes." (internal quotation marks and citation omitted)).

45.     In *Milwaukee I*, a unanimous Court held that a suit for interstate water pollution arose under federal law and was within the jurisdiction of the federal district courts.  In that case, the State of Illinois filed a motion for leave to pursue an original action in the Supreme Court.  406 U.S. at 93.  The proposed action sought to abate a nuisance allegedly created by Milwaukee and its sewerage authorities by their discharges of inadequately treated sewerage into Lake Michigan. *Id.*  The Court denied the motion to invoke its original jurisdiction, but held that Illinois could seek relief in federal district court under the federal common law of nuisance.  *See id.* at 107-08.

46.     The Court characterized the issue before it as whether "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C.] § 1331(a)."  *Id.* at 99.  The Court answered that question in the affirmative, giving "laws" its "natural meaning" and holding that an action based on federal common law, as much as an action based on a federal statute, supports federal question jurisdiction.  *Id.* at 99-100.  The *Milwaukee I* Court was explicit: "federal common law . . . is [an] ample basis for jurisdiction under 28 U.S.C. § 1331(a)."  *Id.* at 102 n.3.  The Supreme Court reaffirmed the jurisdictional holding of *Milwaukee I* in *AEP*.

47.     In *AEP,* plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418 (internal quotation marks and citation omitted).  In determining whether plaintiffs had properly stated a claim for relief, the Supreme Court determined that federal common law governs claims involving "air and water in

their ambient or interstate aspects." *Id.* at 421 (internal quotation marks and citation omitted) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law." (quoting *Milwaukee I*, 406 U.S. at 103)).  The Court rejected the notion that state law could govern public-nuisance claims related to global climate change, stating that "borrowing the law of a particular State would be inappropriate." *Id.* at 422.

48.      The Ninth Circuit's decision in *Kivalina* applies the same logic.  There, a municipality asserted a public-nuisance claim for damages to its property allegedly resulting from the defendant energy companies' "emissions of large quantities of greenhouse gases."  696 F.3d at 853-54.  Plaintiff contended that its claim arose under federal and (alternatively) state common law.  *Native Village of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009).  The district court dismissed the federal claim and declined to exercise supplemental jurisdiction over any related state-law claims.  *Id.* at 882-83.  On appeal, the Ninth Circuit held that federal common law governed plaintiff's claims.  *Kivalina*, 696 F.3d at 855.  Citing *AEP*, the Ninth Circuit began from the premise that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.*  Given the interstate and transnational character of claims asserting damage from greenhouse-gas emissions, the court concluded that the suit fell within that rule.  *Id.*

49.      Most recently, in *City of New York*, plaintiff sued energy companies for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming."  325 F. Supp. 3d at 471 (internal quotation marks and citation omitted).  Because plaintiff's claims were "based on the 'transboundary'

emission of greenhouse gases," the court held that they "ar[o]se under federal common law and require[d] a uniform standard of decision."[11] *Id.* at 472.

50.     Although the Attorney General frames its suit as derived from a state statute that concerns consumer protection, the gravamen of the Attorney General's alleged claims and damages is that Defendants caused consumers in the District of Columbia and around the world to consume fossil fuel products, which in turn contributed to greenhouse gas emissions, which in turn contributed to global climate change, which in turn caused harm to District of Columbia residents and consumers. The Attorney General may opportunistically attempt to fixate on an earlier moment in this causal chain, but claims regarding Defendants' roles in the promotion and sale of fossil fuels plainly constitute the type of transboundary pollution suit that has historically been governed by federal common law. The Complaint alleges at length the harms the District of Columbia will experience as a result of climate change, including heightened temperatures, an increased number of "extreme heat days" and "heatwaves," a rise in sea levels, and "inland drainage and riverine and coastal flooding." Compl. ¶¶ 94-97; *see Michigan* v. *U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771-72 (7th Cir. 2011).

51.     Because this suit is inherently premised on interstate pollution that allegedly causes environmental harm in the form of climate change, it implicates uniquely federal interests and is

---

[11] The federal district court in *City of Oakland* ruled that similar climate change lawsuits arose under federal common law. *See California* v. *BP p.l.c.*, Civ. No. 17-06011, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018) ("Plaintiffs' nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law."). The Ninth Circuit reversed on other grounds. *See City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (9th Cir. 2020). A petition for rehearing and rehearing *en banc* is currently pending before the Ninth Circuit.

governed by federal common law.  *See AEP*, 564 U.S. at 421; *Kivalina*, 696 F.3d at 855; *City of New York*, 325 F. Supp. 3d at 472.

**Navigable Waters**

52.     Federal common law also governs claims arising out of the "interstate or navigable waters" of the United States.  *District of Columbia* v. *Schramm*, 631 F.2d 854, 864 (D.C. Cir. 1980); *accord Milwaukee I*, 406 U.S. at 92; *see, e.g.*, *Michigan*, 667 F.3d at 771-72.  Thus, as noted above, the Supreme Court in *Milwaukee I* held that federal common law governed, and original federal question jurisdiction existed over, the State of Illinois's nuisance abatement suit against four cities and two sewerage commissions in Wisconsin, alleging that defendants were polluting Lake Michigan.  406 U.S. at 91-92.  And in *Michigan*, the Seventh Circuit considered the application of federal common law to claims alleging that the operation of the Chicago Area Waterway System would allow invasive non-native species of carp to enter the Great Lakes.  *See* 667 F.3d at 771.  Because federal common law "extends to the harm caused by . . . environmental and economic destruction" by way of navigable waters, it necessarily applied to the claims at issue. *Id.*

53.     Federal common law applies here because the claims at issue arise from navigable waters.  Plaintiff alleges that the District of Columbia has suffered, or will suffer, "environmental and economic destruction" via the "navigable waters" of the United States.  According to the Complaint, "sea level rise" is among the "economic impacts in the United States" felt from climate change, which is, in turn, allegedly caused by Defendants' fossil fuel production.  Compl. ¶¶ 4, 94, 96.  The District of Columbia, "[l]ocated at the confluence of the Anacostia and Potomac, two tidally influenced rivers," is "vulnerable to inland drainage and riverine and coastal flooding." *Id.* ¶ 97.  "Relative sea level rise in the District has been higher than global sea level rise," the

Complaint alleges, "because the local landmass in the region also has been sinking as the result of long-term land subsidence. Sea level rise is expected to continue, and even accelerate, in the future due to climate change." *Id.* ¶ 96. Accordingly, the Complaint has tied the claim asserted in this action to the navigable waters of the United States, for which federal common law must govern.

***International Affairs and Commerce***

54. The international nature of the claims provides further support for the proposition that they cannot be local-law claims and that, if anything, they are federal common law claims that support jurisdiction in federal court. *See Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *accord Marcos*, 806 F.2d at 352 (explaining that "there is federal question jurisdiction over actions having foreign policy implications" under federal common law). As noted above, *supra* ¶¶ 27-34, these claims involve foreign commerce and the foreign affairs of the United States. That is an area where federal common law—not state or municipal law—must govern. *Tex. Indus.*, 451 U.S. at 641 ("[It is] the interstate or international nature of the controversy [that] makes it inappropriate for state law to govern.").

55. This suit implicates multiple "uniquely federal interests": transboundary pollution, injuries arising from the "navigable waters" of the United States, and international affairs and commerce. Accordingly, these claims must be brought, if at all, under federal common law, and must be heard in federal court.

### III.     This Action Arises out of Federal Enclaves

56. This Court also has original jurisdiction under the federal enclave doctrine. The Constitution's "Enclave Clause" authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts,

Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const., art. I, § 8, cl. 17.

Courts have "generally read the 'Enclave Clause' to establish federal subject matter jurisdiction

over tort claims occurring on federal enclaves, and have allowed such claims to proceed even when

applying state law." *Jograj* v. *Enter. Servs., LLC*, 270 F. Supp. 3d 10, 16 (D.D.C. 2017); *see, e.g.*,

*Federico* v. *Lincoln Mil. Hous.*, 901 F. Supp. 2d 654, 672 (E.D. Va. 2012).

57.     The "key factor" in determining whether federal enclave jurisdiction exists "is the

location of the plaintiff's injury or where the specific cause of action arose."  *Sparling* v. *Doyle*,

Civ. No. 13-0323, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate

the federal enclave status and the location of the exposure will not shield plaintiffs from the

consequences" of "federal enclave status."  *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal.

1992).

58.     *First*, in targeting Defendants' oil and gas operations, Plaintiff necessarily sweeps

in those activities that occur on military bases and other federal enclaves.  *See, e.g.*, *Humble Pipe

Line Co.* v. *Waggonner*, 376 U.S. 369, 372-74 (1964) (noting that the United States exercises

exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in

Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on

Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[]

takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000,

approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their

land," and these activities were spread across 22 different states.  U.S. Gov't Accountability Off.,

GAO-02-64R, U.S. Fish & Wildlife Service Information on Oil and Gas Activities in the National

Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.

59.     *Second*, the Complaint alleges that climate change injuries will be suffered in federal enclaves within the District of Columbia.  Plaintiff alleges that, on account of climate change, the District of Columbia will experience heightened temperatures, an increased number of "extreme heat days" and "heatwaves," a rise in sea levels, and "inland drainage and riverine and coastal flooding."  Compl. ¶¶ 95-97.  Necessarily impacted are the following federal enclaves, among others:

- The Washington D.C. Navy Yard, *see Jograg*, 270 F. Supp. 3d at 16-17;

- Military installations, such as the Marine Barracks and the Naval Observatory, *see Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998);

- Monuments and parks controlled by the National Park Service, such as the National Mall, and the Pennsylvania Avenue National Historic Park, *see* Memorandum from Randolph J. Meyers, Senior Att'y, Branch of Nat'l Parks, *National Park Service regulatory authority of the Cross Street Sidewalks at 3rd, 4th, 7th and 14th Streets on the National Mall* (July 28, 2010), https://comp.ddot.dc.gov/Documents/National%20Park%20Service%20Jurisdicti on%20of%20Mall%20Street%20Crossings%20Memo.pdf; Nat'l Park Serv., *Legal Considerations for the National Mall and Pennsylvania Avenue National Historic Park*, https://www.nps.gov/nationalmallplan/Documents/Symposium%20Papers/Legal_ Considerations_29_Oct.pdf (last visited July 16, 2020); and

- The Smithsonian Institution, *cf. Expeditions Unlimited Aquatic Enters., Inc.* v. *Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (holding Smithsonian

Institution is a federal agency for the purposes of determining whether it is immune from suit under the Federal Tort Claims Act).

60.    *Third*, the Complaint alleges that Defendants' actions were material to District of Columbia consumers' decisions to purchase fossil fuel products.  *See* Compl. ¶¶ 161-68.  Fossil fuel products, including upon information and belief Defendants' products, were marketed and sold to consumers by the Army Air Force Exchange Service ("AAFES") at Express stations located on federal enclaves in the District of Columbia such as U.S. Army Fort Lesley J. McNair and Joint Base Anacostia-Bolling.

61.    Because the Complaint's claims arise out of federal enclaves both within and without the District of Columbia, this Court has original jurisdiction over this action.

## IV.    This Action Meets the Elements of the Federal Officer Removal Statute

62.    Removal is also proper under the Federal Officer Removal Statute, 28 U.S.C. § 1442, which allows for removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  Among other things, Defendants have acted under federal government mandates, leases, and contracts, performed critical and necessary functions for the U.S. military, and engaged in activities on federal lands under federal direction, oversight, and control.  And "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform" these essential tasks itself.  *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 154 (2007).

63.    Removal under Section 1442 is warranted if: (i) the defendant is a "person" within the meaning of the statute; (ii) plaintiff's claims are "for or relating to" an act under color of federal office; and (iii) the defendant raises a colorable federal defense.  *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 466, 470-71 (3d Cir. 2015); *see K&D LLC* v. *Trump Old Post*

*Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).  These elements are construed "liberally in favor

of removal," *K&D*, 951 F.3d at 506, and each is satisfied here.

64.     Defendants, all of which are corporations, are "person[s]" within the meaning of

Section 1442.  *See Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 135-36 (2d Cir. 2008).

65.     Defendants "acted under" federal officers because the government exerted

subjection, guidance, or control over Defendants' actions, and because Defendants engaged in "an

effort to *assist*, or to help *carry out*, the federal superior's duties or tasks."  *Watson*, 551 U.S. at

152.  The Supreme Court has emphasized that "[t]he words 'acting under' are broad."  *Id.* at 147.

Moreover, Defendants' allegedly improper conduct, undertaken in part at the direction of federal

officials, was "connected or associated" with Plaintiff's claims.[12]  *E.g.*, *Latiolais* v. *Huntington*

*Ingalls, Inc.*, 951 F.3d 286, 291-92 (5th Cir. 2020) (*en banc*).  As explained above, the Attorney

General's causes of action are aimed at stopping or reducing Defendants' production and sale of

fossil fuels, which has allegedly played a "central role" in "causing climate change."  Compl. ¶ 1;

*see id.* ¶¶ 4, 6.  But the activity the Complaint targets was precisely what the federal government

*directed or obligated* Defendants to do.  *See Latiolais*, 951 F.3d at 291.

--------

[12] Prior to 2011, Section 1442 conditioned removal on a defendant being "sued in an official or
individual capacity *for* any act under color of such office."  28 U.S.C. § 1442(a) (2010) (emphasis
added).  As part of the Removal Clarification Act of 2011, Congress "amended section 1442(a) to
add 'relating to'" to the statutory text, thereby "broaden[ing] federal officer removal to actions,
not just *causally* connected, but alternatively *connected or associated*, with acts under color of
federal office."  *Latiolais*, 951 F.3d at 292, 296; *accord Baker* v. *Atl. Richfield Co.*, 962 F.3d 937,
943-45 (7th Cir. 2020); *Sawyer* v. *Foster Wheeler, L.L.C.*, 860 F.3d 249, 258 (4th Cir. 2017);
*Caver* v. *Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017); *In re Commonwealth's
Motion to Appoint Counsel*, 790 F.3d at 470-71; *see also K&D*, 951 F.3d at 507 n.1 (deeming it
unnecessary to resolve the impact of the 2011 amendments on Section 1442's scope, but noting
the views of its sister circuits).

66.    *First*, acting under federal officers, Defendants developed and produced special fuels for the U.S. government, including unique fossil fuel products to meet national security requirements.  The U.S. government is one of the largest consumers of fossil fuel products in the world.  Indeed, the U.S. Department of Defense alone is the world's largest institutional user of petroleum fuels.  There is thus far more than an incidental relationship between the United States' fuel needs (that have driven the federal government to mandate exploration and production of fossil fuels) and the alleged impacts about which Plaintiff complains here.  The government relies heavily on Defendants and other industry members to meet these needs. This reliance is particularly acute with respect to matters of national security and defense. Starting at least as early as World War II, officers of the federal government were authorized to direct, and have directed, Defendants to conduct their production, extraction, and development of fossil fuel products, including the sale of gasoline at military exchanges located in the District of Columbia.

67.    As just one example, during World War II, the federal government asserted substantial control over certain Defendants' development and production of high-octane aviation fuels ("avgas").[13]  *See Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (removal proper where defendant "acted under the military's detailed and ongoing control" by "contract[ing] to manufacture heavy bomber aircraft"); *Greene* v. *Citigroup, Inc.*, Civ. No. 99-1030, 2000 WL 647190, at *2 (10th Cir. May 19, 2000) (removal proper where defendant chemical company conducted a radium cleanup pursuant to a "remedy selected by the EPA"); *see also Camacho* v.

---

[13] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.  Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this Notice of Removal only, ExxonMobil describes the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Complaint, as pleaded, can and should be removed to federal court.

*Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (removal proper when

the defendants "were acting under express orders, control and directions of federal officers"

(internal quotation marks omitted)).

68.     Avgas "was the most critically needed refinery product during World War II and

was essential to the United States' war effort." *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285

(Fed. Cir. 2014) (internal quotation marks and citations omitted).

> Because avgas was critical to the war effort, the United States government
> exercised significant control over the means of its production during World War II.
> In 1942, President Roosevelt established several agencies to oversee war-time
> production.  Among those with authority over petroleum production were the War
> Production Board ("WPB") and the Petroleum Administration for War ("PAW").
> The WPB established a nationwide priority ranking system to identify scarce goods,
> prioritize their use, and facilitate their production; it also limited the production of
> nonessential goods.  The PAW centralized the government's petroleum-related
> activities.  It made policy determinations regarding the construction of new
> facilities and allocation of raw materials, and had the authority to issue production
> orders to refineries.

*United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002).  In short, the "PAW told the

refiners what to make, how much of it to make, and what quality." *Shell Oil*, 751 F.3d at 1286.

69.     In the days after the attack on Pearl Harbor, the federal government "recognized

the need to quickly mobilize avgas production, with the [Office of the Petroleum Coordinator for

National Defense] stating: 'It is *essential*, in the national interest that the supplies of all grades of

aviation gasoline for military, defense, and essential civilian uses *be increased immediately to the*

*maximum.*" *Id.* (emphasis added).   The federal government thus entered into contracts with

predecessors or affiliates of Chevron and Shell "to sell vast quantities of avgas." *Id.*  For example,

the government's contract with Shell's predecessor or affiliate specified that it "*shall* use its best

efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and

not later than August 1, 1943." *Shell Oil Co.* v. *United States*, Civ. No. 06-141 (Nov. 20, 2012),

ECF No. 106-1 (emphasis added) (contract between Defense Supplies Corporation and Shell Oil Company, Inc., dated April 10, 1942).  And to maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell Oil*, 751 F.3d at 1287 (internal quotation marks omitted).  At the direction of the federal government, the oil companies increased avgas production over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, which was "crucial to Allied success in the war." *Id.*

70.     During the Korean War, the Defense Production Act of 1950, Pub. L. No. 81-774 ("DPA"), gave the federal government broad powers to issue production orders to private companies to prioritize military procurement requirements.  On September 9, 1950, President Truman issued Executive Order 10161 establishing the Petroleum Administration for Defense ("PAD"), which had the authority to issue orders under the DPA requiring private companies to operate refineries to ensure sufficient petroleum production for the military.  The PAD issued production orders to oil and gas companies, including Defendants.  For example, PAD issued orders to ensure adequate quantities of avgas for military use.  *See* Fourth Annual Report on the Activities of the Joint Committee on Defense Production, 84th Cong., 1st Sess., H. Rep. No. 1, at 122 (Jan. 5, 1955).  When supplying the federal government with fuels required to support the country's military, Defendants again were "acting under" federal officers "to *assist*, or help *carry out*, the duties or tasks" of the federal superior vital to national security.  *Watson*, 551 U.S. at 152.

71.     During the Cold War, Shell Oil Company (or a predecessor or affiliate) developed and produced specialized jet fuel for the federal government to meet the unique performance requirements of the U-2 spy plane (known as LF-1A) and later the Blackbird program (known as

JP-7, PF-1, or MIL-T-38219).  *See* Ben Rich & Leo Janis, Skunk Works 73, 113 (1996); Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974, at 61-62 (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf.

72.     Certain Defendants continue to produce special military fuels to meet the United States' need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  Historically, Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors or affiliates) have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009).  DESC procures a range of military-unique petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, and JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion in procurement actions.  *See id.* at 2.  In fact, "[t]he U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."  Subcommittee on Jet-Propulsion Fuel 8, Committee on Toxicology, National Research Council, Toxicologic Assessment of Jet-Propulsion Fuel 8 (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/.

73.     By developing and producing these special fuels for the federal government and military, Defendants performed tasks under federal officers that, "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform."  *Watson*, 551 U.S. at 154.

74.     In addition, Defendants and other non-Defendant producers and refiners also continue to sell consumer products under contract with the United States government for the direct marketing and sale to military service members, retirees, and their families at military exchanges in the District of Columbia, including at AAFES Express, located on Joint Base Anacostia-Bolling at 1311 Chappie James Boulevard, Washington, D.C. 20032, and at AAFES Exchange on Fort McNair at 103 Fourth Avenue, SW, Washington, D.C. 20319.

75.     *Second*, certain Defendants have engaged in the exploration and production of fossil fuels under agreements with federal agencies exercising supervision and control.

76.     For example, in 1944, one of Chevron's predecessors, the Standard Oil Company, entered into a contract with the United States Navy "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve." *Chevron U.S.A., Inc.* v. *United States*, 116 Fed. Cl. 202, 205 (2014).  "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."  U.S. Gov't Accountability Off., RCED-87-75FS, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (Jan. 1987), http://www.gao.gov/assets/90/87497.pdf.  Standard Oil worked at the direction of the U.S. Navy to produce oil to assist with the war effort during World War II.  *See* Ex. 8 (NPR-1 operational documents from World War II providing production information and describing why Standard Oil was selected as the operator for the U.S. Navy, with the Navy "express[ing] its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company").

77.     In response to the Organization of the Petroleum Exporting Countries ("OPEC") oil embargo of 1973–1974, the Naval Petroleum Reserves Production Act of 1976 was enacted,

which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years." U.S. Gov't Accountability Off., RCED-87-75FS, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (Jan. 1987), http://www.gao.gov/assets/90/87497.pdf; *see* Pub. L. No. 94-258, 90 Stat. 303.  Congress directed production at Elk Hills to be significant; as the naval officer in charge of the facility explained, "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of" the 1970s.  Robert Lindsey, *Elk Hills Reserve Oil Will Flow Again*, N.Y. Times, July 3, 1976.  The oil produced pursuant to this renewed effort was intended for sale in the domestic marketplace to reduce the economic shocks caused by the OPEC embargo.  Given Elk Hills Reserve's new focus on production for civilian consumption, Congress in 1977 transferred the Navy's interests and management obligations to the Department of Energy, and Chevron continued its interest in the joint operation until 1997.  Lindsey, *Elk Hills Reserve Oil Will Flow Again*, *supra*.

78.     Akin to the avgas production arrangement, Standard Oil's contract with the Navy evidenced significant control over fossil fuel exploration, production, and sales at the reserve.  *See Betzner*, 910 F.3d at 1015; *Greene*, 2000 WL 647190, at *2; *Camacho*, 868 F.2d at 486.  Indeed, the Navy was "afforded" a "means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."  Ex. 9, Recitals § 6(d)(i) (emphasis added). The Navy would, "subject to the provisions hereof, have the exclusive control over the exploration, prospecting[,] development and operation of the Reserve," *id.* § 3(a), and "*full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut off wells on the Reserve if it so desires," *id.* § 4(a) (emphasis added).  An "Operating Committee" was to "supervise and direct" "all exploration, prospecting, development and producing operations on the Reserve."  *Id.*

§ 3(b).  And the Navy retained ultimate and even "absolute" discretion to suspend production, decrease the maximum amount of production per day that Standard Oil was entitled to receive, or increase the rate of production.  *Id.* §§ 4(b), 5(d)(1).

79.     Although Standard Oil conducted the exploration and drilling activities on the Reserve, it "share[d] production, revenues, and expenses" with the government "in proportion to their ownership shares."   U.S. Gov't Accountability Off., RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (Jan. 29, 1987), http://www.gao.gov/assets/90/87497.pdf; *see also United States* v. *Standard Oil Co.*, 545 F.2d 624, 636-37 (9th Cir. 1976) (noting dispute over Navy's payment of its share of costs). From 1976 to 1998, the Reserve generated over $17 billion for the United States Treasury.  *See* Dep't of Energy, Naval Petroleum Reserves, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited July 16, 2020).

80.     In addition, certain Defendants, including ExxonMobil and Chevron, have explored for, developed, and produced oil and gas on federal lands under federal government leases governed by OCLSA, 43 U.S.C. § 1331 *et seq.* and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* ("MLA").   The unique and controlling provisions of these statutes and leases demonstrate that when producing federal minerals, Defendants were "acting under" a federal official within the meaning of Section 1442(a)(1).

81.     In enacting OCSLA in 1953, "Congress was most concerned with establishing federal control over resources" on the outer Continental Shelf ("OCS").   *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1227 (5th Cir. 1985)*.*  Congress made clear that it intended the leasing program "to meet the urgent need for further exploration and development of the oil and gas deposits" of the OCS.  43 U.S.C. § 1337(i).  In 1978, following the Arab oil

embargo of 1973, Congress directed the federal government to develop and use the resources of the OCS to reduce dependence on foreign oil and address "the Nation's long-range energy needs." *Id.* § 1801.  In aid of this objective, Congress established detailed "policies and procedures for managing the oil and gas resources" of the OCS, which were "intended to result in *expedited exploration and development* of the Outer Continental Shelf in order *to achieve national economic and energy policy goals*, *assure national security*, *reduce dependence on foreign sources*, and maintain a favorable balance of payments." *California ex rel. Brown* v. *Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981) (emphasis added).  In so doing, Congress confirmed OCSLA's objective: "the expeditious development of OCS resources," which the Department of Interior is called upon to implement.  *Id.* at 1316-17.

82.     To fulfill their statutory obligations, Department of Interior officials maintain and administer the OCS leasing program, under which lessees are obligated to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area." Ex. 10 § 10; *see* 30 C.F.R. § 250.1150.  The leasing program is reviewed every five years, and leases are permitted in the manner that the Secretary of Interior "determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a).

83.     The federal government supervises and controls the oil and gas development and production activities of its lessees, like Defendants, in myriad and extensive ways.  The OCS leases instruct that "[t]he Lessee *shall comply* with all regulations and orders relating to exploration, development, and production," and that "[a]fter due notice in writing, the Lessee *shall drill* such wells and produce at such rates *as the Lessor may require* in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating

principles." Ex. 11 § 10 (emphasis added). All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operation coordination document (DOCD)" as well as "approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which must conform to "diligence" and "sound conservation practices." Ex. 10 §§ 9, 10.

84.     Critically, the federal government retains the right to control a lessee's rate of production from its lease. *See* 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law."). In particular, the Bureau of Safety and Environmental Enforcement within the Department of Interior may set the Maximum Efficient Rate for production from a reservoir— that is, a cap on the production rate from all of the wells producing from a reservoir. 30 C.F.R. § 250.1159. This requirement has been in existence since 1974, *see* 39 Fed. Reg. 15,885 (May 6, 1974) (approving OCS Order No. 11), and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises," 75 Fed. Reg. 20,271, 20,272 (Apr. 19, 2010), a public policy purpose distinct from the conservation factors that typically motivate lessors regarding production rates. For onshore operations, the Interior Department's Bureau of Land Management leases similarly provide that the United States "reserves the right to specify rates of development and production in the *public interest*." Ex. 12 § 4 (emphasis added).

85.     The government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. For example, the government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe." Ex. 10 § 15(d); Ex. 11 § 15(d); *see* 43 U.S.C.

40

§ 1341(b).  The government also reserves the right to purchase up to 16 2/3% of lease production, less any royalty share taken in-kind.  43 U.S.C. § 1353(a)(2).  The Secretary of Interior may direct a lessee to deliver any reserved production to the Department of Defense (military operations), the Department of Energy (*e.g.*, Strategic Petroleum Reserve), or the General Services Administration (government civilian operations).  *Id.* § 1353(a)(3).  For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."  30 U.S.C. § 192.  Bureau of Land Management leases also provide that the "[l]essor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly." Ex. 12 § 10.  In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners). Ex. 10 § 15(c); Ex. 11 § 15(c); *see* 43 U.S.C. § 1337(b)(7) (OCS leases); 30 U.S.C. § 192 (onshore leases).

86.     The federal government also uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes.  Ex. 11 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added).  The standard Bureau of Land Management lease for onshore minerals in effect for decades has a similar provision.  *See* Ex. 12 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products.").  A typical commercial private (*i.e.*, fee) lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract; this would be akin to an apartment rental lease providing that the landlord has sole discretion to specify the rent owed.

87.     Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.") (OCS lease); 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).  The Secretary may also suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."  43 U.S.C. § 1334(a)(1); *see id.* § 1334(a)(2) (authority to cancel any lease for similar reasons); Ex. 10 § 13 (offshore lease provision governing suspension or cancellation).  For onshore federal leases, the Secretary may similarly direct or grant suspensions of operations.  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.  The standard Bureau of Land Management onshore lease also requires the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.  Ex. 12 § 6.

88.     Through federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the MLA, are an exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause

under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities. 30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Ex. 10 § 3. But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest. Nor may a federal lessee assign its lease to another person without express government approval. 30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

89. The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior* v. *California*, 464 U.S. 312, 337-39 (1984); *Village of False Pass* v. *Clark*, 733 F.2d 605, 614-16 (9th Cir. 1984). The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court. 30 U.S.C. § 184(d), (h). The government has the right to obtain "prompt access" to facilities and records. Ex. 10 § 12; Ex. 11 § 12; 30 U.S.C. § 1713. And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 43 U.S.C. § 1341(f); Ex. 10 § 6(a); Ex. 11 § 6(a) (OCS leases); 30 U.S.C. § 181 (onshore leases).

90. As the above statutory and lease provisions demonstrate, a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives. In light of these restrictions, obligations, and directives, Defendants were acting at the direction of a federal officer within the meaning of Section 1442 when they fulfilled their obligations with respect to oil and

gas development and production under the leases.  *See Betzner*, 910 F.3d at 1015; *Greene*, 2000 WL 647190, at *2; *Camacho*, 868 F.2d at 486.  These are activities that the federal government would itself need to undertake unless the Defendants did it for the government through the obligations of the federal leases on federal lands.  Under *Watson*, this is not run of the mill regulation; rather, it is the kind of "special relationship" that supports federal officer removal.  551 U.S. at 157.

91.     In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly 1 billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018).  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government.

92.     As another example, several Defendants also "acted under" federal officers in producing oil and operating infrastructure for the Strategic Petroleum Reserve.  Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCLSA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas."  *See* Ex. 8 § 6.  For example, after the September 11 attacks, President George W. Bush ordered that the Strategic Petroleum Reserve, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the Department of Energy and the Department of the Interior."  Statement on the Strategic Petroleum Reserve, 1 Pub. Papers 1406 (Nov. 13, 2001).  From 1999 to December 2009, the federal government's "primary

means of acquiring oil for the [Strategic Petroleum Reserve]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called "RIK" program. U.S. Dep't of Energy, Filling the Strategic Petroleum Reserve, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited July 16, 2020).  During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.  U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010, at 18 (2011) ("SPR 2010 Report"); *see id.* at 39 (Table 13).  The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations. *See, e.g.*, U.S. Dep't of Interior, Mins. Mgmt. Serv., Sample Dear Operator Letter (Dec. 14, 1999), https://onrr.gov/ReportPay/PDFDocs/991214.pdf (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").  Defendants thus "help[ed] the Government to produce an item that it needs."  *Watson*, 551 U.S. at 153.

93.     The federal government also contracted with certain Defendants (and/or their predecessors, subsidiaries, or affiliates) to deliver millions of barrels of oil to the Strategic Petroleum Reserve as part of the RIK program.  *See, e.g.*, U.S. Dep't of Interior, Mins. Mgmt. Serv., MMS RIK Program to Help Fill Strategic Petroleum Reserve (May 31, 2007), https://www.onrr.gov/PDFDOCS/20070531.pdf (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Perm. Subcomm. on Investigations of the Comm. on Governmental

Affairs, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Costs To Consumers But Not Overall U.S. Energy Security, S. Rprt. 108-18, at 19 (2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company (Equiva Trading Company) to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program). Defendants thus engaged in "an effort to *assist*, or to help *carry out*," the federal government's task in ensuring energy security.  *Watson*, 551 U.S. at 152.

94.    In addition, certain Defendants acted under federal officers within the meaning of 28 U.S.C. § 1442 as operators and lessees of Strategic Petroleum Reserve infrastructure.  For example, from 1997 to 2019, the Department of Energy leased to affiliates of Defendant Shell Oil Company (Equilon Enterprises LLC dba Shell Oil Products US and Shell Pipe Line Corporation) the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana. *See* SPR 2010 Report, at 34.  "The St. James terminal [wa]s leased to Shell Oil Products US under a long-term lease agreement.  Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s *required* to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown."  *Id.* at 16 (emphasis added).  Beginning in January 2020, the Department of Energy leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).  *See* U.S. Dep't of Energy, Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil (Oct. 28, 2019), https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr.  And the Department has leased the same ExxonMobil affiliate two government-owned pipelines that are part of the Strategic Petroleum Reserve near Freeport, Texas.  *See* SPR 2010 Report, at 34; U.S. Dep't of Energy, DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve (Jan. 14, 1999),

https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.   The Department of Energy's leases enable the affiliates of Defendants Shell Oil Company and ExxonMobil to use the facilities for their commercial purposes, subject to the federal government's supervision and control in the event of the President's call for an emergency drawdown.   *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").   The United States has exercised this control, including through the President's orders to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011, emergency actions taken in coordination with the International Energy Agency.   *See* U.S. Dep't of Energy, History of SPR Releases, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited July 16, 2020).   Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision.

95.     These are but a few examples of the services Defendants have provided the federal government, under the direction of federal officers.   Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice.   *Cf., e.g.*, *Betzner*, 910 F.3d at 1014-16.

96.     Finally, Defendants have several colorable (indeed, likely meritorious) federal defenses to Plaintiff's claims, including preemption, and that those claims are barred by the Commerce Clause, *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989); Due Process Clause, *State Farm Mut. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003), *BMW of N. Am.* v. *Gore*, 517 U.S. 559, 572-73 & n.19 (1996); First Amendment, *see Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 481-82

(1995); derivative sovereign immunity, *see Yearsley* v. *W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940); and foreign affairs doctrine, *see Garamendi*, 539 U.S. at 419.  Each of these defenses satisfies Section 1442, which requires only that a defendant identify a single defense that is "colorable," *i.e.*, is neither "immaterial and made solely for the purpose of obtaining jurisdiction" nor "wholly insubstantial and frivolous."  *Latiolais*, 951 F.3d at 297 (internal quotation marks omitted); *see, e.g.*, *K&D*, 951 F.3d at 506 ("The federal defense need only be colorable, not clearly sustainable.  We do not require the officer virtually to win his case before he can have it removed." (internal quotation marks and citations omitted)).

97.     Because Defendants are "persons" within the meaning of Section 1442, are being sued for activity taken at the direction of federal officers, and have colorable federal defenses to Plaintiff's claims, removal under Section 1442 is proper.

### V.      This Action Is Removable under the Outer Continental Shelf Lands Act

98.     This Court also has original jurisdiction pursuant to the OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

99.     OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . .  any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (The "language" of § 1349(b)(1) is "straightforward and broad.").  The OCS includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

100.     Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  "[T]he efficient

exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod.*

*Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it

"to be the policy of the United States that . . . the [OCS] . . . should be made available for

expeditious and orderly development."   43 U.S.C. § 1332(3).  The statute further provides that

"since exploration, development, and production of the minerals of the outer Continental Shelf

will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States,

and through such States, affected local governments, are entitled to an opportunity to participate,

*to the extent consistent with the national interest*, in the policy and planning decisions made by the

Federal Government relating to exploration for, and development and production of, minerals of

the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

101.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal

leasing program aiming to develop and exploit the oil and gas resources of the federal OCS.  *Id.*

§ 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active

oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases

generated $4.4 billion in leasing revenue . . . [and] provided more than 550 million barrels of oil

and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil

production and about five percent of domestic natural gas production."  *The Impact of the*

*President's FY 2017 Budget on the Energy and Min. Leasing and Production Missions of the*

*Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental*

*Enforcement (BSEE), and the Bureau of Land Management (BLM): Hearing Before the Subcomm.*

*on Energy and Min. Resources of the H. Comm. on Nat. Resources*, 114th Cong. 3 (2016)

(statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Dep't of the

Interior), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[14]  In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the last six years, together with 1.034 trillion cubic feet of natural gas.  Bureau of Safety & Envtl. Enf't, Outer Continental Shelf Oil and Gas Production, https://www.data.bsee.gov/Production/ OCSProduction/Default.aspx (last visited July 16, 2020).

102.     Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior under OCSLA.  Hopper, *supra*.

103.     For example, from 1947 to 1995, Chevron U.S.A. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal OCS in the Gulf of Mexico alone. U.S. Dep't of Interior, Mins. Mgmt. Serv., Gulf of Mexico Region, Production by Operator Ranked by Volume (1947-1995), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas% 201947%20-%201995.pdf.  In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the OCS in the Gulf of Mexico.  U.S. Dep't of Interior, Bureau of Safety & Envtl. Enf't, Gulf of Mexico Region, Production by Operator Ranked by Volume (2016), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202 016.pdf.  Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS.  *See* Bureau of Ocean Energy Mgmt., Lease Owner Information, https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx (last visited July 16, 2020).

---

[14] The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co.* v. *Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

104.     Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).   In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* § 1333(a)(2)(A).

105.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  Consistent with Congress's intent, courts have repeatedly found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.  *See, e.g.*, *EP Operating Co.*, 26 F.3d at 569-70; *United Offshore* v. *S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

106.     A substantial part of Plaintiff's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *In re Deepwater Horizon*, 745 F.3d at 163.  The Complaint, in fact, challenges Defendants' advertising relating to all of their products, regardless of where they were extracted and produced.  And a substantial quantum of those products are extracted and produced from OCS operations.  *See, e.g.*, Bureau of Ocean Energy Mgmt., Ranking Operator by Oil, https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and

natural gas production on the federal OCS from 1947 to 2017) (last visited July 16, 2020). Therefore, Plaintiff's claims necessarily encompass all of Defendants' exploration, production, extraction, and development on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd.*, 26 F.3d at 569.

107.    Thus, as *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption. 139 S. Ct. at 1889. "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." *Id.* (internal quotation marks omitted, alteration in original). Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under" 43 U.S.C.§ 1333(a)(2) such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp.* v. *Cape Wind Assoc., LLC*, 373 F.3d 183, 193 (1st Cir. 2004). Accordingly, this lawsuit is removable under OCSLA.

## VI.    This Action Satisfies the Class Action Fairness Act's Requirements

108.    In the alternative, even if properly brought under municipal law, this Court has original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the Attorney General expressly seeks to represent a class of District of Columbia consumers and CAFA's statutory requirements are satisfied.

109.    CAFA permits removal of (i) any "class action" (ii) where minimal diversity exists; (iii) at least 100 class members are represented; and (iv) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs." 28 U.S.C. § 1332(d)(1), (2), (5); *Bradford* v. *George Wash. Univ.*, 249 F. Supp. 3d 325, 332 (D.D.C. 2017); *see also* 28 U.S.C. § 1453(b). Each criterion is satisfied here.

110.    CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).  CAFA's legislative history provides that "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labelled 'class actions.'  Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions." S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered); *see also McMullen* v. *Synchrony Bank*, 82 F. Supp. 3d 133, 140 (D.D.C. 2015) (relying on CAFA's legislative history to interpret its scope).  In other words, CAFA permits removal of a suit that is "in substance a class action" notwithstanding a plaintiff's "attempt to disguise the true nature of the suit."  *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Williams* v. *Empl'rs Mut. Cas. Co.*, 845 F.3d 891, 901-02 (8th Cir. 2017); *Song* v. *Charter Commc'ns, Inc.*, Civ. No. 17-325, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

111.    Notably, Congress did not exempt actions by attorneys general from CAFA.  To the contrary, Congress *rejected* an amendment proposing such an exemption.  *See* 151 Cong. Rec. S1,157-65 (daily ed. Feb. 9, 2005) (statement of Sen. Mark Pryor).

112.    This action is a putative "class action" under CAFA.  This suit—brought in the name of the "public interest"—is filed on behalf of a class of "consumers in Washington, D.C." Compl. ¶¶ 1, 12.  The suit seeks to hold Defendants liable for the "unabated and expanded extraction, production, promotion, marketing and sale of Defendants' fossil fuel products, to the detriment" not of the District of Columbia itself, but "*of DC consumers and the public generally*." *Id.* ¶ 2 (emphasis added).

113.   The Complaint alleges (i) efforts by Defendants to mislead *Washington, D.C. consumers*, and (ii) resulting injuries allegedly suffered by *Washington, D.C. consumers*. *See, e.g.*, *id.* ¶ 7 ("Defendants . . . create unwarranted doubt in the minds of consumers about the reality and severity of the climate change impacts from their fossil fuel products."); ¶ 71 ("Defendants have deceived—and they continue to deceive—DC consumers."); ¶ 109 ("[G]reenwashing advertisements . . . are deceptive to DC consumers."); ¶ 148 ("[T]he development, production, refining, and consumer use of Defendant's fossil fuel products . . . increase greenhouse gas emissions to the detriment of public health and consumer welfare."); ¶ 163 ("By misleading DC consumers about the climate impacts of using fossil fuel products . . . Defendants have deprived and are continuing to deprive consumers of information about the consequences of their purchasing decisions.").

114.   The Complaint also requests relief on behalf of the class members it represents, seeking "restitution or damages" to make *District of Columbia consumers* whole, and an injunction to protect *District of Columbia consumers* from future injuries. *See id.* § XII (Prayer for Relief); *see also id.* ¶ 3 ("The District seeks . . . restitution for DC consumers.").

115.   By suing in a representative capacity on behalf of "consumers in Washington, DC," *id.* ¶ 1, Plaintiff has chosen to bring what is in substance a putative class action: a "representative suit[] on behalf of [a] group[] of persons similarly situated," 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002). Indeed, the District of Columbia Court of Appeals has recently explained that similar, private-attorney general suits for damages under the District of Columbia Consumer Protection Procedures Act ("CPPA") are necessarily subject to the "framework long established by" D.C. Superior Court Rule of Civil Procedure 23, *Rotunda* v. *Marriot Int'l, Inc.*, 123 A.3d 980, 982 (D.C. 2015), which is in all relevant respects "identical"—

not merely "similar"—to Federal Rule of Civil Procedure 23, *see* D.C. Super. Ct. R. Civ. P. 23 cmt. *But see Nat'l Consumers League* v. *Gen. Mills Inc.*, 680 F. Supp. 2d 132, 136-39 (D.D.C. 2010).

116. Minimal diversity is present here, too. *See* 28 U.S.C. § 1332(d)(2)(A) (requiring that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant"). This suit seeks to represent District of Columbia consumers, at least one of which, on information and belief, is a citizen of the District of Columbia. *See, e.g.*, Compl. ¶ 12. Yet not a *single* Defendant is a citizen of—*i.e.*, is either incorporated or has its principal place of business in, *see* 28 U.S.C. § 1332(c)(1)—the District of Columbia:

- Exxon Mobil Corporation is incorporated in New Jersey and has its principal place of business in Texas, Compl. ¶ 13(a);

- Exxon Oil Corporation is incorporated in New York and has its principal place of business in Texas, *id.* ¶ 13(f);

- Royal Dutch Shell PLC is incorporated in England and Wales and has its principal place of business in the Netherlands, *id.* ¶ 14(a);

- Shell Oil Company is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 14(e);

- BP P.L.C. is incorporated in England and Wales and has its principal place of business in England, *id.* ¶ 15(a);

- BP America Inc. is incorporated in Delaware and has its principal place of business in Texas, *id.* ¶ 15(e);

- Chevron Corporation is incorporated in Delaware and has its principal place of business in California, *id.* ¶ 16(a); and

- Chevron U.S.A. Inc. is incorporated in Pennsylvania and has its principal place of business in California, *id.* ¶ 16(f).

117.    The number of represented plaintiffs necessary for CAFA jurisdiction is present here because the number of "consumers in Washington, DC," *id.* ¶ 1, plainly exceeds 100, *see* 28 U.S.C. § 1332(d)(5)(B); U.S. Census Bureau, *Quick Facts: District of Columbia* (July 1, 2019), https://www.census.gov/quickfacts/DC (estimating the District of Columbia population at 705,749).

118.    Although the Complaint does not allege a specific amount in controversy, the Complaint's allegations demonstrate that CAFA's $5,000,000 threshold is satisfied.[15]   *See* 28 U.S.C. § 1332(d)(2).   In noticing removal, a defendant need only include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014).   Here, the Complaint alleges that Defendants are liable under the CPPA for a sweeping pattern of deception in countless communications with consumers for more than 50 years, and seeks restitution and damages, as well as civil penalties in the amount of $5,000 per purchase of Defendants' products.   *See* D.C. Code § 28-3909; *Zuckman* v. *Monster Beverage Corp.*, 958 F. Supp. 2d 293, 300-01 (D.D.C. 2013); Compl. §§ IV-XII.

119.    Those allegations alone establish that the amount in controversy plausibly exceeds $5,000,000.   But Plaintiff also seeks injunctive relief, for which the amount in controversy is "measured by the value of the object of the litigation," *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977), and can be satisfied either by the "value of the right that plaintiff seeks to enforce or to protect" or "the cost to the defendant[] to remedy the alleged denial," *Smith* v.

---

[15] Indeed, even the "Civil Division Information Sheet" acknowledges that the suit demands "[i]n excess of $1 million."

*Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978); *accord Pietrangelo* v. *Refresh Club, Inc.*, Civ. No. 18-1943, 2019 WL 2357379, at *8 (D.D.C. June 4, 2019).  Put differently, "[t]he value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant."  *GEO Specialty Chems., Inc.* v. *Husisian*, 951 F. Supp. 2d 32, 39 (D.D.C. 2013).

120.    Here, Plaintiff seeks to enjoin Defendants from "violating the CPPA."  Compl. § XII(a).  To the extent that means precluding Defendants from utilizing specific means of advertising and marketing, the value of such an injunction far exceeds $5,000,000.  The Complaint asserts that Defendants' present advertising campaigns are deceptive to District of Columbia consumers.  For example, Plaintiff alleges that ExxonMobil is currently running a series of deceptive "full-page advertisements in print editions and posts in the electronic edition of the *New York Times*, and in other publications with wide circulation to DC consumers, such as *The Economist*, as well as on ExxonMobil's YouTube channel."  *Id.* ¶ 110.  The Complaint also accuses Shell, BP, and Chevron of running current or recent deceptive advertising campaigns.  *See id.* ¶¶ 118-24 (allegations regarding Shell's "Make the Future" advertising campaign currently being run on the *Washington Post* and *New York Times* websites); ¶¶ 127-29 (allegations regarding BP's 2019 "Possibilities Everywhere" advertising campaign); ¶ 145 (allegations regarding Chevron advertisement currently available on *New York Times* website).  Moreover, the Complaint alleges that Defendants "currently advertise [fossil fuel products] to DC consumers as environmentally beneficial, while simultaneously omitting any mention of the products' role in causing catastrophic climate change," thereby deceiving District of Columbia consumers.  *Id.* ¶¶ 155-60.  Overhauling Defendants' existing advertising and marketing campaigns to meet the Complaint's specifications would indisputably exceed $5,000,000.  *See Dart Cherokee*, 574 U.S. at 89.

121.    Insofar as Plaintiff seeks to enjoin Defendants from violating the CPPA by altering Defendants' business practices, and not merely their marketing and advertisements, the amount in controversy is even higher.  The Complaint alleges, for example, that Defendants engaged in deceptive and unfair business by "portray[ing] themselves as working to reduce reliance on fossil fuels through investment in alternative energy sources" while their "investments in low-carbon energy [we]re negligible" in comparison to "fossil fuel production . . . and new fossil fuel development."  Compl. ¶¶ 100-01.  Even assuming this described a cognizable "deceptive and unfair business practice[]"—which it does not[16]—putting an end to said practice would require Defendants to substantially increase their investments in "low-carbon energy."  *Id.* ¶ 100.  Such an investment would surely exceed $5,000,000 by many, many multiples.

122.    Just by way of example, the Complaint alleges that ExxonMobil earned $198 billion in revenue in 2016, but "invested less than 1% of that in alternative energy research."  *Id.* ¶ 113.  BP's "activities in solar energy" represent "only 0.4% of BP's annual capital expenditure of approximately $16 billion, nearly all of which focuses on fossil fuels."  *Id.* ¶ 130.  And Chevron's "investment of 'millions' in renewables is miniscule in comparison to its investment of billions in fossil fuels."  *Id.* ¶ 142.  Bringing their investments in renewable energy to just **5%** of capital expenditures, then, would require Defendants to invest billions on an annual basis.  Given the magnitude of the investments Defendants already make in renewable energy, any increase

---

[16] Defendants do not concede—and in fact deny—that Plaintiff is entitled to any of the relief it seeks.  A plaintiff's claim "fixes the right of the defendant to remove" whether "well or ill-founded in fact."  *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 294 (1938); *accord Griffin* v. *Coastal Int'l Sec., Inc.*, Civ. No. 06-2246, 2007 U.S. Dist. LEXIS 40041, at *7 (D.D.C. June 4, 2007); *see also* 14B Wright & Miller, *supra* § 3702.1 ("[A] defendant who seeks to prove that the amount in controversy is greater than the jurisdictional amount does not automatically concede that the jurisdictional amount is recoverable.").

sufficient to address the Complaint's allegations of deception would necessarily exceed the $5,000,000 jurisdictional threshold. *See Dart Cherokee*, 574 U.S. at 89.

123.     Finally, CAFA's purposes are best served by litigating this case in federal court, as the statute was intended "to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications." S. Rep. No. 109-14, at 35; *see also Dart Cherokee*, 574 U.S. at 89 ("CAFA's primary objective is to ensur[e] Federal court consideration of interstate cases of national importance." (internal quotation marks and citation omitted)); *Standard Fire Ins. Co.* v. *Knowles*, 568 U.S. 588, 595 (2013) (same). As described more fully above, this lawsuit implicates issues of national and international importance. It belongs in federal court.

124.     CAFA jurisdiction is proper because this suit is in substance a "class action" on behalf of more than 100 purported class members, for which there is (greater than) minimal diversity, and an amount in controversy in excess of $5,000,000.

## VII.     This Court Has Diversity Jurisdiction Because the Real Party in Interest Has Diverse Citizenship from All Defendants

125.     Defendants are also authorized to remove this action under 28 U.S.C. § 1441, based on diversity jurisdiction. This court has original diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), because the real parties in interest are citizens of different states, and the amount in controversy exceeds the value of $75,000.

126.     *First*, as explained above, this suit is brought on behalf of the citizens of the District of Columbia, who are the real parties in interest to this action. "[D]iversity jurisdiction must be based only on the citizenship of the real parties in interest." *Nat'l Ass'n of State Farm Agents, Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 201 F. Supp. 2d 525, 529 (D. Md. 2002). While Plaintiff is captioned as the "District of Columbia," the Attorney General is bringing these consumer protection claims against Defendants on behalf of "misled consumers in Washington, DC."

Compl. ¶ 1.  It is those consumers who hold the substantive right to be free from allegedly unfair or deceptive trade practices, and thus those consumers are the real parties in interest.

127.    The Attorney General brings its claims under the CPPA, D.C. Code §§ 28-3901 *et seq.*, specifically for alleged violations of Section 28-3904.  Section 28-3909 allows the Attorney General to bring claims for the "unfair and deceptive trade practices" disallowed by Section 28-3904, when it is "in the public interest."  D.C. Code § 28-3909.  However, that provision granting the Attorney General the right to sue does not itself make the District of Columbia a party in interest to these consumer protection claims.  *See Merrill Lynch, Pierce, Fenner & Smith* v. *Cavicchia*, 311 F. Supp. 149, 155-56 (S.D.N.Y. 1970) (rejecting New York Attorney General's argument that New York was the real party in interest because a state statute gave him "power to bring an action in the name of the state" (citing *Missouri, K. & T. R. Co.* v. *Hickman*, 183 U.S. 53, 59-60 (1901))).  "The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."  *Varnum Props., LLC* v. *Dep't of Consumer & Reg. Affair*s, 204 A.3d 117, 121 (D.C. 2019) (citing *United States ex rel. Spicer* v. *Westbrook*, 751 F.3d 354, 362 (5th Cir. 2014)).  Here, the Complaint asserts a substantive right to avoid allegedly deceptive statements and advertising, and a right that is held by consumers who are District of Columbia residents, not by the District of Columbia itself.

128.    The District of Columbia could theoretically be the party in interest if it "articulate[d] an interest apart from the interests of particular private parties."  *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).  However, a generalized interest in protecting the citizens of the District of Columbia from deceptive consumer practices is not enough.  *See Hickman*, 183 U.S. at 60 (noting that a state's general interest in protecting the welfare of its citizens "is not that which makes the state, as an organized political community, a party in

interest in the litigation"); *Dep't of Fair Empl. & Hous.* v. *Lucent Techs., Inc.*, 642 F.3d 728, 737 (9th Cir. 2011) ("'[G]eneral governmental interest[s]' will not satisfy the real party to the controversy requirement for the purposes of defeating diversity" (quoting *Hickman*, 183 U.S. at 60)); *Ramada Inns, Inc.* v. *Rosemount Mem'l Park Ass'n*, 598 F.2d 1303, 1307 (3d Cir. 1979) ("If a federal judgment will have no effect other than to implicate the state's general 'governmental interest in the welfare of all its citizens . . . and in securing compliance with all its laws,' . . . then the state is not a real party in interest." (quoting *Hickman*, 183 U.S. at 60 (citation omitted))).  The District of Columbia has not asserted an interest in this action beyond the welfare of its citizens and a desire to enforce its consumer protection laws.  Given that those laws exist for the benefit of consumers, it is clear that District of Columbia consumers are the real parties in interest here.

129.    Because the real parties in interest to this action are citizens of District of Columbia, Plaintiff's citizenship for purposes of determining diversity jurisdiction is the District of Columbia.

130.    *Second*, as no Defendant is a citizen of the District of Columbia, *see supra* ¶ 116, there is complete diversity of citizenship, and thus diversity jurisdiction.

131.    *Third*, as shown above, *supra* ¶¶ 118-22, the amount-in-controversy requirement is satisfied.

132.    Having established complete diversity of the parties and a sufficient amount in controversy, Defendants have demonstrated that this Court has original diversity jurisdiction over this action, and are authorized to remove it to this Court.

## <u>COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS</u>

133.    Based on the foregoing, this Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1367, 1442, 1453(b), and 43 U.S.C. § 1349(b)(1).

134.    The United States District Court for the District of Columbia is the appropriate venue for removal under 28 U.S.C. §1441(a) because it is the federal judicial district encompassing the Superior Court of the District of Columbia, where this suit was originally filed.

135.    Copies of all process, pleadings, and orders from the state-court action being removed to this Court that ExxonMobil has obtained from the Superior Court and which are in the possession of ExxonMobil are attached hereto as Exhibit 13.  Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by ExxonMobil in the action.

136.    Pursuant to 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the Clerk of the Superior Court of District of Columbia, and serve a copy of the same on all parties.  A copy of this filing (without exhibits) is attached as Exhibit 14.

137.    This Notice of Removal is signed pursuant to Federal Rule of Civil Procedure 11. *See* 28 U.S.C. § 1446(a).

138.    Defendants reserve the right to amend or supplement this Notice of Removal. Defendants also reserve all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, Defendants respectfully give notice that this action is hereby removed from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia.

DATE: July 17, 2020
New York, New York


Respectfully submitted,

EXXON MOBIL CORPORATION and
EXXONMOBIL OIL CORPORATION,

62

By its attorneys,

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

    /s/  Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
Daniel J. Toal*
twells@paulweiss.com
dtoal@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990

Justin Anderson
janderson@paulweiss.com
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420

*_Pro hac vice_ forthcoming

EXXON MOBIL CORPORATION

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336