UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>                  Plaintiff,<br><br>      v.<br><br>EXXON MOBIL CORP., EXXONMOBIL OIL CORPORATION, ROYAL DUTCH SHELL PLC, SHELL OIL COMPANY, BP P.L.C., BP AMERICA INC., CHEVRON CORPORATION, CHEVRON U.S.A. INC.,<br><br>                  Defendants. | 20 Civ. 1932 (TJK) |

**<u>BRIEF OF DEFENDANTS IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 3

THE COMPLAINT ........................................................................................................... 7

LEGAL STANDARD...................................................................................................... 10

ARGUMENT .................................................................................................................. 10

I.      The Complaint Arises under Federal Common Law. ........................................ 10

        A.     This Suit Asserts Interstate and International Pollution Claims. ......................... 12

              1.    The Supreme Court Has Repeatedly Held that Federal Common Law Exclusively Governs Interstate and International Pollution Claims. ........................................................................................ 12

              2.    Federal Common Law Governs This Interstate Pollution Suit. ............... 13

              3.    *AEP* Did Not Authorize Transboundary Pollution Suits to Be Decided under State Law. ....................................................................... 14

        B.     The Attorney General's Claims Arise out of the Interstate or Navigable Waters of the United States...................................................................... 15

        C.     The Attorney General's Claims Implicate Foreign Affairs. ................................. 16

        D.     The Well-Pleaded Complaint Rule Is No Obstacle to Removal........................... 20

II.    This Action Satisfies the *Grable* Doctrine's Jurisdictional Prerequisites....................... 21

        A.     The Attorney General's Claims Necessarily Raise Substantial Federal Issues that Are Actually Disputed............................................................... 22

        B.     Federal Jurisdiction Would Protect, Not Disturb, Federalism Principles. ............ 26

        C.     The Attorney General's Arguments Against *Grable* Are Unpersuasive. ............. 28

III.   This Action Arises out of Federal Enclaves. ..................................................... 29

IV.   This Action Meets the Elements of the Federal Officer Removal Statute........................ 33

        A.     Defendants Have, for Many Decades, Acted under the Direction and Subject to the Control of the Federal Government. ................................. 34

              1.    The Federal Government Has Directed and Controlled Defendants' Conduct since at Least World War II. ..................................................... 35

              2.    Defendants Have Engaged in the Exploration and Production of Fossil Fuels under Agreements with Federal Agencies Exercising Supervision and Control. ....................................................................... 40

        B.     Defendants' Activities, Undertaken at Federal Direction, Are "Connected or Associated" with the Attorney General's Claims............................................. 46

i

V.      This Action Is Removable under the Outer Continental Shelf Lands Act........................ 47

VI.     This Court Has Diversity Jurisdiction Because the Real Parties in Interest Are Completely Diverse from All Defendants. ......................................................... 50

VII.    This Action Satisfies the Class Action Fairness Act's Requirements. ............................ 54

CONCLUSION.................................................................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*,
  731 F.3d 740 (7th Cir. 2013) ...............................................55

*Akin* v. *Ashland Chem. Co.*,
  156 F.3d 1030 (10th Cir. 1998) ...........................................30

*Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982)......................................................51, 59

*Am. Elec. Power Co.* v. *Connecticut*,
  564 U.S. 410 (2011)..................................................... *passim*

*Am. Ins. Ass'n* v. *Garamendi*,
  539 U.S. 396 (2003)......................................................26, 34

*State* v. *Am. Petrol. Inst.*,
  Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020) .....................6

*Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*,
  844 F.2d 1202 (5th Cir. 1988) ............................................49

*Animal Legal Defense Fund* v. *Hormel Foods Corp.*,
  249 F. Supp. 3d 53 (D.D.C. 2007) .......................................25

*Baker* v. *Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) ...........................33, 34, 46, 47

*In re Baldwin-United Corp.*,
  770 F.2d 328 (2d Cir. 1985)...............................................54

*Banco Nacional de Cuba* v. *Sabbatino*,
  376 U.S. 398 (1964).........................................................16

*Nevada* v. *Bank of America Corp.*,
  672 F.3d 661 (9th Cir. 2012) ..........................................27, 53

*Barker* v. *Hercules Offshore, Inc.*,
  713 F.3d 208 (5th Cir. 2013) ..............................................48

*Baumann* v. *Chase Inv. Servs. Corp.*,
  747 F.3d 1117 (9th Cir. 2014) ............................................58

*Bd. of Comm'rs* v. *Tenn. Gas Pipeline Co.*,
  850 F.3d 714 (5th Cir. 2017) ..............................................24

*District of Columbia* v. *Beretta U.S.A. Corp.*,
   2000 WL 34591622 (D.C. Super. Ct. Jan. 20, 2000) ............................................... 59

*Betzner* v. *Boeing Co.*,
   910 F.3d 1010 (7th Cir. 2018) ................................................................................... 38

*BMW of N. Am.* v. *Gore*,
   517 U.S. 559 (1996) ................................................................................................... 34

*Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.)
   Inc.*,
   405 F. Supp. 3d 947 (D. Colo. 2019), *aff'd*, 965 F.3d 792 (10th Cir. 2020) .............. 20, 28, 50

*Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.)
   Inc.*,
   965 F.3d 792 (10th Cir. 2020) ................................................................................... 50

*Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.),
   Inc.*,
   Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018) ..................................................... 6

*State* v. *BP Am. Inc.*,
   Civ. No. 20-097 (Del. Super. Ct. Sept. 10, 2020) ...................................................... 6

*Rhode Island* v. *BP p.l.c.*,
   393 F. Supp. 3d 142 (D.R.I. 2019), *appeal pending*, No. 19-1818 (1st Cir.) ......................... 28

*California* v. *BP p.l.c.*,
   Civ. No. 17-06011, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) ....................................... 20

*Bradford* v. *George Wash. Univ.*,
   249 F. Supp. 3d 325 (D.D.C. 2017) ............................................................................ 54

*Brooklyn Union Expl. Co.* v. *Tejas Power Corp.*,
   930 F. Supp. 289 (S.D. Tex. 1996) ............................................................................ 49, 50

*California ex rel. Brown* v. *Watt*,
   668 F.2d 1290 (D.C. Cir. 1981) .................................................................................. 41

*Bryan* v. *BellSouth Commc'ns, Inc.*,
   377 F.3d 424 (4th Cir. 2004) ...................................................................................... 24

*Buckman Co.* v.
   *Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001) ............................................................ 22

*Camacho* v. *Autoridad de Telefonos de Puerto Rico*,
   868 F.2d 482 (1st Cir. 1989) ...................................................................................... 38

iv

*Capitol Servs. Mgmt., Inc.* v. *Vesta Corp.*,
   933 F.3d 784 (D.C. Cir. 2019) ...........................................................................60

*Caterpillar, Inc.* v. *Williams*,
   482 U.S. 386 (1987) ...........................................................................................19

*Caudill* v. *Blue Cross & Blue Shield of N.C.*,
   999 F.2d 74, 77 (4th Cir. 1993) .........................................................................25

*Caver* v. *Cent. Ala. Elec. Coop.*,
   845 F.3d 1135 (11th Cir. 2017) ..........................................................................46

*State* v. *Chevron Corp.*,
   Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018) ..................................................6

*Chevron U.S.A., Inc.* v. *United States*,
   116 Fed. Cl. 202 (Fed. Cl. 2014) .......................................................................43

*City & County of Honolulu* v. *Sunoco LP*,
   Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020) ....................................................6

*City & County of San Francisco* v. *BP p.l.c.*,
   Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017) ..........................................6

*City of Charleston* v. *Brabham Oil Co.*,
   Civ. No. 20-10 (S.C. Ct. Common Pleas Sept. 9, 2020) ......................................6

*City of Hoboken* v. *Exxon Mobil Corp.*,
   Civ. No. 20-3179 (N.J. Super. Ct. Sept. 2, 2020) ................................................6

*City of Imperial Beach* v. *Chevron Corp.*,
   Civ. 17-1227 (Cal. Super. Ct. July 17, 2017) ......................................................6

*Illinois* v. *City of Milwaukee*,
   406 U.S. 91 (1972) ...................................................................................12, 15, 16

*City of Milwaukee* v. *Illinois*,
   451 U.S. 304 (1981), 1980 WL 339512............................................11, 12, 14, 20

*City of New York* v. *BP p.l.c.*,
   325 F. Supp. 3d 466 (S.D.N.Y. 2018), *appeal pending*, No. 182188- (2d Cir.
   argued Nov. 22, 2019) .........................................................................13, 18, 25

*City of New York* v. *BP p.l.c.*,
   Civ. No. 18-182 (S.D.N.Y. Jan. 9, 2018)..............................................................6

*City of Oakland* v. *BP p.l.c.*,
  325 F. Supp. 3d 1017 (N.D. Cal. 2018), *vacated on other grounds*, 960 F.3d
  570 (9th Cir. 2020)................................................................................................23

*City of Oakland* v. *BP p.l.c.*,
  Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017) ...................................6, 20, 28

*City of Richmond* v. *Chevron Corp.*,
  Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018)..............................................................6

*City of San Francisco* v. *Exxon Mobil Corp.*,
  2020 WL 3969558 (Tex. App. June 18, 2020) ............................................6, 24, 30

*City of Santa Cruz* v. *Chevron Corp.*,
  Civ. No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017).......................................................6

*Kansas* v. *Colorado*,
  206 U.S. 46 (1907)........................................................................................................12

*In re Commonwealth's Motion to Appoint Counsel*,
  790 F.3d 457 (3d Cir. 2015)..................................................................................46, 47

*County of Marin* v. *Chevron Corp.*,
  Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017) ....................................................6

*County of Maui* v. *Sunoco LP*,
  Civ. No. 20-283 (Haw. Cir. Ct. Oct. 12, 2020).............................................................6

*County of San Mateo* v. *Chevron Corp.*,
  294 F. Supp. 3d 934 (N.D. Cal. 2018), *aff'd on other grounds*, 960 F.3d 586
  (9th Cir. 2020)..............................................................................................................28

*County of San Mateo* v. *Chevron Corp.*,
  Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017) ....................................................6

*County of Santa Cruz* v. *Chevron Corp.*,
  Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017).......................................................6

*Dart Cherokee Basin Operating Co.* v. *Owens*,
  574 U.S. 81 (2014).......................................................................................................56

*Davis* v. *United States*,
  385 A.2d 757 (D.C. 1978) ...........................................................................................32

*Dep't of Fair Empl. & Hous.* v. *Lucent Techs., Inc.*,
  642 F.3d 728 (9th Cir. 2011) ......................................................................................51

*Durham* v. *Lockheed Martin Corp.*,
   445 F.3d 1247 (9th Cir. 2006) ...................................................................32

*EP Operating Ltd. P'ship* v. *Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) .......................................................................48

*Massachusetts* v. *EPA*,
   549 U.S. 497 (2007) ...................................................................................26

*Erie R. Co.* v. *Tompkins*,
   304 U.S. 64 (1938) .....................................................................................11

*Expeditions Unlimited Aquatic Enters., Inc.* v. *Smithsonian Inst.*,
   566 F.2d 289 (D.C. Cir. 1977) ...................................................................31

*People* v. *Exxon Mobil Corp.*,
   2019 WL 6795771 (N.Y. Sup. Ct. Dec. 10, 2019) .......................................6

*Massachusetts* v. *Exxon Mobil Corp.*,
   Civ. No. 19-12430, 2020 U.S. Dist. LEXIS 93153 (D. Mass. May 28, 2020) ............46, 57, 59

*State* v. *Exxon Mobil Corp.*,
   Civ. No. 20-6132568 (Conn. Super. Ct. Sept. 14, 2020) ..............................6

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ...................................................................................10

*Exxon Mobil Corp.* v. *United States*,
   2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .............................35, 36, 37, 39

*People* v. *ExxonMobil Corp.*,
   Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018) ........................................6

*Commonwealth* v. *ExxonMobil Corp.*,
   Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019) ......................................6

*Fairfield Indus., Inc.* v. *EP Energy E&P Co.*,
   Civ. No. 12-2665, 2013 WL 12145968 (S.D. Tex. May 2, 2013) ...................49, 50

*Floyd* v. *Bank of Am. Corp.*,
   70 A.3d 246 (D.C. 2013) ............................................................................22

*Franchise Tax Bd. of Cal.* v. *Constr. Laborers Vacation Tr. for S. Cal.*,
   463 U.S. 1 (1983) .......................................................................................20

*Fung* v. *Abex Corp.*,
   816 F. Supp. 569 (N.D. Cal. 1992) ............................................................29

*Goncalves* v. *Rady Children's Hosp. San Diego*,
   865 F.3d 1237 (9th Cir. 2017) ........................................................38

*Grable Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005)................................................................21, 26

*Grayson* v. *AT&T Corp.*,
   15 A.3d 219 (D.C. 2011) ...........................................................22

*Greene* v. *Citigroup, Inc.*,
   2000 WL 647190 (10th Cir. May 19, 2000) ...........................................38

*Grynberg Prod. Corp.* v. *British Gas, P.L.C.*,
   817 F. Supp. 1338 (E.D. Tex. 1993)..................................................25

*Healy* v. *Beer Inst.*,
   491 U.S. 324 (1989)...............................................................34

*Hill* v. *BellSouth Telecomms., Inc.*,
   364 F.3d 1308 (11th Cir. 2004) ....................................................24

*Hines* v. *Davidowitz*,
   312 U.S. 52 (1941)................................................................26

*Humble Pipe Line Co.* v. *Waggoner*,
   376 U.S. 369 (1964)...............................................................30

*Huron* v. *Cobert*,
   809 F.3d 1274 (D.C. Cir. 2016).....................................................59

*Int'l Paper Co.* v. *Ouellette*,
   479 U.S. 481 (1987)............................................................12, 13

*Isaacson* v. *Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008).......................................................34

*Jefferson County* v. *Acker*,
   527 U.S. 423 (1999)...............................................................33

*JMM Corp.* v. *District of Columbia*,
   378 F.3d 1117 (D.C. Cir. 2004)..................................................32, 33

*Jograg* v. *Enter. Servs., LLC*,
   270 F. Supp. 2d 10 (D.D.C. 2017)...............................................29, 30

*Johnson* v. *City of Shelby*,
   574 U.S. 10 (2014)................................................................21

*Juliana* v. *United States*,
   947 F.3d 1159 (9th Cir. 2020) ..................................................................................23

*K&D LLC* v. *Trump Old Post Office LLC*,
   951 F.3d 503 (D.C. Cir. 2020) .............................................................................34, 46

*Kemp* v. *Medtronic, Inc.*,
   231 F.3d 216 (6th Cir. 2000) ....................................................................................22

*King County* v. *BP p.l.c.*,
   Civ. No. 18-11859 (Wash. Super. Ct. May 9, 2018) ...................................................6

*Knop* v. *Mackall*,
   645 F.3d 381 (D.C. Cir. 2011) ..................................................................................60

*Lambram* v. *Havel*,
   43 F.3d 918 (4th Cir. 1995) .......................................................................................21

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
   754 F.2d 1223 (5th Cir. 1985) ...................................................................................48

*Latiolais* v. *Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (*en banc*) ........................................................33, 46, 48

*Legg* v. *Wyeth*,
   428 F.3d 1317 (11th Cir. 2005) .................................................................................10

*Leite* v. *Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) .............................................................................33, 47

*Lincoln Prop. Co.* v. *Roche*,
   546 U.S. 81 (2005)......................................................................................................50

*LLOG Expl. Co.* v. *Certain Underwriters*,
   Civ. No. 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007) .............................50

*Maryland* v. *Louisiana*,
   451 U.S. 725 (1981)....................................................................................................52

*Martin* v. *Franklin Cap. Corp.*,
   546 U.S. 132 (2005)....................................................................................................60

*Mater* v. *Holley*,
   200 F.2d 123 (5th Cir. 1952) .....................................................................................32

*Mayor & City Council of Baltimore* v. *BP p.l.c.*,
   388 F. Supp. 3d 538 (D. Md. 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *cert. granted*, 2020 WL 5847132 (U.S. Oct. 2, 2020) ....................................................28

ix

*Mayor & City Council of Baltimore* v. *BP p.l.c.*,
    952 F.3d 452 (4th Cir. 2020) ....................................................................43

*Mayor & City Counsel of Baltimore* v. *BP p.l.c.*,
    Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018)..........................................6

*McEachin* v. *United States*,
    432 A.2d 1212 (D.C. 1981) ......................................................................32

*West Virginia ex rel. McGraw* v. *Comcast Corp.*,
    705 F. Supp. 2d 441 (E.D. Pa. 2010) ......................................................54

*McMullen* v. *Synchrony Bank*,
    82 F. Supp. 3d 133 (D.D.C. 2015)............................................................54

*Mizell* v. *SunTrust Bank*,
    26 F. Supp. 3d 80 (D.D.C. 2014) .............................................................10

*Mo., K. & T. Ry. Co.* v. *Mo. R.R. & Warehouse Comm'rs*,
    183 U.S. 53 (1901)....................................................................................51

*Nat'l Consumers League* v. *Bimbo Bakers USA*,
    46 F. Supp. 3d 64 (D.D.C. 2014)..............................................................58

*Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*,
    471 U.S. 845 (1985)..................................................................................10

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
    483 F. Supp. 2d 934 (N.D. Cal. 2007) .....................................................25

*Native Village of Kivalina*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009), *aff'd*, 696
    F.3d 849 (9th Cir. 2012) .....................................................................29, 49

*Pennsylvania* v. *New Jersey*,
    426 U.S. 660 (1976)..................................................................................51

*Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017)......................................................................33

*Olig* v. *Xantera Parks & Resorts, Inc.*,
    2013 WL 3936904 (D. Mont. July 30, 2013) ...........................................29

*Palmore* v. *United States*,
    411 U.S. 389 (1973)..................................................................................32

*Papp* v. *Fore-Kast Sales Co., Inc.*,
    842 F.3d 805 (3d Cir. 2016)......................................................................47

*Parish of Plaquemines* v. *Total Petroleum & Refin. USA, Inc.*,
 64 F. Supp. 3d 872 (E.D. La. 2014)..................................................................49

*Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*,
 559 F.3d 772 (8th Cir. 2009) .................................................................22, 24

*United States* v. *Pink*,
 315 U.S. 203 (1942)................................................................................26

*Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co.*,
 46 F. Supp. 3d 701 (S.D. Tex. 2014) ............................................................49

*Police Officers Guild, Nat'l Union of Police Officers* v. *Washington*,
 369 F. Supp. 543 (D.D.C. 1973).................................................................32

*Quackenbush* v. *Allstate Ins. Co.*,
 517 U.S. 706 (1996)...............................................................................10

*R.I. Fishermen's All., Inc.* v. *R.I. Dep't of Envtl. Mgmt.*,
 585 F.3d 42 (1st Cir. 2009)..................................................................27, 50

*Republic of Philippines* v. *Marcos*,
 806 F.2d 344 (2d Cir. 1986)................................................................16, 25

*Rotunda* v. *Marriott International, Inc.*,
 123 A.3d 980 (D.C. 2015) .................................................................57, 58

*Rubin* v. *Coors Brewing Co.*,
 514 U.S. 476 (1995)...............................................................................34

*Sam L. Majors Jewelers* v. *ABX, Inc.*,
 117 F.3d 922 (5th Cir. 1997) .............................................................10, 20

*Sawyer* v. *Foster Wheeler LLC*,
 860 F.3d 249 (4th Cir. 2017) .............................................................43, 46

*Schmitt* v. *War Emergency Pipelines, Inc.*,
 175 F.2d 335 (8th Cir. 1949) .....................................................................37

*Schmitt* v. *War Emergency Pipelines, Inc.*,
 72 F. Supp. 156 (E.D. Ark. 1947)..............................................................37

*District of Columbia* v. *Schramm*,
 631 F.2d 854 (D.C. Cir. 1980).................................................................15

*SEIU Health & Welfare Fund* v. *Philip Morris, Inc.*,
 249 F.3d 1068 (D.C. Cir. 2001)..................................................................59

*United States* v. *Shell Oil Co.*,
   294 F.3d 1045 (9th Cir. 2002) .............................................................35

*Shell Oil Co.* v. *United States*,
   751 F.3d 1282 (Fed. Cir. 2014).......................................................35, 36

*Song* v. *Charter Commc'ns Inc.*,
   2017 WL 1149286 (S.D. Cal. Mar. 28, 2017) .......................................55

*Sparling* v. *Doyle*,
   2014 WL 2448926 (W.D. Tex. May 30, 2014) .................................29, 31

*In re Standard & Poor's Rating Agency Litig.*,
   23 F. Supp. 3d 378 (S.D.N.Y. 2014)......................................................52

*Standard Fire Ins. Co.* v. *Knowles*,
   568 U.S. 588 (2013)................................................................................20

*United States* v. *Standard Oil Co.*,
   332 U.S. 301 (1947)...........................................................................11, 14

*United States* v. *Standard Oil Co. of Cal.*,
   545 F.2d 624 (9th Cir. 1976) .................................................................43

*State Farm Mut. Ins. Co.* v. *Campbell*,
   538 U.S. 408 (2003)................................................................................34

*United States* v. *Swiss Am. Bank, Ltd.*,
   191 F.3d 30 (1st Cir. 1999)....................................................................11

*Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*,
   87 F.3d 150 (5th Cir. 1996) .......................................................47, 48, 49

*Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*,
   451 U.S. 630 (1981).......................................................................11, 15, 19

*In re Tobacco/Governmental Health Care Costs Litigation*,
   100 F. Supp. 2d 31 (D.D.C. 2000)..........................................................19

*Treiber & Straub, Inc.* v. *U.P.S., Inc.*,
   474 F.3d 379 (7th Cir. 2007) .................................................................11

*Michigan* v. *U.S. Army Corps of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011)............................................................15, 16

*Louisiana* v. *Union Oil Co. of Cal.*,
   458 F.3d 364 (5th Cir. 2006) .................................................................51

*Watson* v. *Phillip Morris Cos.*,
    551 U.S. 142 (2007).................................................................34, 45

*Wecker* v. *Nat'l Enameling & Stamping Co.*,
    204 U.S. 176 (1907).......................................................................30

*Wehrs* v. *Wells*,
    688 F.3d 886 (7th Cir. 2012) .........................................................60

*Willingham* v. *Morgan*,
    395 U.S. 402 (1969).......................................................................34

*Yearsley* v. *W.A. Ross Const. Co.*,
    309 U.S. 18 (1940).........................................................................34

*Zaccari* v. *Apprio, Inc.*,
    390 F. Supp. 3d 103 (D.D.C. 2019) ...............................................59

**STATUTES**

15 U.S.C. §§ 41-58.........................................................................26, 27

15 U.S.C. § 57b(e)................................................................................27

15 U.S.C. § 1692–1692p......................................................................27

28 U.S.C. § 1331...................................................................................32

28 U.S.C. § 1332...................................................................................51

28 U.S.C. § 1332(a)..............................................................................50

28 U.S.C. § 1332(d)....................................................................... *passim*

28 U.S.C. § 1332(d)(1).........................................................................54

28 U.S.C. § 1332(d)(1)(B)....................................................................54

28 U.S.C. § 1332(d)(2).........................................................................54

28 U.S.C. § 1332(d)(5).........................................................................54

28 U.S.C. § 1367...................................................................................10

28 U.S.C. § 1441(a)..............................................................................10

28 U.S.C. § 1442.......................................................................33, 34, 46

28 U.S.C. § 1442(a)..............................................................................46

28 U.S.C. § 1442(a)(1)................................................................................................33

28 U.S.C. § 1446(c)(2)................................................................................................46

28 U.S.C. § 1447(c) ....................................................................................................60

28 U.S.C. § 1453 ...................................................................................................*passim*

28 U.S.C. § 1453(b) ....................................................................................................54

28 U.S.C. § 1653 ........................................................................................................35

28 U.S.C. § 1711-1715 ..........................................................................................*passim*

42 U.S.C. § 6231(b) ....................................................................................................17

42 U.S.C. § 6241(d)(1) ...............................................................................................45

42 U.S.C. § 7401 *et seq.*..................................................................................13, 14, 15, 23

42 U.S.C. § 15927(b) ..................................................................................................23

43 U.S.C. § 1331 *et seq.* ........................................................................................*passim*

43 U.S.C. § 1332(3) ....................................................................................................41

43 U.S.C. § 1344(a)-(e)...............................................................................................42

43 U.S.C. § 1349(b) ...............................................................................................47, 48

43 U.S.C. § 1802(1) ....................................................................................................41

43 U.S.C. § 1802(2) ....................................................................................................41

50 U.S.C. ch. 55 ..........................................................................................................38

District of Columbia Court Reform and Criminal Procedure Act, Pub. L. No. 91-
    358, 84 Stat. 473 (1970)...............................................................................31, 32, 33

Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, *as amended by* Pub. L. No. 85-
    72 ,686 Stat. 678, § 8(a) (Aug. 20, 1958) ...............................................................17

D.C. Code § 11-501 ....................................................................................................32

D.C. Code § 11-501(2)(A)...........................................................................................32

D.C. Code § 11-501(3)(A)...........................................................................................32

D.C. Code § 11-502 ....................................................................................................32

xiv

D.C. Code §§ 28-3901 *et seq.* ................................................................ *passim*

D.C. Code § 28-3904(a) ........................................................................... 22

D.C. Code § 28-3904(e) ........................................................................... 22

D.C. Code § 28-3904(f) ............................................................................ 22

D.C. Code § 28-3905(k)(2) ....................................................................... 54

D.C. Code § 28-3909 ........................................................................... 50, 53

**OTHER AUTHORITIES**

30 C.F.R. § 250.1165 ............................................................................... 42

40 C.F.R. § 60.1 *et seq.* ......................................................................... 23

8 Fed. Reg. 1,068, 1,069, § (e)(4) ........................................................... 38

8 Fed. Reg. 13,343 ................................................................................... 38

38 Fed. Reg. 30,572, 30,572, § 3 (Nov. 6, 1973) ..................................... 39

83 Fed. Reg. 23295, 23296 ...................................................................... 18

84 Fed. Reg. 32,520 (Sept. 6, 2019) ........................................................ 23

84 Fed. Reg. 51,310-01 (Sept. 27, 2019) ................................................. 23

Adjusting Imports of Petroleum and Petroleum Products into the United States,
    Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959) ................. 17

1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed.
    2002) .................................................................................................... 56

Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel
    Spending, Supply, Acquisition, and Policy 10 (2009) ............................ 40

14C Charles Alan Wright et al., Federal Practice and Procedure § 3722.1 (4th ed.
    2020) ............................................................................................... 10, 20

D.C. Super. Ct. R. Civ. P. 23 cmt. ........................................................... 57

D.C. Super. Ct. R. 23 ............................................................................... 57

Fed. R. Civ. P. 23 ............................................................................. *passim*

H.R. Rep. No. 91-907 (1970) ................................................................... 32

H.R. Rep. No. 94-1084 (1976)...........................................................................................42

*Innovation in Offshore Leasing Act: Hearing on H.R. 5577 Before the Subcomm.
on Energy and Min. Res. of the H. Comm. on Nat. Res.*, 114th Cong. (2016) .......................40

John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law &
Contemp. Probs. 3, 22-28 (1948).................................................................................56

Juliet Eilperin, *NYU Law Launches New Center to Help State AGs Fight
Environmental Rollbacks*, Wash. Post, Aug. 16, 2017 ...........................................................7

Nat'l Energy Policy Dev. Grp., National Energy Policy 817- (2001),
https://www.nrc.gov/docs/ML0428/ML042800056.pdf...........................................................17

Noelle Straub, *Obama Proposes Opening Vast Offshore Areas to Drilling*, N.Y.
Times, Mar. 31, 2010......................................................................................................18

Press Release, Office of the Press Secretary, Obama Administration Holds Major
Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011),
https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-
administration-holds-major-gulf-mexico-oil-and-gas-lease-sale...............................................18

S. Rep. No. 91-405 (1969).............................................................................................32

S. Rep. No. 109-14........................................................................................................56

S. Rep. No. 109-14........................................................................................................56

S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 ..............54

S. Res. 98, 105th Cong., 1st Sess. (1997) ....................................................................17

*Shell Oil Co.* v. *United States*,
Civ. No. 06-141 (Ct. Cl. Nov. 20, 2012), ECF No. 106-1 (contract between
Defense Supplies Corporation and Shell Oil Company, Inc., dated April 8,
1942) ...........................................................................................................................36

Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received
Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth
(July 7, 2020), https://eidclimate.org/law-firm-behind-washington-d-c-
climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-
foundation/ ........................................................................................................................7

Statement by the President Upon Signing Proclamation Governing Petroleum
Products, 1 Pub. Papers 240-41 (Mar. 10, 1959)..................................................................17

U.S. Const. amend I .......................................................................................................34

U.S. Const. amends. V and XIV ...................................................................................34

U.S. Const. art. I, § 8, cl. 3 ....................................................................................34

U.S. Const. art. I, § 8, cl. 17 ..................................................................................28

U.S. Dep't of Energy, History of SPR Releases,
    https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-
    reserve/releasing-oil-spr ...............................................................................45

U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for
    Calendar Year 2010, at 16 (2011)..................................................................45

U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for
    Calendar Year 2018, at 15 (2020) ("2018 SPR Report").................................45

U.S. Dep't of Interior, Bureau of Safety & Env't Enf't, *Gulf of Mexico Region:
    Annual Summary of Production for Entire Region* (last visited Sept. 29, 2020),
    https://www.data.bsee.gov/Main/HtmlPage.aspx?page=annualRegion ................42

U.S. Dep't of Interior, Mins. Mgmt. Serv., *Gulf of Mexico Region:Production by
    Operated Ranked by Volume* (Dec. 22, 2000),
    https://www.data.bsee.gov/Production/Files/Rank%20File%20Oil%201947-
    1995.pdf ......................................................................................................42

U.S. Gov't Accountability Off., GAO-02-64F, U.S. Fish & Wildlife Service
    Information on Oil and Gas Activities in the National Wildlife Refuge System
    1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf..............................30

U.S. Gov't Accountability Off., RCED-87-75FS, Naval Petroleum Reserves: Oil
    Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3
    (Jan. 29, 1987), http://www.gao.gov/assets/90/87497.pdf.....................................43

U.S. Gov't Accountability Off., RCED-88-198, Naval Petroleum Reserve No. 1:
    Efforts to Sell the Reserve, at 15 (July 28, 1988),
    https://www.gao.gov/assets/220/210337.pdf ("GAO Report") ..............................44

*Wartime Petroleum Policy under the Petroleum Administration for War: Hearing
    Before the Special Comm. Investigating Petrol. Res.*, 78th Cong. 17 (1945).........38

The White House, Statement by President Trump on the Paris Climate Accord
    (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-
    president-trump-paris-climate-accord/...................................................................18

## PRELIMINARY STATEMENT

In this case of national and global dimension, federal jurisdiction is not merely permissible, but necessary.  Plaintiff the District of Columbia, acting through the Office of the Attorney General ("Attorney General"), cannot avoid federal court simply because it has omitted the language of federal law from its complaint.  The Attorney General seeks to use the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, as a vehicle to force Defendants to discontinue or reduce their extraction, production, and sale of fossil fuels around the world.  But United States federal policy has, for many decades, expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  Congress provided for removal to prevent precisely this type of interference with longstanding federal policy.  This case belongs in federal court.

In an attempt to evade federal jurisdiction, the Attorney General *now* claims not to "seek relief to stop or reduce" fossil-fuel sales.  Br. 28.  But the Complaint's allegations contradict this litigation position—as do the origins of this lawsuit, which is part of an avowed campaign to discourage the production and sales of fossil fuels in favor of renewable energy sources.  The Complaint challenges, *inter alia*, Defendants' "commitment to sustainable development" based on their alleged "expansion of fossil fuel production," as well as Defendants' alleged decisions to "continue[] to ramp up fossil fuel production globally and invest in new fossil fuel development." Compl. ¶¶ 87, 88, 101.  By putting production and sales activities front and center, the Attorney General cannot reasonably deny that this lawsuit seeks to curtail them—that is its very design.

This action originates from a pact of like-minded attorneys general seeking to "limit[] climate change" and compel energy companies and the public to transition to clean energy.  Ex. 1 at 1.  These attorneys general, along with other climate-activist strategists and funders, seek to force Defendants to significantly scale down, if not eliminate, fossil-fuel production as a means of

1

regulating—and reducing—global carbon emissions.  Indeed, this lawsuit is part of an effort to use litigation to impose sufficient "pressure" to coerce "the energy industry's cooperation in converting to renewable energy" and away from oil and gas.  Ex. 2 at 27-28.

Curtailing domestic production of oil and gas, however, is fundamentally inconsistent with and contrary to longstanding federal policy. For vital economic and security reasons, every administration since at least Franklin D. Roosevelt's has taken active steps to increase domestic oil production.  Through a variety of means, the federal government regulates greenhouse gas emissions and seeks to balance the nation's energy needs with environmental considerations.  Any attempt by a municipal court to balance the costs and benefits of the use of oil and gas will constitute a collateral attack on the balance already struck under the laws, regulations, and treaties of the United States.  That is why this case belongs in federal court.

Seven separate grounds provide independent bases for federal subject matter jurisdiction:

*First*, the Attorney General's claims implicate a variety of "uniquely federal interests" including the regulation of transboundary pollution, U.S. navigable waters, and foreign affairs and commerce.  Under our constitutional structure, these claims arise exclusively under federal common law, not the diverse laws of the various states and the District of Columbia.

*Second*, this lawsuit requires the resolution of substantial, disputed questions of federal law about national and international energy policy and environmental protection.  Congress and federal agencies have already decided—over the course of several decades and administrations—that domestic oil and gas production should be promoted.  The Attorney General disputes that long-held conclusion, and would have this Court declare that fossil fuel products are so "detrimental" to the environment that statements promoting oil and gas are inherently misleading.  Compl. ¶ 11.

*Third*, the Attorney General seeks to hold Defendants liable for sales and use of their

products on federal enclaves in the District of Columbia, supporting federal enclave jurisdiction.

*Fourth*, the Attorney General's claims are connected to many actions Defendants undertook at the direction of federal officers, warranting removal under the Federal Officer Removal Statute. Defendants have engaged in substantial activities at federal direction since the 1940s, including through (i) the production and transportation of fuels indispensable to the Allied effort in World War II; (ii) production of specialized jet fuels throughout the Cold War and up to the present; (iii) fossil fuel exploration and extraction on the federally managed Outer Continental Shelf; and (iv) exploration and production pursuant to agreements with federal agencies.

*Fifth*, the Attorney General challenges as misleading Defendants' advertisements about their fossil fuel production activities including, necessarily, their activities on the Outer Continental Shelf. Jurisdiction is thus authorized under the Outer Continental Shelf Lands Act.

*Sixth*, diversity jurisdiction is satisfied because the District of Columbia consumers on whose behalf the Attorney General sues are completely diverse from all Defendants.

*Seventh*, this case can be removed under the Class Action Fairness Act because it is in substance a class action and subject to procedures identical to Federal Rule of Civil Procedure 23.

Litigation about the appropriate level of fossil fuels and the national and global issues presented by global climate change belongs in a federal forum. Because of the overtly federal nature of this lawsuit, removal is proper. The motion should be denied.[1]

## BACKGROUND

The Attorney General brought this action as part of a long-standing effort by state and municipal officials to limit and ultimately end Defendants' production and sale of fossil fuels. In

---

[1] By filing this brief in opposition to the Attorney General's motion to remand, Defendants do not waive any right, defense, affirmative defense, or objection, including any challenges to personal jurisdiction over Defendants.

2016, a coalition of state attorneys general, including the D.C. Attorney General, joined a "Climate Change Coalition Common Interest Agreement" to advance their shared interests of "limiting climate change" and pursuing investigations and litigation to accelerate "the implementation and deployment of renewable energy technology." Ex. 1 at 1. Those officials, approximately 20 in number, called themselves the "Green 20," to reflect their commitment to a progressive climate change agenda.[2]

That same year, the Green 20 held a press conference, entitled "AGs United for Clean Power," with at least one representative of the Attorney General in attendance. Ex. 3 at 1. There, they unveiled an agenda of promoting "clean power" from renewable sources as the only legitimate response to climate change. *Id.* at 13. Noting what he characterized as the "gridlock in Washington," the New York Attorney General promoted "collective efforts to deal with the problem of climate change" and urged his colleagues to "step into this [legislative] breach" through the "creative[]" and "aggressive[]" use of their respective offices to end the world's reliance on fossil fuels. *Id.* at 1, 3, 18. He insisted, "We have to change conduct" to "mov[e] more rapidly towards renewables" and away from fossil fuels. *Id.* at 20. This press conference drew criticism from thirteen other state attorneys general, who correctly described the intentions expressed as an attempt to "[u]s[e] law enforcement authority to resolve a public policy debate." Ex. 4 at 3.

The AGs United for Clean Power press conference echoed themes expressed in June 2012 by climate activists gathered in La Jolla, California for a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies." Ex. 2 at 1. There, they began to formulate a plan to utilize the law enforcement powers of "sympathetic" attorneys general, in conjunction with civil

---

[2] The "Green 20" comprises the attorneys general of California, Connecticut, Delaware, D.C., Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and U.S. Virgin Islands. *See* Ex. 3 at 1.

4

litigation, to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." *Id.* at 11, 27.  The activists concluded that "a single sympathetic state attorney general" might have "substantial success in bringing key internal documents to light" that might influence national climate and energy policy.[3] *Id.* at 11.  They hoped the "pressure" caused by the burden of investigations would force energy companies to alter their speech on climate policies and coerce "the energy industry's cooperation in converting to renewable energy" and away from fossil fuels.  *Id.* at 27-28.

Several years later, the climate activists reconvened in New York City to transform their strategy into a plan of action.  Meeting at the Rockefeller Family Fund offices, the climate activists formulated a so-called "Exxon campaign" to undermine ExxonMobil's ability to continue producing and promoting fossil fuels by "delegitimiz[ing] [ExxonMobil] as a political actor," "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and "driv[ing] divestment from Exxon." Ex. 5 at 1.  Then, before the AGs United for Clean Power press conference, one of the activists who had contributed to the development of the "Exxon Campaign" conducted a closed-door briefing on the campaign to members of the Green 20.[4]

Over the ensuing years, nearly a third of the Green 20 have filed lawsuits against ExxonMobil and other energy companies named in this lawsuit, all with the purpose of limiting— if not ceasing—Defendants' production and sales of fossil fuels, including by stifling speech on

---

[3] The workshop participants also emphasized the power of civil litigation to achieve these goals, with one opining that "[e]ven if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties."  Ex. 2 at 13.
[4] One state official cautioned the activist that, "if you speak to the [Wall Street Journal] reporter, do not confirm that you attended or otherwise discussed the event."  Ex. 6 at 1.

political issues and questions.[5]  The first of these lawsuits, a fraud action brought by the New York Attorney General, went to trial in October 2019, and concluded with a complete defense verdict for ExxonMobil.  Justice Ostrager, who presided, found the State's allegations to be "without merit," and its complaint to be "hyperbolic" and the "result of an ill-conceived initiative of the Office of the Attorney General."  *People* v. *Exxon Mobil Corp.*, 2019 WL 6795771, at *1-2, *26 (N.Y. Sup. Ct. Dec. 10, 2019).

Municipal governments have filed similar lawsuits against energy companies.[6]  Like the state complaints, the municipal complaints expressly target efforts to "promot[e] fossil fuels and undercut[] non-dangerous renewable energy and clean technologies."  *City of San Francisco* v. *Exxon Mobil Corp.*, 2020 WL 3969558, at *5 (Tex. App. June 18, 2020).  A Texas trial court found this litigation campaign to be a "crusade" "aimed to chill and suppress ExxonMobil's speech through legal actions & related campaigns."  *Id.* at *3, *8.  And a Texas appellate court expressed

---

[5] *See State* v. *Exxon Mobil Corp.*, Civ. No. 20-6132568 (Conn. Super. Ct. Sept. 14, 2020); *State* v. *BP Am. Inc.*, Civ. No. 20-097 (Del. Super. Ct. Sept. 10, 2020); *State* v. *Am. Petrol. Inst.*, Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).
[6] *See City of New York* v. *BP p.l.c.*, Civ. No. 18-182 (S.D.N.Y. Jan. 9, 2018); *County of Maui* v. *Sunoco LP*, Civ. No. 20-283 (Haw. Cir. Ct. Oct. 12, 2020);  *City of Charleston* v. *Brabham Oil Co.*, Civ. No. 20-10 (S.C. Ct. Common Pleas Sept. 9, 2020); *City of Hoboken* v. *Exxon Mobil Corp.*, Civ. No. 20-3179 (N.J. Super. Ct. Sept. 2, 2020); *City & County of Honolulu* v. *Sunoco LP*, Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Counsel of Baltimore* v. *BP p.l.c.*, Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, Civ. No. 18-11859 (Wash. Super. Ct. May 9, 2018); *Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.), Inc.*, Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City & County of San Francisco* v. *BP p.l.c.*, Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, Civ. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017).

dismay about the California municipality plaintiffs' "[l]awfare"—"an ugly tool by which to seek the environmental policy changes the California Parties desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do." *Id.* at *20.

The climate activists have continued to facilitate similar litigation to advance their agenda of pushing the energy industry away from fossil fuels and toward renewables. Recently, Bloomberg Philanthropies joined their cause by funding the creation of a State Energy and Environmental Impact Center (the "Impact Center") to assist in litigation to shape national energy policy.[7] The Impact Center has encouraged state attorneys general to bring climate lawsuits by providing them resources—including Special Assistant Attorneys General ("SAAG"), whose salaries and benefits it pays—on the condition that they do so. Indeed, the Complaint's signature block includes a SAAG sponsored by the Impact Center. Compl. 78.

When the Attorney General filed the Complaint in this action, its allegations echoed the strategies announced at the AGs United for Clean Power press conference and the objectives of the Impact Center. The Complaint includes counsel from Sher Edling LLP, *see id.* at 78-79, which reportedly received at least $1.75 million in grants from Resources Legacy Fund, a San Francisco-based organization focused on curbing the production and sale of fossil fuels through advocacy.[8]

### THE COMPLAINT

The Complaint's allegations demonstrate that this lawsuit is an artfully pleaded effort to use claims nominally asserted under a local consumer-protection statute to discourage federally promoted fossil-fuel production, reduce federally regulated interstate and international carbon

---

[7] *See* Juliet Eilperin, *NYU Law Launches New Center to Help State AGs Fight Environmental Rollbacks*, Wash. Post, Aug. 16, 2017.

[8] *See* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://eidclimate.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.

emissions, and undermine federal energy and environmental policy.  The Attorney General alleges that Defendants violated the CPPA by "engaging in a number of deceptive acts and practices in [their] marketing, promotion, and sale of fossil fuel products."  *See, e.g.*, Compl. ¶¶ 174, 181, 188, 195.  The Complaint recites a laundry list of alleged advertisements—appearing across the country, over diverse media—that, in the Attorney General's view, misled consumers about the role Defendants' products play in causing climate change.  Its allegations of "greenwashing"—*i.e.*, "creat[ing] a false impression that a company and/or its products are environmentally friendly," *id.* ¶ 98—demonstrate the Attorney General's focus on reducing fossil-fuel production.

For example, the Complaint challenges as deceptive one Defendant's alleged advertisements promoting its investments in hydrogen fuel cells as "'[o]ne of the cleaner sources' that power electric vehicles."  *See id.* ¶¶ 121-22.  The Complaint asserts that hydrogen fuel cells cannot be "solutions to global warming" because "almost all of the hydrogen fuel in the United States is produced by reforming natural gas, which releases significant amounts of greenhouse gases," and because "producing and transporting the natural gas for hydrogen fuel production leads to methane emissions that make the total greenhouse gas emissions associated with hydrogen fuel similar to petroleum."  *Id.* ¶ 122.  The problem, according to the Complaint, is that "Defendants have cut fossil fuels from their brand but not their business."  *Id.* ¶ 109.  The Attorney General wants this Court to compel Defendants to "cut fossil fuels" from their businesses across the globe.

The Complaint unequivocally asserts the Attorney General's view that Defendants' fossil fuel products, produced and sold around the world, are to blame for climate change and that its preferred solution is to end reliance on those products.  According to the Complaint, "Defendants' deception" was "detriment[al]" to "DC consumers and the public generally" because it allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of

Defendants' fossil fuel products." *Id.* ¶ 2 (emphasis added).  Those products, the Complaint alleges, "pollute and ultimately warm the planet." *Id.* ¶ 8.  Revealing that the claims—however labeled by the Attorney General—are, at bottom, interstate and international pollution claims, the Complaint further alleges that "the development, production, refining, and consumer use of [Defendants'] fossil fuel products—including gasoline and motor oil—emit large volumes of greenhouse gases, which cause global climate change." *Id.* ¶ 71; *see also id.* ¶ 106 ("Defendants' fossil fuel products are the primary driver of global warming."); ¶ 149 (asserting that "current levels of fossil fuel use—even purportedly 'cleaner' or more efficient products—represent a direct threat to District residents and the environment").

According to the Complaint, Defendants' "commitment to sustainable development" is contradicted by their alleged "expansion of fossil fuel production," as well as Defendants' alleged decisions to "continue[] to ramp up fossil fuel production globally and invest in new fossil fuel development—including in tar sands crude and shale gas fracking, some of the most carbon-intensive extraction projects—and to plan for unabated oil and gas exploitation indefinitely into the future."  Compl. ¶¶ 87-88, 101.  The Attorney General's preferred solution, like those of the other Green 20 members, is to end the world's "rel[iance] on fossil fuel[s]" and "mov[e] more rapidly towards renewables."  Ex. 3 at 16, 20; Ex. 2 at 27-28 (discussing compelling the energy industry's "cooperation in converting to renewable energy"); *see also* Compl. ¶ 52 ("fossil fuel products contribute[] to severe environmental and health threats at significant economic cost").

The purported harms that the Attorney General identifies are directly linked to Defendants' fossil fuel production and sales and demonstrate the Complaint's objective of reducing both.  According to the Complaint, Defendants' alleged deception was harmful because it caused consumers to use more fossil fuels, which in turn contributed to greenhouse gas emissions and

global climate change.  *See, e.g.*, *id.* ¶¶ 6, 65, 89-97, 161, 168.

## LEGAL STANDARD

"The removal process was created by Congress to protect defendants."  *Legg* v. *Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005).  A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  Although the party opposing remand "bears the burden of establishing that jurisdiction exists in federal court," *Mizell* v. *SunTrust Bank*, 26 F. Supp. 3d 80, 84 (D.D.C. 2014), removal is proper so long as jurisdiction exists over a single claim, *see* 28 U.S.C. § 1367; *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).  The inherently federal nature of the claims stated on the face of the complaint, not the plaintiff's characterization of them as state law claims, is controlling.  14C Charles Alan Wright et al., Federal Practice and Procedure § 3722.1 (4th ed. 2020); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997).  It is well-settled that the question of whether a case arises under state or federal law, and is, therefore, properly removable, is a question of subject matter jurisdiction that the federal removal court must resolve for itself, subject to the court's "unflagging obligation" to exercise such jurisdiction where it does exist.  *Quackenbush* v. *Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

## ARGUMENT

### I.    The Complaint Arises under Federal Common Law.

This Court is vested with federal question jurisdiction over this suit because the Attorney General's claims necessarily arise—if at all—under federal common law.  *See Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985).  Although "[t]here is no federal general common law," *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as federal common law," *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451

U.S. 630, 640 (1981).  In particular, "federal common law addresses . . . subjects . . . where the basic scheme of the Constitution so demands," *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421 (2011), such as issues "so vitally affecting interests, powers and relations of the Federal Government as to require uniform national disposition," *United States* v. *Standard Oil Co.*, 332 U.S. 301, 307 (1947), as when "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.  "[I]f federal common law exists, it is because state law cannot be used."  *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 314 n.7 (1981).

Courts have long recognized that claims may arise under federal common law regardless of whether a plaintiff affixes a federal law label.  Courts determine at the outset whether plaintiffs' claims arise under federal or state law.  This analysis does not implicate preemption principles or standards because a claim that "arise[s] under federal common law" is "a permissible basis for jurisdiction based on a federal question." *Treiber & Straub, Inc.* v. *U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007).  The two-step analysis the Supreme Court established in *Standard Oil* for determining whether a common law claim arises under state or federal law makes clear that this threshold jurisdictional question does not depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.  Under the applicable two-step approach, courts must (1) determine whether the source of law is federal or state based on the nature of the issues at stake, and (2) if federal law is the source, then determine the substance of the federal law, including whether plaintiff has stated a viable federal claim.  *United States* v. *Swiss Am. Bank, Ltd.*, 191 F.3d 30, 42-45 (1st Cir. 1999) (citing *Standard Oil*, 332 U.S. 301).  The Attorney General's claims, purportedly brought under municipal law, implicate three "uniquely federal interests" that demand the application of federal common law: (i) transboundary pollution,

(ii) the navigable waters of the U.S., and (iii) foreign affairs and commerce.

    **A.**    **This Suit Asserts Interstate and International Pollution Claims.**

        **1.**    **The Supreme Court Has Repeatedly Held that Federal Common Law Exclusively Governs Interstate and International Pollution Claims.**

The United States Supreme Court has long recognized that interstate "[e]nvironmental protection is undoubtedly an area within national legislative power" for which federal courts may "fashion" federal common law. *AEP*, 564 U.S. at 421; *see also Illinois* v. *City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 103 (1972). Thus, federal common law applies to claims that "deal with air and water in their ambient or interstate aspects." *AEP* 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *see, e.g.*, *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 487-88 (1987), including suits asserting claims rooted in the effects of global greenhouse gas emissions. As the Supreme Court has held, "[e]ach state stands on the same level with all the rest" and none "can impose its own legislation on . . . one of the others." *Kansas* v. *Colorado*, 206 U.S. 46, 97 (1907). The Court put the point succinctly in *Ouellette*, observing that "interstate water pollution is a matter of federal, not state law." 479 U.S. at 488.

Actions like the Attorney General's, which seek to use municipal law to limit the production, sale, and use of fossil fuels not just in the District of Columbia but in all 50 states, some of which disagree with the Attorney General's policy preferences and explicitly *encourage* the production of oil and gas for multiple purposes, are precisely those that necessitate the application of federal law. *See* Brief for the United States, *Milwaukee II*, 451 U.S. 304 (1981) (No. 79-408), 1980 WL 339512, at *18.

In *AEP*, the plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or,

in the alternative, of state tort law." 564 U.S. at 418.  In assessing whether the plaintiffs had stated a claim for relief, the Supreme Court determined that federal common law governs claims involving "air and water in their ambient or interstate aspects."  *Id.* at 421.  Rejecting the notion that state law could govern claims related to global climate change, the Court stated, "borrowing the law of a particular State would be inappropriate." *Id.* at 422.  Federal common law thus applied. The Court held plaintiffs could not state viable federal common law claims because the Clean Air Act, and the EPA actions it authorizes, "displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power-plants." *Id.* at 424.

In *City of New York* v. *BP p.l.c.*, the plaintiff sued energy companies for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming." 325 F. Supp. 3d 466, 471 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188 (2d Cir. argued Nov. 22, 2019).  Because plaintiff's claims were "based on the 'transboundary' emission of greenhouse gases," the court held that they "ar[o]se under federal common law and require[d] a uniform standard of decision."[9] *Id.* at 472.

### 2.    Federal Common Law Governs This Interstate Pollution Suit.

The Complaint's allegations make evident that this is an "interstate pollution" suit for which the application of federal common law is necessary. *AEP*, 564 U.S. at 421; *Milwaukee I*, 406 U.S. at 91; *see also Ouellette*, 479 U.S. at 488 ("interstate water pollution is a matter of federal, not state, law").  The thrust of this action is that Defendants are responsible for climate change brought about by greenhouse gas emissions.  The Complaint endeavors to trace Defendants'

---

[9] The Attorney General argues *City of New York* is distinguishable because it concerned causes of action for public nuisance, private nuisance, and trespass.  *See* Br. 16 n.5.  Yet in the rest of its brief, the Attorney General claims that *Baltimore*, *Boulder*, *Oakland*, *Rhode Island*, *and San Mateo*, which asserted the same causes of action, are "materially indistinguishable" and provide support for the Attorney General's positions.  *Id.* at 3.  It cannot have it both ways.

advertisements to the Attorney General's alleged climate change injuries.[10]  The Complaint alleges that Defendants' advertising allegedly "influenc[es]" consumers' decisions to purchase and consume Defendants' fossil fuel products, *see, e.g.*, Compl. ¶¶ 175, 182, 189, 196; consumers' use of those products allegedly contributes to greenhouse gas emissions, *see, e.g.*, *id.* ¶ 4; emissions allegedly contribute to climate change, *see, e.g.*, *id.* ¶ 6; and climate change allegedly causes harms including "increased sea levels; increased ocean temperatures and acidity; extreme weather including heat and drought, as well as extreme precipitation events, wildfires, flooding, and more frequent, longer-lasting, and more severe storms." *Id.*  An entire section of the Complaint focuses on the harms the District of Columbia and its residents allegedly suffer, and expect to suffer, from climate change. *See id.* § VII.  By seeking to hold Defendants liable for activities that, the Attorney General alleges, ultimately implicate "air and water in their ambient or interstate aspects," *AEP*, 564 U.S. at 421, the Attorney General has brought an interstate pollution suit for which federal common law must govern, and "state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7.

### 3.     *AEP* Did Not Authorize Transboundary Pollution Suits to Be Decided under State Law.

The Attorney General responds that *AEP* permits state law, not federal law, to govern transboundary pollution suits.  This argument misunderstands both *AEP* and federal jurisdiction.

*First*, the Attorney General contends that, because *AEP* ultimately held that the Clean Air Act displaced federal common law remedies for transboundary pollution suits, such suits cannot arise under federal law, and state law fills the void. *See* Br. 16 n.4.  That argument is backward.  Whether federal common law has been displaced—*i.e.*, whether Congress has spoken "directly to [the] question" at issue, *AEP*, 564 U.S. at 424—is relevant to the merits of whether the Attorney

---

[10] Defendants dispute the notion that the Complaint's alleged climate change injuries are caused by or traceable to Defendants' activities, as opposed to global emissions due to billions of actors.

General can state a claim for relief, not the jurisdictional inquiry of whether its claims arise under federal law in the first instance. *See Standard Oil*, 332 U.S. at 316-17. More importantly, the Attorney General's approach turns the *Erie* doctrine on its head. As a matter of constitutional structure, federal law exclusively governs claims implicating "uniquely federal interests" that make it "inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 640-41. That Congress, through the Clean Air Act, would have so comprehensively addressed the "question" at issue so as to leave no room for *federal* common-law remedies cannot mean *state* statutory remedies become viable. By its very nature, federal common law—whether displaced or not—exists precisely where state law cannot, because "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.

*Second*, the Attorney General suggests that *AEP*'s observation that "the availability *vel non* of a state lawsuit depends" on the Clean Air Act's "preemptive effect" expressly left open the possibility of climate-change-based claims, like the Attorney General's, being brought under state law. *See* Br. 16 n.4. That aspect of *AEP* is of no help to the Attorney General. The Court left "open for consideration" only the narrow question of whether the Clean Air Act preempted state-law nuisance claims based on "the law of each State where the defendants operate power plants." 564 U.S. at 429. Claims seeking to regulate the interstate and international productions and sales of fossil fuels—such as those brought by the Attorney General here—however, arise under federal law because "the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421-22. "[B]orrowing the law of a particular State would be inappropriate." *Id.*

### B. The Attorney General's Claims Arise out of the Interstate or Navigable Waters of the United States.

Federal common law also governs claims, like the Attorney General's, that arise out of the "interstate or navigable waters" of the United States. *District of Columbia* v. *Schramm*, 631 F.2d

854, 864 (D.C. Cir. 1980); *accord Milwaukee I*, 406 U.S. at 99; *see, e.g.*, *Michigan* v. *U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771-72 (7th Cir. 2011).  In *Milwaukee I*, the Court held that federal common law necessarily governed the State of Illinois's nuisance abatement suit against four cities and two sewerage commissions in Wisconsin, which alleged that defendants were polluting Lake Michigan.  406 U.S. at 91-92.  Similarly, in *Michigan*, the Seventh Circuit considered the application of federal common law to claims alleging that the operation of the Chicago Area Waterway System would allow invasive non-native species of carp to enter the Great Lakes.  *See* 667 F.3d at 771.  Because federal common law "extends to the harm caused by . . . environmental and economic destruction" by way of navigable waters, it applied to the claims at issue.  *Id.*

The Complaint details the alleged harms the District of Columbia suffers—and expects to suffer—from climate change by way of its navigable waters.  Specifically, the Complaint alleges that "sea level rise" is among the "economic impacts" felt in the United States from climate change.  Compl. ¶¶ 94, 96.  The District of Columbia, "[l]ocated at the confluence of the Anacostia and Potomac, two tidally influenced rivers," is particularly "vulnerable to inland drainage and riverine and coastal flooding."  *Id.* ¶ 97.  And "[r]elative sea level rise in the District has been higher than global sea level rise" "because the local landmass in the region also has been sinking as the result of long-term land subsidence.  Sea level rise is expected to continue, and even accelerate, in the future due to climate change."  *Id.* ¶ 96.  Thus, despite the Attorney General's conclusory assertion that this case has "nothing to do with . . . 'interstate or navigable waters,'" Br. 15, the Complaint clearly alleges "environmental and economic destruction" via navigable waters, *Michigan*, 557 F.3d at 771, for which federal common law must govern.

### C.   The Attorney General's Claims Implicate Foreign Affairs.

Finally, the international nature and impacts of the Attorney General's claims are another reason why this suit arises only under federal common law.  Issues involving "our relationships

with other members of the international community must be treated exclusively as an aspect of federal law," *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964), and "actions having important foreign policy implications" should be governed by federal common law and heard in federal court, *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 353 (2d Cir. 1986). This case is designed to—and would—significantly interfere with U.S. foreign policy.

The United States' regulation of energy production through foreign policy traces its origins to at least the 1950s. In 1959, President Eisenhower invoked statutory authority to impose quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security."[11] The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade." Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959). As a matter of United States foreign policy, President Eisenhower explained, "Petroleum, wherever it may be produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id.*

After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks equivalent to at least 90 days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-

---

[11] Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, *as amended by* Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).

owned stocks held in the U.S. Strategic Petroleum Reserve.[12]

In the 1990s, the Senate responded to President Clinton's signing of the Kyoto Protocol by resolving on a 95-0 vote that the nation should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations.  *See* S. Res. 98, 105th Cong., 1st Sess. (1997).  In May 2011, President Obama issued a series of directives "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."[13]  President Obama explained, "Given our energy needs, in order to sustain economic growth and produce jobs, and keep our businesses competitive, we are going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."[14]

President Trump cited foreign-affairs implications in withdrawing from the Paris Agreement, after his administration concluded the treaty did not strike the proper balance between environmental and national economic and security concerns.[15]  In a similar case, the United States explained as amicus that "federal law and policy has long declared that fossil fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the

---

[12] *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Policy Dev. Grp., National Energy Policy 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

[13] Press Release, Office of the Press Secretary, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

[14] Noelle Straub, *Obama Proposes Opening Vast Offshore Areas to Drilling*, N.Y. Times, Mar. 31, 2010.

[15] *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/; *see also* 83 Fed. Reg. 23295, 23296.

United States on politically and economically unstable sources of foreign oil imports."[16]

In seeking to achieve different regulatory objectives than those advanced by longstanding U.S. foreign policy, the Attorney General's claims not only affect U.S. interests, but also necessarily "implicate countless foreign governments and *their* laws and policies." *City of New York*, 325 F. Supp. 3d at 475 (emphasis added).  Thus, in this case, the interests of countless foreign sovereigns affected by U.S. foreign policy must be considered and protected by federal law and federal court jurisdiction. *See Tex. Indus.*, 451 U.S. at 641.

The Attorney General contends that a court in this District rejected "virtually identical arguments" for the application of federal common law in *In re Tobacco/Governmental Health Care Costs Litigation*, 100 F. Supp. 2d 31 (D.D.C. 2000).  That is not correct.  There, tobacco companies sought to remove to federal court tort suits brought against them in state court by the Republics of Bolivia and Venezuela.  *Id.* at 33-34.  The court recognized that several courts of appeal had understood "the federal common law of foreign relations to encompass any lawsuit that would have an impact on a foreign nation's vital economic or sovereign interests," *id.* at 36, but was unwilling to do so because the potentially affected foreign nations had "*chose[n]* to bring these lawsuits under state law in state courts," *id.* at 37 (emphasis added).  "To the extent that the federal common law of foreign relations is premised on the notion that the federal courts must protect foreign sovereigns from diverse decisions by state courts," the court reasoned, "such protection ought not to be provided when it is not sought—and in fact is resisted—by foreign sovereigns, as is the case here."  *Id.*  In this action, by contrast, the potentially affected sovereigns—the foreign countries, and their economies, that would be impacted by a U.S. court

---

[16] Brief of the United States as Amicus Curiae 10, *Oakland* v. *BP PLC*, 960 F.3d 570 (2020) (No. 18-16663), ECF No. 198 (quoting 42 U.S.C. § 15927(b)(1)).

passing judgment on U.S. foreign policy—have not appeared, much less affirmatively eschewed the protection that federal common law, and federal court adjudication, are designed to confer.

### D.     The Well-Pleaded Complaint Rule Is No Obstacle to Removal.

The Attorney General asserts that Defendants have "[i]gnor[ed]" the well-pleaded complaint rule, and that the invocation of federal common law "amounts to an unsupported claim of preemption," which is a federal defense. Br. 17. The well-pleaded complaint rule provides that federal question jurisdiction exists only when "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc.* v. *Williams*, 482 U.S. 386, 392 (1987). Thus, neither plaintiff's anticipation, nor defendant's assertion, of a federal defense suffices for a case to arise under federal law. *See Franchise Tax Bd. of Cal.* v. *Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10 (1983). Defendants do not invoke federal common law here as a defense to state-law claims. Rather, Defendants argue that federal common law exclusively governs claims for interstate and international pollution because the Constitution dictates that "state law cannot be used." *Milwaukee II*, 451 U.S. at 314 n.7. State or municipal law simply has no presence and no role to play in this realm of exclusive federal law. Under the well-pleaded complaint rule, the substance of the claims, not the plaintiff's characterization of them as state or federal claims, controls. *See Majors*, 117 F.3d at 928. As the inherently federal nature of the Attorney General's claims is clear from the face of the Complaint, the well-pleaded complaint rule is satisfied.

Several courts in related cases have come to a contrary conclusion; in doing so, they have misinterpreted the well-pleaded complaint rule.[17] Those decisions have given dispositive force to

---

[17] The Attorney General's assertion that Defendants "deliberately misl[ed]" this Court is wrong. *Contra* Pl.'s Br. 18. Defendants cited the district court's holding in *California* v. *BP p.l.c.*, Civ. No. 17-06011, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018), to the effect that climate-change claims "are necessarily governed by federal common law," *see* Notice ¶ 49 n.11. The Ninth Circuit (incorrectly) held that no exception to the well-pleaded complaint rule permits removal based on federal common law. *See City of Oakland*, 969 F.3d at 906.

the *label* a plaintiff applies to the claims in its complaint, rather than the *substance* of the allegations. *See, e.g.*, *Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 968 (D. Colo. 2019), *aff'd*, 965 F.3d 792 (10th Cir. 2020). The well-pleaded complaint rule, however, does not allow a plaintiff to "exalt form over substance," *Standard Fire Ins. Co.* v. *Knowles*, 568 U.S. 588, 595 (2013), by affixing a state-law label to a claim that is necessarily federal in nature. That is, a plaintiff cannot "block removal" by attempting to "disguise [an] inherently federal cause of action." Wright § 3722.1. That is consistent with the general rule that courts do not rely on "[l]egal labels characterizing a claim" to determine whether a complaint suffices. *Lambram* v. *Havel*, 43 F.3d 918, 920 (4th Cir. 1995); *see Johnson* v. *City of Shelby*, 574 U.S. 10, 11 (2014). The substance controls. Here, though the Attorney General labels its claims as arising under municipal law, the federal issues implicated by the substance of those claims demand that federal common law apply.

## II.   This Action Satisfies the *Grable* Doctrine's Jurisdictional Prerequisites.

This suit, which purports to allege only municipal law claims, "arises under" federal law pursuant to *Grable*. That doctrine provides federal jurisdiction over a putative state law claim if a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *Grable Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312-13.

While the Complaint asserts violations of municipal consumer protection law, the Attorney General's allegations demonstrate an attempt to countermand federal energy and environmental policy. The federal government has already addressed, and is currently addressing, climate change

21

through domestic statutes and regulations, and international agreements.  The Attorney General's allegations necessarily implicate those federal issues, requiring the application of *Grable* here.

### A.   The Attorney General's Claims Necessarily Raise Substantial Federal Issues that Are Actually Disputed.

The first three elements of *Grable* are satisfied here.  The Complaint (1) "necessarily raise[s] a stated federal issue" that is (2) "actually disputed" and (3) "substantial."  *Id.* 314.

*First*, the Attorney General's theory of deception expressly seeks to impose liability for representations made to federal policymakers.  Indeed, this is a key part of the Complaint's chain of alleged injury causation.  It alleges that the Communications Team for Global Climate Science (a trade association) "continued Defendants' efforts to deceive the public about the dangers of fossil fuel use" by "[d]evelop[ing] and implement[ing] a direct outreach program to inform and educate members of Congress . . . about uncertainties in climate science" to "begin to erect a barrier against further efforts to impose Kyoto-like measures in the future."   Compl. ¶ 64; *see also id.* ¶ 20(d) (one of the stated purposes of the American Petroleum Institute is "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas industry").  But claims of fraud on the federal government arise under federal law. *See Buckman Co.* v. *Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001); *Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009); *Kemp* v. *Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000).

The Attorney General contends that "[n]o element" of its claims "requires proof" of Defendants' alleged misstatements to policymakers.  Br. 10 n.3.  That is incorrect.  To state a claim for relief under the CPPA, a plaintiff must establish that a defendant (i) made a "misrepresentation as to a material fact which has a tendency to mislead," *Grayson* v. *AT&T Corp.*, 15 A.3d 219, 251 (D.C. 2011); (ii) failed to "state a material fact if such failure tends to mislead," *id.*; or (iii) made specific representations that its "goods or services" have "characteristics" or "standards" that they

do not, in fact, possess, *Floyd* v. *Bank of Am. Corp.*, 70 A.3d 246, 255 (D.C. 2013); *see* D.C. Code § 28-3904(a), (e), (f). The Attorney General's theory of materiality is that Defendants' allegedly "false and misleading misrepresentations and omissions . . . have the capacity to . . . deter consumers from adopting cleaner, safer alternatives" to Defendants' "fossil fuel products." Compl. ¶¶ 175, 182, 189, 196; *see also id.* ¶ 168.

That theory implicates Defendants' alleged statements to policymakers because those statements allegedly contributed to policymakers not implementing legislation that would limit emissions (*e.g.*, the Kyoto Protocol), which then prevented consumers from adopting "cleaner, safer alternatives." *Id.* ¶ 175; *see, e.g., id.* ¶ 64. The Complaint's theory is that Defendants' alleged misstatements or omissions were false and material as they led consumers to use more fossil fuels compared to renewables—that is, they supposedly led consumers to believe that the costs of fossil fuels did not outweigh the benefits. But that theory necessarily implicates the federal political branches' policy decisions over decades that the benefits of fossil fuels outweigh the costs.

*Second*, Congress has already struck a careful balance between energy production and environmental protection by passing federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426-47.[18] The federal government "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and

---

[18] The EPA regulates both stationary and mobile sources of greenhouse gases on a national basis. *See* 40 C.F.R. § 60.1 *et seq.*; *id.* § 85.501 *et seq.* The EPA has pending rulemakings addressing the emission of greenhouse gases from numerous sources. *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310-01 (Sept. 27, 2019); Repeal of the Clean Power Plan; Emissions Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations, 84 Fed. Reg. 32,520 (Sept. 6, 2019). This lawsuit would allow a municipal court to balance exactly the same competing interests at issue in those rulemakings and come to potentially different results.

exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana* v. *United States*, 947 F.3d 1159, 1167 (9th Cir. 2020). These federal statutes and regulations demonstrate that Congress has already weighed the costs and benefits of fossil fuels, and permitted and encouraged their sale in part because affordable energy is critical for economic stability and growth. *See, e.g.*, 42 U.S.C. § 15927(b); *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1023 (N.D. Cal. 2018), *vacated on other grounds*, 960 F.3d 570 (9th Cir. 2020).

The Attorney General's request that a municipal court substitute its judgment for that of Congress and the EPA on these issues—and impose significant penalties, damages, and injunctive relief based on the Attorney General's assertion that a different balance should be struck, *see* Compl. § XII—constitutes a "collateral attack" on an "entire [federal] regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs* v. *Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017). Removal is thus essential. *See, e.g.*, *Pet Quarters*, 559 F.3d at 779; *Bryan* v. *BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429-30 (4th Cir. 2004); *Hill* v. *BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).

This action will upset the careful balance Congress has struck regarding energy production, greenhouse gas emissions, and climate change. The Green 20—of which the Attorney General is a member—specifically proclaimed their intent to "step into th[e] [legislative] breach" through the "creative[]" and "aggressive[]" use of enforcement authority. Ex. 3 at 3, 18. This Complaint tries to second-guess congressional judgments. *See San Francisco*, 2020 WL 3969558, at *20. The Attorney General is thus forced to argue that its collateral attack is "irrelevant" to federal question jurisdiction because second-guessing congressional judgments is not "essential" to its claims, essentially accusing Defendants of raising preemption arguments. Br. 8-9. That argument fails because "some areas involving 'uniquely federal interests' may be so important to the federal

government that a 'federal common law' related to those areas will supplant state law . . . regardless of whether Congress has shown any intent to preempt the area." *Caudill* v. *Blue Cross & Blue Shield of N.C.*, 999 F.2d 74, 77 (4th Cir. 1993). In an effort to establish the CPPA's essential materiality element, the Complaint asserts that the risks of fossil-fuel production and use outweigh the benefits, such that promotion of fossil fuels that allegedly minimizes those risks is materially misleading. Thus, it alleges that Defendants misled consumers by marketing their fossil fuel products as "safe" and "impliedly beneficial to the climate" when the "production and use of such products is the leading cause of climate change." Compl. ¶ 150. Indeed, the Attorney General asserts that Defendants acted unlawfully because their conduct allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and *sale* of Defendants' fossil fuel products, to the detriment of DC consumers and the public generally." *Id.* ¶ 2 (emphasis added). But the extent to which the production and use of fossil fuels should be restricted as unduly "detriment[al]" to the environment is *precisely* the question Congress and the EPA have addressed through legislation and national policy.[19]

*Third*, as described in detail *supra*, U.S. foreign policy reflects the federal government's careful balancing of a variety of interests relevant to the regulation of energy production, greenhouse gas emissions, and climate change. Because the Attorney General's claims necessarily

---

[19] *Animal Legal Defense Fund* v. *Hormel Foods Corp.*, 249 F. Supp. 3d 53 (D.D.C. 2007), on which the Attorney General relies, *see* Br. 10-11, is not to the contrary. There, plaintiff challenged as misleading a meat producer's advertisements claiming that its products were "natural." 249 F. Supp. 3d at 55. *Grable* jurisdiction was proper, defendant averred, because plaintiff's claims would "subvert" existing federal regulations "on the use of 'natural'" in describing meat and poultry products. *Id.* The district court disagreed. There was no "real conflict between the false advertising claims and the [applicable] federal laws" because plaintiff's claims concerned product *advertising*, and the federal laws governed product *labeling* and *packaging*. *See id.* at 57. There is no similar mismatch here. To prevail on its claims, the Attorney General must show that Congress's determination that Defendants' products are not "detrimental" is wrong.

require determining the social utility of fossil fuels in relation to the environmental consequences, they will require this Court to evaluate and interfere with the wisdom of those policy judgments. Any such judicial evaluation "will directly and significantly affect American foreign relations," *Marcos*, 806 F.2d at 352; *see City of New York*, 325 F. Supp. 3d at 475, justifying *Grable* jurisdiction, *Grynberg Prod. Corp.* v. *British Gas, P.L.C.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993).  Moreover, because foreign policy inherently implicates national security, the need for federal jurisdiction in this case is only heightened.  *See In re Nat'l Sec. Agency Telecomms. Records Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007).

### B.     Federal Jurisdiction Would Protect, Not Disturb, Federalism Principles.

Federal jurisdiction over this case would be fully "consistent with congressional judgments about the sound division of labor between state and federal courts."  *Grable*, 545 U.S. at 313. Federal courts are the traditional fora for adjudicating claims involving the federal issues implicated here: environmental regulation, regulation of vital national resources, foreign policy, and national security.  *Cf., e.g.*, *Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007).

In fact, permitting these claims to be governed by municipal law would *threaten* the balance of federal-state relations.  "Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States* v. *Pink*, 315 U.S. 203, 233 (1942). State and municipal governments must yield to the federal government in foreign affairs so that this exclusively national power is "entirely free from local interference."  *Hines* v. *Davidowitz*, 312 U.S. 52, 63 (1941).  It is even more important for foreign policy to be free from state or municipal *judicial* interference.  The Supreme Court has recognized that courts should not "judge the wisdom of the National Government's [foreign] policy; dissatisfaction should be addressed to the President or, perhaps, Congress."  *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 427 (2003).

The Attorney General responds by denying any objective other than "enforc[ing] its own

state consumer protection laws," for which the Federal Trade Commission Act ("FTCA") purportedly affords the District of Columbia an "equal role" in enforcement.  *See* Br. 13.  This argument fails for at least three reasons.

*First*, this is not a traditional state consumer protection enforcement action; it is an attempt to change federal policy by reducing the production and use of fossil fuels and regulating global greenhouse gas emissions.  *See supra* § I.A.  The Complaint therefore challenges longstanding federal energy and environmental policy.  Its origin in a pledge among attorneys generals to "change conduct" to "mov[e] more rapidly towards renewables," Ex. 3 at 20, confirms that conclusion.  To achieve this goal, the Attorney General seeks relief aimed at forcing Defendants to adopt the Attorney General's preferred energy-production means, rather than the means federal law encourages and promotes.

*Second*, even assuming this were purely a consumer protection action, the FTCA does not call for states to play an "equal role" in consumer protection.  The provision to which the Attorney General points merely provides that the Federal Trade Commission's enforcement tools "are in addition to, and not in lieu of, any other remedy provided by State or Federal law."  15 U.S.C. § 57b(e).  That Congress has not preempted states from providing remedies for unfair or deceptive practices hardly creates an "equal" role in all respects.

*Third*, even if this were a pure consumer protection action, and even if Congress intended for state courts to play an "equal role" in adjudicating such disputes, federal jurisdiction in *this* case would not disrupt that balance.  This is no garden-variety consumer protection suit.  Its resolution—even on state consumer protection grounds—could have sweeping impacts on national and international economies and policies.  *See supra* § I.A.  Exercising jurisdiction over this unique

case will not meaningfully alter the caseloads of state and federal courts.[20]  *Cf. R.I. Fishermen's All., Inc.* v. *R.I. Dep't of Envtl. Mgmt.*, 585 F.3d 42, 52 (1st Cir. 2009).

### C.    The Attorney General's Arguments Against *Grable* Are Unpersuasive.

Arguing that the Complaint does not support *Grable* jurisdiction, the Attorney General relies on rulings in several of the climate-change tort actions brought against certain Defendants in other jurisdictions.  Br. 7.  But in those cases, plaintiffs advanced claims largely based on nuisance, not consumer protection theories.[21]  Here, federal jurisdiction exists because the Attorney General claims would force a court to second-guess federal decision-making on the propriety of fossil-fuel-production activities in the process of deciding whether Defendants' advertisements of those activities were misleading.  The Complaint alleges Defendants' conduct was "detriment[al]" as it "enabled the unabated and expanded extraction, production . . . and sale of Defendants' fossil fuel products."  Compl. ¶ 2.  Moreover, all but one of the other decisions the Attorney General cites remain subject to further review, and in only one has the *Grable* ruling been subject to appellate consideration.[22]  In none of those cases did a court address "defendants'

---

[20] For this reason, the Attorney General's reliance on *Nevada* v. *Bank of America Corp.*, 672 F.3d 661, 676 (9th Cir. 2012), is misplaced.  In that case, defendant premised *Grable* jurisdiction on the state consumer protection statute's reference to the federal Fair Debt Collection Practices Act.  *See id.* at 674-75.  Unlike here, the *Bank of America* court had reason for concern that exercising jurisdiction would "herald[] a potentially enormous shift of traditionally state cases into federal courts" given the "frequen[cy]" with which "[s]tate courts . . . handle state-law consumer protection suits that refer to or are predicated on standards set forth in federal statutes."  *Id.* at 676.

[21] *See, e.g.*, *Mayor & City Council of Baltimore* v. *BP p.l.c.*, 388 F. Supp. 3d 538, 559 (D. Md. 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *cert. granted*, 2020 WL 5847132 (U.S. Oct. 2, 2020).

[22] The Supreme Court recently granted Defendants' petition for certiorari in *BP plc* v. *Mayor & City Council of Baltimore*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020), to determine whether a court of appeals may review any issue encompassed in a district court's remand order where the removing defendant premised removal in part on the federal-officer removal statute, or the civil-rights removal statute.  Thus, the prior decisions to which the Attorney General refers may be subject to further review should the Supreme Court rule in Defendants' favor.

arguments" as to whether federal adjudication would "disrupt the principles of federalism,"[23] and in only two did the court consider whether the federal interests were "substantial."[24]

## III.     This Action Arises out of Federal Enclaves.

The Constitution's "Enclave Clause," which authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings," U.S. Const. art. I, § 8, cl. 17, has "generally [been] read" to "establish federal subject matter jurisdiction over tort claims occurring on federal enclaves," *Jograg* v. *Enter. Servs., LLC*, 270 F. Supp. 2d 10, 16 (D.D.C. 2017). The "key factor" in evaluating federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling* v. *Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). This action arises out of federal enclaves in three distinct ways, each sufficient to justify federal enclave jurisdiction.

*First*, the Attorney General's claims arise out of sales of Defendants' (or their subsidiaries' or affiliates') products within the District of Columbia—as well as their advertisements allegedly inducing these sales—including those on federal enclaves such as the Army Air Force Exchange Service Express stations at U.S. Army Fort Lesley J. McNair and Joint Base Anacostia-Bolling. *See* Ex. 7. The Attorney General does not dispute that these locations within the District of Columbia are federal enclaves. Instead, it claims that removal cannot be premised on these sales because they are not specifically identified in the Complaint. *See* Br. 20-21. Not so. "Failure to indicate federal enclave status and the location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal.

---

[23] *Rhode Island* v. *BP p.l.c.*, 393 F. Supp. 3d 142, 150-51 (D.R.I. 2019), *appeal pending*, No. 19-1818 (1st Cir.); *Baltimore*, 388 F. Supp. 3d at 559; *County of San Mateo* v. *Chevron Corp.*, 294 F. Supp. 3d 934, 938 (N.D. Cal. 2018), *aff'd on other grounds*, 960 F.3d 586 (9th Cir. 2020).
[24] *City of Oakland*, 969 F.3d at 906-07 (9th Cir. 2020); *Boulder*, 405 F. Supp. 3d at 968.

1992).  The Complaint "clearly alleges that the District seeks redress" regarding "goods and services that are or would be purchased, leased, or received in the District."  Br. 20; *see, e.g.*, Compl. ¶ 10.  That the Complaint does not enumerate where precisely "in the District" those sales took place, including on these enclaves, is irrelevant.  *See, e.g.*, *Olig* v. *Xantera Parks & Resorts, Inc.*, 2013 WL 3936904, at *3-4 (D. Mont. July 30, 2013).  The Attorney General also cannot pick and choose which fossil fuels sales are responsible for its alleged climate change injuries.  "[T]here is no realistic possibility of tracing any particular alleged effect of global warming to any particular emissions by any specific person, entity, [or] group at any particular point in time."  *Native Village of Kivalina*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).

*Second*, in targeting Defendants' oil and gas operations and their alleged impacts, this action necessarily sweeps in those operations that occur on military bases and other federal enclaves.  *See, e.g.*, *Humble Pipe Line Co.* v. *Waggoner*, 376 U.S. 369, 372-74 (1964).  As of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.[25]  The Attorney General dismisses these activities as irrelevant.  This action, it says, is limited to "seek[ing] redress under a District statute for misrepresentations and omissions."  Br. 20.  But such an opportunistic characterization counts for little.  *See Wecker* v. *Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907).  This action is a self-proclaimed "effort[] to deal with the problem of climate change."  Ex. 3 at 1.  It is a "tool by which to seek the environmental policy changes" the Attorney General desires by "enlisting the judiciary to do the work that the other two branches of government cannot or will not do."  *City of San Francisco*, 2020 WL 3969558, at *20.

---

[25] U.S. Gov't Accountability Off., GAO-02-64F, U.S. Fish & Wildlife Service Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.

*Third*, the Complaint alleges a variety of climate change injuries suffered—and expected to be suffered—within the District of Columbia: heightened temperatures, an increased number of "extreme heat days" and "heatwaves," a rise in sea levels, "inland drainage and riverine coastal flooding," and others.  Compl. ¶¶ 95-97.  Necessarily impacted are these federal enclaves within the District of Columbia, among others: (i) the Washington Navy Yard, *see Jograg*, 270 F. Supp. 3d at 16-18; (ii) military installations, such as the Marine Barracks and Naval Observatory, *see Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); (iii) monuments and parks controlled by the National Park Service, such as the National Mall and the Pennsylvania Avenue National Historic Park;[26] and (iv) the Smithsonian Institution, *cf. Expeditions Unlimited Aquatic Enters., Inc.* v. *Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977).

The Attorney General does not dispute that these locations are federal enclaves, or that its Complaint necessarily alleges injuries suffered to those federal enclaves.  Instead, it argues that those injuries cannot support federal enclave jurisdiction because it does not "seek relief for . . . injuries to land."  Br. 20.   This purported disclaimer will not suffice to deprive this Court of jurisdiction, however, because federal enclave jurisdiction can be predicated on either "the location of the plaintiff's injury or *where the specific cause of action arose*."  *Sparling*, 2014 WL 2448926, at *3 (emphasis added).  Here, the Complaint's causes of action arise out of harms allegedly suffered on federal enclaves even if it does not seek relief for them.  As the Attorney General's own brief spells out, the Complaint's "references to the effects of climate change in the District . . . summarize[] . . . why Defendants' misrepresentations and omissions" matter to District of Columbia consumers.  Br. 20; *see* Compl. ¶ 65.  In any event, the Attorney General did

---

[26] *See* Memorandum from Randolph J. Meyers, Senior Att'y, Branch of Nat'l Parks, U.S. Dep't of the Interior, to John Piltzecker, Superintendent, Nat'l Mall & Mem'l Parks, U.S. Dep't of the Interior (July 28, 2010), https://tinyurl.com/MeyersLetter.

not disclaim injuries allegedly suffered by District of Columbia consumers on federal enclaves.

The Attorney General argues that, even assuming federal enclave jurisdiction is otherwise satisfied, the District of Columbia Court Reform and Criminal Procedure Act divests this Court of jurisdiction over "purely local" matters like this one.  *See* Pub. L. No. 91-358, 84 Stat. 473 (1970) ("Court Reform Act").  The Court Reform Act's provisions and purposes contradict that argument. Prior to 1970, District of Columbia courts had "limited jurisdiction," and the U.S. District Court had "concurrent jurisdiction with the Court of General Sessions [one of three local trial courts] over most of the criminal and civil matters handled by that court."  *Palmore* v. *United States*, 411 U.S. 389, 392 n.2 (1973).  By enacting the Court Reform Act, Congress intended to give the District of Columbia "a court system comparable to those of the states," and to place this Court "on a par with other United States District Courts" in its relationship with the local courts.  *JMM Corp.* v. *District of Columbia*, 378 F.3d 1117, 1123-24 (D.C. Cir. 2004).  The Court Reform Act thus transferred all "purely local" jurisdiction from the District of Columbia federal courts to the District of Columbia Superior Court and Court of Appeals.  *Id.*  That transfer, however, did not divest this Court of jurisdiction over this action for at least three reasons.

*First*, federal enclave jurisdiction is an exercise of federal question jurisdiction under 28 U.S.C. § 1331,[27] *see Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); *Mater* v. *Holley*, 200 F.2d 123, 125 (5th Cir. 1952), which this Court "plain[ly] retained" "in the wake" of the Court Reform Act, *Police Officers Guild, Nat'l Union of Police Officers* v. *Washington*, 369 F. Supp. 543, 548 (D.D.C. 1973); *see* D.C. Code § 11-501.[28]

---

[27] Even the Attorney General acknowledges that "any claim that arises on a federal enclave is necessarily a creature of federal law."  Br. 19.

[28] The Attorney General's reliance on *McEachin* v. *United States*, 432 A.2d 1212 (D.C. 1981), and *Davis* v. *United States*, 385 A.2d 757 (D.C. 1978), is misplaced.  Both involved criminal jurisdiction, which the Court Reform Act treated separately differently than civil jurisdiction.

*Second*, the "purely local" matters over which this Court was divested of jurisdiction include only specific, enumerated categories of cases, such as those relating to "gifts to minors," "partition and assignment of dower," and "the proof of wills."[29]  This case does not fit within any of these categories, and is in *no sense* "purely local."[30]

*Third*, this argument, taken to its logical conclusion, is untenable.  The Court Reform Act's purpose was to place this Court "on a par with other United States District Courts."  *JMM Corp.*, 378 F.3d at 1124.  Thus, if the Court Reform Act divested this Court of jurisdiction over this case, then *no* federal district court could *ever* have subject matter jurisdiction over a consumer protection action, or any action "aris[ing] under local law."  Br. 19.  That is not the state of the law.  *See, e.g.*, *Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017).

## IV.   This Action Meets the Elements of the Federal Officer Removal Statute.

Defendants may also remove this action because the federal government directed Defendants to engage in activities relating to the Attorney General's claims.  *See* 28 U.S.C. § 1442(a)(1).  "[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute."  *Leite* v. *Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014).  A defendant's allegations "in support of removal" need only be "facially plausible."  *Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020).  A court must "credit

---

*Compare* D.C. Code § 11-502, *with id.* § 11-501.  Both cases also addressed whether the Superior Court *possessed* jurisdiction, not whether the federal courts *lacked* jurisdiction; "[e]xisting federal jurisdiction is not affected by concurrent jurisdiction in the state courts."  *Mater*, 200 F.2d at 125.
[29] D.C. Code §§ 11-501(2)(A), (3)(A); 11-921(a)(5)(A)(iv), (a)(5)(B); *see* S. Rep. No. 91-405, at 19 (1969); H.R. Rep. No. 91-907, at 31-33 (1970).
[30] In addition to the national and global reach of the Attorney General's efforts to curtail greenhouse gas emissions, its nominal consumer protection claims reach far beyond the District of Columbia.  The Complaint challenges dozens of Defendants' nationwide advertisements, including advertorials in the *New York Times*, *see, e.g.*, Compl. ¶ 74, online advertisements accessible anywhere in the world, *see, e.g.*, *id.* ¶ 131, and television advertisements appearing in San Francisco, *see, e.g.*, *id.* ¶ 139.

[the defendant's] theory of the case," *Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999), and grant it the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

The Federal Officer Removal Statute authorizes removal of claims where the defendant (1) is a "person" within the meaning of 28 U.S.C. § 1442; (2) it acted pursuant to the directions of a federal officer; (3) the claim is "for or relating to"—*i.e.*, "connected or associated with"—that act under color of federal office; and (4) the defendant raises a colorable federal defense. *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 291-92 (5th Cir. 2020) (*en banc*); *see K&D LLC* v. *Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).  Only the second and third elements are in dispute.[31]

Allegations in the Attorney General's Complaint and statements made by a coalition of attorneys general and climate activists over the years demonstrate that the Attorney General seeks to penalize Defendants for their lawful production and marketing of fossil fuels, while forcing Defendants to switch their portfolios to renewable energy.  While the Attorney General might contest the degree to which its claims are predicated on Defendants' production of oil and gas under the direction and control of federal officers, that is a *merits question* for a federal court to decide.  *See Willingham* v. *Morgan*, 395 U.S. 402, 409 (1969); *accord Baker*, 962 F.3d at 944.

**A.     Defendants Have, for Many Decades, Acted under the Direction and Subject to the Control of the Federal Government.**

The Supreme Court has emphasized that "[t]he words 'acting under' are broad," and are

---

[31] The Attorney General does not dispute that the first and fourth elements are satisfied.  Defendants, all of which are corporations, are "person[s]" within the meaning of § 1442.  *See Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 135-36 (2d Cir. 2008).  Defendants also have several colorable (indeed, meritorious) federal defenses, including preemption, and that those claims are barred by the Commerce Clause, *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989); Due Process Clause, *State Farm Mut. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003), *BMW of N. Am.* v. *Gore*, 517 U.S. 559, 572-73 & n.19 (1996); First Amendment, *see Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 481-82 (1995); derivative sovereign immunity, *see Yearsley* v. *W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940); and foreign affairs doctrine, *see Garamendi*, 539 U.S. at 419.

satisfied where, "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform."  *Watson* v. *Phillip Morris Cos.*, 551 U.S. 142, 147, 154 (2007). Defendants "acted under" federal officers because the government guided, supervised, and controlled Defendants' actions, and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the federal superior's duties or tasks."  *Watson*, 551 U.S. at 143.

### 1.     The Federal Government Has Directed and Controlled Defendants' Conduct since at Least World War II.

Federal officers extensively supervised and controlled Defendants' production of fossil fuels and development of specialized military products in support of multiple war efforts.[32]

*First*, the federal government exercised comprehensive control over the entire oil and gas industry in World War II by enlisting and fundamentally reshaping the industry to produce necessary war products.  "Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II." *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002).  As the U.S. District Court for the Southern District of Texas recently held, "the federal government directed the owners and operators of the nation's crude oil refineries to convert their operations" to produce 100-octane aviation gasoline ("avgas"), which "the military desperately needed as fast as possible," and other products "like motor gasoline that also met military needs."  *See Exxon Mobil Corp.* v. *United States*, 2020 WL 5573048, at *30 (S.D. Tex. Sept. 16, 2020).  Avgas was considered indispensable to an Allied victory.  *See id.* at *13 (quoting a Petroleum Administration for War ("PAW") official: "[o]n all counts, 100-octane [avgas] was the lifeblood of the [U.N.] in the air"); *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) (Avgas "was the most critically needed

---

[32] The facts discussed in the text are only examples of the many ways in which Defendants have acted under federal officers. Defendants reserve the right to supplement the factual bases supporting federal-officer removal.  *See* 28 U.S.C. § 1653.

refinery product during World War II and was essential to the United States' war effort.").

Defendants would not have produced avgas—let alone at the levels the military required— without federal control and direction. The federal government "insist[ed] that each company utilize all of its facilities to make 100 octane aviation gasoline to the extent of its ability to so do, and there [wa]s not in fact any freedom to make a choice between contracting and not contracting." *Exxon Mobil*, 2020 WL 5573048, at *12. The PAW—one of the federal entities responsible for directing avgas production—"told the refiners what to make, how much of it to make, and what quality," *Shell Oil*, 751 F.3d at 1286, going so far as to issue monthly instructions as to "the composition of [the refiner's] blends, the sources from which he was to obtain components, and to whom he was to ship other components—all to the end that the utmost possible 100-octane could be forced each month from the available facilities." *Exxon Mobil*, 2020 WL 5573048, at *12.

The PAW issued directives to refineries to "run their production operations on a continuous basis and to minimize downtime for maintenance and repair" in order to ensure maximum production. *Id.* For example, Shell Oil Company's predecessor or affiliate was obligated to "use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943." *Shell Oil Co.* v. *United States*, Civ. No. 06-141 (Ct. Cl. Nov. 20, 2012), ECF No. 106-1 (emphasis added) (contract between Defense Supplies Corporation and Shell Oil Company, Inc., dated April 10, 1942). These "extraordinary modes of operation" were "often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell Oil*, 751 F.3d at 1287. At the direction of the federal government, the oil companies, which include certain Defendants, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945,

[which] was crucial to Allied success in the war." *Id.*[33]

When directing the production of avgas and other essential military products, PAW coordinated all oil and gas company activities as if they were "units of one enterprise and directed their operations so as to produce the maximum quantities of aviation gasoline at the earliest possible time." *Exxon Mobil*, 2020 WL 5573048, at *12.  The PAW's chief counsel testified that it would "quit allocating crude oil to those that didn't devote themselves to what we called the war effort," in effect shuttering them.  *Id.*  Companies that "weren't making essential war materials" were simply not able to run their refineries.  *Id.*  The court rejected the argument that private industry "voluntarily cooperated."  *Id.* at *11.  Defendants had no choice but to comply with the federal government's production and specifications mandates.  Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, "under direct contract with the Army Ordnance Department."  Ex. 8 at 222; *see Exxon Mobil*, 2020 WL 5573048, at *13; Harold Nockolds, The Engineers 28 (1949).

Defendants also acted under the federal government as its agents in building and operating pipelines transporting oil.  During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."  Ex. 9 at 3.  "To insure adequate supplies of petroleum through the east during . . . World War II, the Government caused to be constructed, between the Texas oilfield and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines").  *Schmitt* v. *War*

---

[33] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.  Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this remand opposition only, Defendants describe the conduct of certain predecessors, subsidiaries, or affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

*Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*").  War Emergency

Pipelines, Inc. ("WEP"), an entity that included predecessors or affiliates of Defendants,[34]

constructed and operated the Inch Lines "under contracts" and "*as agent*" for the federal

government "without fee or profit."  *Id.* at 335-36 (emphasis added); *see Schmitt* v. *War*

*Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*") (explaining

delegating and agency relationship).  The government had power to "direct such affirmative action

as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages"

and "augmenting supplies for offshore shipments."  8 Fed. Reg. at 13,343.  Through Petroleum

Directives 63 and 73, the government controlled all oil that WEP moved through the pipelines on

its behalf.  8 Fed. Reg. 1,068, 1,069, § (e)(4); *id.* at 13,343, § (d)(3).

During their operation by WEP, to counteract the transportation barriers imposed by

submarine warfare, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels

of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."

Ex. 8 at 104-05, 108.  The Inch Lines "were built for a single purpose, to meet a great war

emergency. . . .  [T]hey helped to win a war that would have taken much longer to win without

them."[35]  Defendants who participated in the construction and delivery of oil by WEP "acted

under" federal officers by "serving as the government's agent."  *Goncalves* v. *Rady Children's*

*Hosp. San Diego*, 865 F.3d 1237, 1246 (9th Cir. 2017).  Indeed, the significant and comprehensive

control the federal government exerted over Defendants' World War II activities is precisely what

the Federal Officer Removal Statute contemplates.  *See Betzner* v. *Boeing Co.*, 910 F.3d 1010,

1015 (7th Cir. 2018); *Greene* v. *Citigroup, Inc.*, 2000 WL 647190, at *2 (10th Cir. May 19, 2000);

---

[34] *See* Ex. 8 at 108; Ex. 10 at 1-2.
[35] *Wartime Petroleum Policy under the Petroleum Administration for War: Hearing Before the Special Comm. Investigating Petrol. Res.*, 78th Cong. 17 (1945).

*see also Camacho* v. *Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989).

*Second*, the federal government has continued its control of Defendants' contributions to military efforts.  At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. 81-774.  The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.  *See* Ex. 11 at 122; *Exxon Mobil*, 2020 WL 5573048, at *15.

After the 1973 Oil Embargo, the government invoked the PAD to address "immediate and critical" military petroleum shortages.  Ex. 12 at 442.  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided complying companies with immunity from "damages or penalties." Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30,572, 30,572, § 3 (Nov. 6, 1973).  The government "issued directives to 22 companies [including Defendants] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."  Ex. 13 at 78; Ex. 12 at 443; Ex. 14.

During the Cold War, Shell Oil Company developed and produced specialized jet fuel for the federal government to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.  For the U-2, Shell Oil Company produced fuel known as JP-7, which required special processes and a high boiling point to ensure that the fuel could perform at very high altitudes and speeds.  Manufacturing this special fuel required petroleum byproducts. Ex. 15 at 61-62.  "The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . .  A new fuel and a chemical lubricant had to be developed to meet the temperature

39

requirements." Ex. 16 at 23. For OXCART, Shell Oil Company produced millions of gallons of secret fuel under government contracts with specific testing and inspection requirements. Ex. 17; Ex. 18. It also constructed "special fuel facilities" for handling and storage, including a hangar, pipelines, and storage tanks, at air force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program. Exs. 19-25 (attaching CIA contracts).

DOD continues to procure from Defendants highly-specialized military fuels to power planes, ships, and other vehicles, and to satisfy national defense needs. Historically, Shell Oil Company, BP, and ExxonMobil (or their predecessors or affiliates) have been three of the top four suppliers of fossil fuel products to the military.[36]

> **2. Defendants Have Engaged in the Exploration and Production of Fossil Fuels under Agreements with Federal Agencies Exercising Supervision and Control.**

In addition to their service in support of national defense, Defendants have also worked under federal direction in extracting and producing critical energy resources for the nation.

*First*, certain Defendants, including ExxonMobil and Chevron, have explored for, developed, and produced oil and gas on the Outer Continental Shelf ("OCS") pursuant to leases issued by the federal government, and governed by the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.* Under OCSLA, the Department of the Interior is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the energy and mineral resources of the Outer Continental Shelf."[37] To fulfill their statutory obligations, Department of the Interior

---

[36] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009).

[37] *Innovation in Offshore Leasing Act: Hearing on H.R. 5577 Before the Subcomm. on Energy and Min. Res. of the H. Comm. on Nat. Res.*, 114th Cong. (2016) (statement of Walter Cruickshank, Deputy Director, Bureau of Ocean Energy Mgmt., U.S. Dep't of the Interior).

officials maintain and administer the OCS leasing program, under which lessees are obligated to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. 26 § 10.

Over the past 70 years, the U.S. government has directed Defendants to produce oil and gas from the OCS to protect the vital national interest of promoting energy security and reducing reliance on oil imported from hostile powers.  In 1953, Congress passed OCSLA for the express purpose of making these essential national resources "available for expeditious and orderly development" in keeping with "national needs."  43 U.S.C. § 1332(3).  Two decades later, in the wake of the Arab Oil Embargo of 1973, President Nixon announced "a series of plans and goals set to insure that by the end of [the 1970s], Americans will not have to rely on any source of energy beyond our own," which was dubbed "Project Independence."[38]  President Nixon ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[39]

Congress responded to the dire energy shortages of the 1970s by amending OCSLA in 1978 to require "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade," including by "mak[ing] such resources available to meet the Nation's energy needs as rapidly as possible."  43 U.S.C. § 1802(1) & (2); *see also California ex rel. Brown* v. *Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981).  In the lead-up to these amendments, Congress considered a proposal to create a national company to

---

[38] Address to the Nation About National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973).
[39] Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974).

facilitate OCS development.[40]   The proposal was ultimately rejected; instead, the government decided to contract with private energy companies, including Defendants, to perform these essential tasks on its behalf with expanded federal supervision and control.   The adopted amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national needs, and instructed the Secretary to create oil and gas leasing programs on a five-year review cycle "which he [or she] determines will best meet national energy needs for the five-year period following its approval or reapproval."[41]   43 U.S.C. § 1344(a)-(e).

In the years following the 1978 amendments, Defendants' activities on the OCS increased significantly.   For instance, more than three times as many barrels of oil were produced from the OCS in the 25 years following the Arab Oil Embargo of 1973 than in the 25 years before the embargo.[42]   In the years since 1973, Defendants (or their subsidiaries or affiliates) have consistently ranked among the top operators on the OCS, as ranked by volume of oil produced.[43]

The Notice detailed specific lease and statutory provisions through which the federal government supervises and controls them as federal mineral lessees on federal lands, including the OCS.   *See* Notice ¶¶ 80-90; Ex. 26; Ex. 28; Ex. 29.   For example, "the federal government retains the right to control a lessee's rate of production from its lease," including by setting the "Maximum Efficient Rate for production from a reservoir—that is, a cap on the production rate from all of the

---

[40] *See* Ex. 27 at S903-04.

[41] In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."   H.R. Rep. No. 94-1084, at 254 (1976).

[42] U.S. Dep't of Interior, Bureau of Safety & Env't Enf't, *Gulf of Mexico Region: Annual Summary of Production for Entire Region* (last visited Sept. 29, 2020), https://www.data.bsee.gov/Main/HtmlPage.aspx?page=annualRegion.

[43] U.S. Dep't of Interior, Mins. Mgmt. Serv., *Gulf of Mexico Region: Production by Operated Ranked by Volume* (Dec. 22, 2000), https://www.data.bsee.gov/Production/Files/Rank%20File%20Oil%201947-1995.pdf.

wells producing from a reservoir." Notice ¶ 84. Defendants holding leases *must* develop the OCS to meet these needs. *See* Notice ¶ 88; Ex. 26 § 10. Regulations also control the means of oil and gas production on the OCS, including the use of enhanced oil and gas recovery operations (30 C.F.R. § 250.1165), well tests (*id.* §§ 250.1151, 250.1152), and flaring and venting gas (*id.* § 250.1160-64). The Fourth Circuit recognized that, with such details, Defendants could "satisfy their burden of justifying federal officer removal." *Mayor & City Council of Baltimore* v. *BP p.l.c.*, 952 F.3d 452, 466 n.9 (4th Cir. 2020). Through these leases, Defendants have fulfilled a government need to produce oil and gas from federal lands to further energy security. *See Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017).

*Second*, certain Defendants have engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies. *See* Notice ¶¶ 76-79. "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[44] When it was created, the Navy and Standard Oil owned intermingled parts of Elk Hills, and Standard Oil eventually agreed not to produce oil without notice to the federal government. *See United States* v. *Standard Oil Co. of Cal.*, 545 F.2d 624, 626-27 (9th Cir. 1976). As a result of World War II, Standard Oil entered into a United Plan Contract ("UPC") with the United States Navy "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve" to serve the national interest. *Chevron U.S.A., Inc.* v. *United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).

The UPC provided the government with the absolute right to establish the time and rate of production and the exclusive right to carry out the actual operations at the site. *See* Notice

---

[44] U.S. Gov't Accountability Off., RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (Jan. 29, 1987), http://www.gao.gov/assets/90/87497.pdf

¶¶ 76-79.   Indeed, the Navy was "afforded" a "means of acquiring complete control over the development of the entire Reserve and the production of oil therefrom."  Ex. 30, Recitals § 6(d)(i). As operator of Elk Hills, the Navy could operate the Reserve itself, or hire a contractor to perform that function at the direction of federal officers: "The Navy chose to operate the reserve through a contractor rather than with its own personnel.  Standard Oil Company of California bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[45]   The Navy used a private contractor to operate Elk Hills on its behalf instead of doing so itself to maximize production as quickly as possible.  This is reflected in declassified documents explaining the decision to hire Standard Oil:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre . . . .  The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve.  The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.

Ex. 31 at 1.  "Shortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production [at the Elk Hills Reserve] at a level of 65,000 [barrels per day] to address fuel shortages on the West Coast and World War II military needs."[46]   Standard Oil's production and operation of Elk Hills for the Navy were subject to substantial supervision and inspections by Navy officers.   The Operating Agreement between the Navy and Standard Oil provided that "OPERATOR [Standard Oil] is in the employ of the Navy Department and is responsible to the Secretary thereof through the Officer in Charge and Director, Naval Petroleum and Oil Shale

---

[45] U.S. Gov't Accountability Off., RCED-88-198, Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve, at 15 (July 28, 1988), https://www.gao.gov/assets/220/210337.pdf ("GAO Report").
[46] GAO Report at 15.

Reserves."  Ex. 32 at 188.

Standard Oil's operation of Elk Hills "in the employ" of the Navy is quintessential "acting under" as it was "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152.  Standard Oil operated Elk Hills for decades on behalf of, and under the "subjection, guidance or control" of, the Navy, and is a paradigmatic example of the "unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Id.* at 151, 153.

*Third*, certain Defendants acted under federal officers as operators and lessees of the Strategic Petroleum Reserve infrastructure.  From 1997 to 2019, the Department of Energy ("DOE") leased to Shell Oil Company affiliates the Sugarland/St. James Terminal and Bayou Choctaw Pipeline in St. James, Louisiana.  *See* U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2018, at 15 (2020) ("2018 SPR Report").  Starting in January 2020, DOE leased those facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).  *Id.*  The Strategic Petroleum Reserve subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[47]  The United States has exercised this control, including through the President's orders to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011, emergency actions taken in coordination with the International Energy Agency.[48]  Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision, and Defendants engaged in "an effort to *assist*, or to help

---

[47] *See* U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010, at 16 (2011); 2018 SPR Report at 15; 42 U.S.C. § 6241(d)(1).

[48] *See* U.S. Dep't of Energy, History of SPR Releases, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr.

*carry out*," the federal government's task in ensuring energy security.[49]  *Watson*, 551 U.S. at 152.

*Fourth*, Defendants and other non-Defendant producers and refiners sell consumer products under contract with the federal government for direct marketing and sale to military service members, retirees, and their families at exchanges in the District of Columbia, including at AAFES Express on Joint Base Anacostia-Bolling and on Fort McNair.  *See* Ex. 7.

### B. Defendants' Activities, Undertaken at Federal Direction, Are "Connected or Associated" with the Attorney General's Claims.

The Attorney General's claims "relate to" Defendants' activities taken at federal direction. 28 U.S.C. § 1442(a).  Oil and gas production at federal direction are among Defendants' activities the Complaint alleges play a "central role" in causing climate change, Compl. ¶ 1, which is the gravamen of the Complaint.  To evade this conclusion, the Attorney General argues that removal is permissible only if "federal officers *dictated the content* of Defendants' advertisements to D.C. consumers or *the concealment* of their products' known hazards."  Br. 28 (emphasis added).  The Attorney General misstates the governing standard.[50]

The Attorney General has erroneously described the legal standard for federal-officer removal.  Section 1442 originally conditioned removal on a defendant being sued "in an official or individual capacity *for* any act under color of such office."   28 U.S.C. § 1442(a) (2010) (emphasis added).  As part of the Removal Clarification Act of 2011, Congress "amended section 1442(a) to add 'relating to'" to the statutory text, thereby "broaden[ing] federal officer removal to actions, not just *causally* connected, but alternatively *connected or associated*, with acts under

---

[49] The Notice documents several other substantial activities Defendants took at federal direction in connection with the Strategic Petroleum Reserve.  *See* Notice ¶¶ 92-93.

[50] To the extent *Massachusetts* held differently, it is both wrongly decided and distinguishable. Unlike in this case, plaintiff there did not seek almost unbounded damages as a means of crippling defendant into submission.  *Cf. Massachusetts* v. *Exxon Mobil Corp.*, Civ. No. 19-12430, 2020 U.S. Dist. LEXIS 93153, at *37 (D. Mass. May 28, 2020).

color of federal office." *Latiolais*, 951 F.3d at 292, 296.[51]  And in assessing whether the requisite nexus is satisfied, courts credit the defendant's theory of the case.  *Leite*, 749 F.3d at 1124.

*Baker* illustrates how the connection between Defendants' activities under federal direction and the Attorney General's climate change claims suffices.  There, a company that had produced chemicals at the government's direction sought to remove a pollution lawsuit brought against it. 962 F.3d at 939.  The plaintiffs argued that the defendant could do so only by showing that the chemicals allegedly responsible for their injuries were those produced at federal direction.  *Id.* at 943.  The court disagreed; the showing plaintiffs demanded involved "*merits questions* that a federal court should decide." *Id.* at 944.  Indeed, courts have consistently found it is not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if plaintiff's "allegations are directed at the relationship between the [defendants] and the federal government" for at least *some* of the time frame relevant to plaintiff's claims.  *Id.* at 944-45; *accord Commonwealth*, 790 F.3d at 470; *Papp* v. *Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 813 (3d Cir. 2016).  So, too, here.  Defendants have produced fossil fuels at federal direction, and under federal control, for decades.  The issue whether that production is allegedly responsible for the Attorney General's harms is a merits question properly resolved at a later phase of this case.

## V.   This Action Is Removable under the Outer Continental Shelf Lands Act.

Removal is also warranted under OCSLA, which vests federal courts with original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil or seabed of the [OCS], or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see Tenn.*

---

[51] *Accord Baker*, 962 F.3d at 943-45; *Sawyer*, 860 F.3d at 258; *Caver* v. *Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017); *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 470-72 (3d Cir. 2015); *see also K&D*, 951 F.3d at 507 n.1 (resolving the effect of the 2011 amendments on Section 1442's scope unnecessary, but noting other circuits' views).

*Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996).  There is no dispute that Defendants have engaged in significant "exploration, development, or production" of minerals on the OCS.  43 U.S.C. § 1349(b).  Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on the nearly 27 million OCS acres that the Department of the Interior administers under OCSLA, which were collectively responsible for producing 690 million barrels of oil and 1.034 trillion cubic feet of natural gas in 2019 alone.  Notice ¶¶ 101-02.  Chevron U.S.A., for example, produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the OCS in 2016.[52]  *Id.* ¶ 103.

Further, the Attorney General's claims "arise out of, or in connection with" those operations, 43 U.S.C. § 1349(b), a standard not nearly as onerous as the Attorney General's brief would suggest, *see* Br. 22-23 (demanding a "direct[]" or "[]material" connection).  OCSLA's jurisdictional sweep is "broad," *Barker* v. *Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013), as it was intended to "extend[] to the entire range of legal disputes" that Congress "knew would arise relating to resource development" on the OCS, *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  Indeed, the phrase "arising out of, or in connection with" is "undeniably broad in scope."  *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  Courts have adopted a "broad reading of the jurisdictional grant of section 1349," which "is supported by the expansive substantive reach of the OCSLA."  *Id.* Accordingly, a plaintiff's claims "arise out of, or in connection with" operations on the OCS so

---

[52] According to Department of the Interior data for the period 1947 to 1995, thirteen of the twenty largest—including the three largest—OCS operators in the Gulf of Mexico, measured by oil volume, were a Defendant (or a predecessor of a Defendant) or one of their subsidiaries.  Ex. 33. In every subsequent year, from 1996 to present, at least three of the top five OCS operators in this area have been a Defendant (or a predecessor) or one of their subsidiaries.  *See* Ex. 34.

long as those operations *contribute* to the injuries alleged.[53]  *See Tenn. Gas*, 87 F.3d at 155.

The Attorney General's claims arise out of Defendants' OCS operations because fossil fuel production on the OCS is part of the production about which Defendants allegedly misled District of Columbia consumers.[54]  *See Tenn. Gas*, 87 F.3d at 155.  Put differently, in alleging that Defendants' advertisements about their fossil fuel production efforts misled consumers, the Complaint necessarily sweeps in Defendants' activities on the OCS.

Indeed, even if the Attorney General were to purportedly waive any relief for injuries caused by Defendants' OCS activities, that would not deprive this Court of jurisdiction.  Not only are its claims predicated on misleading statements about *all* of Defendants' oil and gas production, not just onshore production, the Attorney General also could not possibly isolate injuries traceable to onshore versus offshore activities in light of the undifferentiated nature of harm alleged in the Complaint.  *See Kivalina*, 663 F. Supp. 2d at 880.

Finally, exercising jurisdiction here would accord with OCSLA's purposes.  Congress "intended" that "any dispute that alters the progress of production activities on the OCS," and thus "threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS," would fall within OCSLA's "grant of federal jurisdiction." *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  That is *precisely* the case here.  The Attorney General seeks potentially billions of dollars in damages plus costly

---

[53] To the extent the Attorney General asserts that OCSLA imposes a causal nexus, it is incorrect. The statutory language—"or in connection with"—means there is no causal requirement.  In the context of federal-officer removal, multiple courts of appeal have held that when Congress added the words "related to" to the statute, it "broadened . . . removal to actions, not just *causally* connected, but alternatively *connected or associated*." *Latiolais*, *supra*.

[54] This reality renders inapposite the Attorney General's cases in which none of the relevant production activities took place on the OCS. *See, e.g.*, *Parish of Plaquemines* v. *Total Petroleum & Refin. USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014); *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co.*, 46 F. Supp. 3d 701, 706 (S.D. Tex. 2014).

equitable relief.  *See* Notice ¶¶ 120-22; Compl. § XII.  An award of that magnitude would substantially discourage OCS production, jeopardizing the federal government's leasing program and impairing national energy security.[55]  *See Brooklyn Union*, 930 F. Supp. at 292.

The Attorney General is mistaken that exercising OCSLA jurisdiction here would "open the floodgates to cases . . . far beyond" OCSLA's "intended purpose."  Br. 23.  As the Attorney General acknowledges, it is "unsurprising[]" that courts have yet to apply OCSLA jurisdiction for claims "involv[ing] state consumer protection laws."[56]  Br. 24.  That is because the Green 20's theory of liability is novel.  Never before have plaintiffs attempted to use state consumer protection law as a vehicle for regulating global greenhouse gas emissions and fossil fuel production efforts.  And if the merits of this approach are rejected (as they should be), the likelihood of similar claims being asserted will only diminish.  *See R.I. Fishermen's All.*, 585 F.3d at 52.

## VI.    This Court Has Diversity Jurisdiction Because the Real Parties in Interest Are Completely Diverse from All Defendants.

Federal courts are vested with diversity jurisdiction over civil actions for which (1) the amount in controversy "exceeds the sum or value of $75,000," and (2) there is "complete

---

[55] The few decisions the Attorney General points to in which courts have deemed the impact on OCS production activities insufficient to warrant OCSLA jurisdiction are clearly distinguishable.  *See Fairfield Indus., Inc.* v. *EP Energy E&P Co.*, Civ. No. 12-2665, 2013 WL 12145968, at *5 (S.D. Tex. May 2, 2013) (no effect where business, having merged with a party to a licensing agreement for seismic data collected from the Gulf of Mexico, was alleged to owe a "transfer fee" due to the merger), *report and recommendation adopted*, 2013 WL 12147780 (S.D. Tex. July 2, 2013); *LLOG Expl. Co.* v. *Certain Underwriters*, Civ. No. 06-11248, 2007 WL 854307, at *3 (E.D. La. Mar. 16, 2007) (no effect where damage to production facilities for which insurance coverage was sought had already occurred, and had already been repaired); *Brooklyn Union Expl. Co.* v. *Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) (no effect where pricing dispute concerned gas that had already been produced, sold, and conveyed to purchaser).

[56] Several district courts have declined to exercise OCSLA jurisdiction over climate change actions asserting nuisance claims.  *See, e.g.*, *Boulder*, 405 F. Supp. 3d at 978.  Those courts, however, are all within courts of appeal with scant OCSLA jurisdiction precedent, and none of those decisions have been affirmed on that basis.  *See, e.g.*, *Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.) Inc.*, 965 F.3d 792, 819 (10th Cir. 2020).

diversity," meaning that no plaintiff is a citizen of the same State as any defendant.  28 U.S.C. § 1332(a); *Lincoln Prop. Co.* v. *Roche*, 546 U.S. 81, 89 (2005).  Both criteria are satisfied here.

*First*, it is undisputed that the amount-in-controversy exceeds $75,000.[57]  *Second*, the parties are "completely diverse."  All plaintiffs—the District of Columbia consumers on whose behalf the Attorney General sues, who are the real parties in interest in this action—and no Defendants are citizens of the District of Columbia.[58]  *See* 28 U.S.C. § 1332.

The Attorney General's only argument in opposition to diversity jurisdiction is that the District of Columbia, rather than the consumers on whose behalf it sues, is the real party in interest. *See* Br. 32.  But because the Attorney General fails to plausibly allege that Defendants caused widespread harm to the District of Columbia as a whole, and seeks relief that would accrue to the personal benefit of individual consumers, the Attorney General is not the real party in interest.

"Ordinarily, [i]n an action where a state is a party, there can be no federal jurisdiction on the basis of diversity of citizenship because a state is not a citizen for purposes of diversity jurisdiction." *Louisiana* v. *Union Oil Co. of Cal.*, 458 F.3d 364, 366 (5th Cir. 2006).  "However, if the State is a nominal party with no real interest in the dispute, its citizenship may be disregarded." *Id.*  To establish more than a nominal interest in the litigation, the Attorney General must demonstrate a "quasi-sovereign interest" distinct "from the interests of particular private parties" such as an "interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *see also Pennsylvania* v. *New Jersey*, 426 U.S. 660, 665 (1976).  A general interest in

---

[57] The Complaint seeks restitution, damages, civil penalties in the amount of $5,000 per purchase of Defendants' products, and costly injunctive relief.  *See* D.C. Code § 28-3909; Compl. §§ IV-XII; Notice ¶¶ 120-22.

[58] No Defendant is incorporated or has its principal place of business in the District.  Notice ¶ 116.

protecting District of Columbia residents from deceptive consumer practices is not enough.  *See*

*Mo., K. & T. Ry. Co.* v. *Mo. R.R. & Warehouse Comm'rs*, 183 U.S. 53, 60 (1901); *Dep't of Fair*

*Empl. & Hous.* v. *Lucent Techs., Inc.*, 642 F.3d 728, 738 (9th Cir. 2011).  The Attorney General

must instead advance an "injury to a sufficiently substantial segment of its population."  *Snapp*,

458 U.S. at 607.   The Attorney General must allege more than a discrete injury to a "group of

individual residents."  *Id.*

The Attorney General has failed to do so.  The Complaint merely claims an undefined

injury to an unquantified segment of District of Columbia residents due to Defendants' alleged

violations of the CPPA.  The Complaint is replete with conclusory allegations that Defendants

have engaged in deceptive practices "to the detriment of DC consumers and the public generally"

and "helped coordinate the deception of consumers and the broader public about the risks of

climate change." Compl. ¶¶ 2, 60.  Nowhere, however, does the Complaint allege that Defendants'

deceptive practices had a widespread financial impact on the District of Columbia's economy

sufficient to implicate the "quasi-sovereign interest in the economic well-being of its citizens."

*In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 405 (S.D.N.Y. 2014).  Nor is

there any allegation that Defendants' purportedly deceptive conduct worked an extensive harm on

consumers such that it would have an aggregate impact on the District of Columbia itself.  Absent

plausible allegations that Defendants caused widespread harm to the District of Columbia as a

whole, the Attorney General is merely a nominal party, suing on behalf of a class of D.C.

consumers, but with no direct interest in the consumer protection claims at issue.

The cases the Attorney General cites to resist this conclusion are inapposite.  It relies, for

example, on *Maryland* v. *Louisiana*, 451 U.S. 725, 731 (1981), in which the Supreme Court

considered whether several states had standing to challenge Louisiana's "First-Use Tax" on any

natural gas brought into Louisiana which was not previously subject to taxation by another state or the United States. While "[a] State is not permitted to enter a controversy as a nominal party in order to forward the claims of individual citizens," the Court reasoned, "it may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Id.* at 737. Because the States had an interest "in protecting [their] citizens from *substantial economic injury* presented by imposition of the First-Use Tax," and "a *great many citizens* in each of the plaintiff States are themselves consumers of natural gas and are faced with *increased costs aggregating millions of dollars per year*," the Court held that exercising original jurisdiction was proper. *Id.* at 739 (emphasis added). Here, by contrast, the Attorney General suggests that Defendants' allegedly deceptive conduct may have the capacity to influence some consumers' subjective preferences in energy and transportation. *See* Compl. ¶¶ 175, 182, 189, 196. That is different in kind from an objective, quantifiable harm to consumers tantamount to injuring the District of Columbia as a whole.

Similarly, the Attorney General relies on *Nevada* v. *Bank of Am. Corp.,* 672 F.3d 661, 670 (9th Cir. 2012), in which the State of Nevada "sued to protect the hundreds of thousands of homeowners in the state allegedly deceived by Bank of America" as a result of deceptive mortgage practices during the foreclosure crisis. In holding that the State was the real party in interest, the court emphasized that foreclosures "work a widespread and devastating injury not only to those borrowers who are defrauded, but also on other Nevada residents and *the Nevada economy as a whole*." *Id.* (emphasis added). Foreclosures affected "nearly one million homes" costing residents approximately $54.5 billion in equity. *Id.* at 670-71. No such harms are alleged here.

The Complaint's prayer for relief fares no better. Pursuant to Section 28-3909 of the D.C. Code, any restitution or economic damages recovered by the Attorney General would be payable

directly to the allegedly aggrieved consumers who purchased Defendants' products.  *See* Compl. ¶ 3 ("The District seeks . . . restitution for DC consumers").  For these claims, the Attorney General is not seeking relief for District of Columbia residents in general, but to restore the interests of certain private individuals who allegedly would have refrained from purchasing gas for their vehicles had they known about a connection between fossil fuel combustion and climate change. That confirms that these consumers are the real parties in interest.  *See In re Baldwin-United Corp.*, 770 F.2d 328, 341 (2d Cir. 1985).  The Attorney General's other requested relief—including prospective injunctive relief and statutory civil penalties—are remedies also available to private consumers to enforce their substantive right to be free from allegedly deceptive trade practices. *See* D.C. Code § 28-3905(k)(2).  Because the benefits of these remedies do not necessarily flow to the District of Columbia as a whole, its quasi-sovereign interest is not implicated.  *See West Virginia ex rel. McGraw* v. *Comcast Corp.*, 705 F. Supp. 2d 441, 450 (E.D. Pa. 2010).

## VII.    This Action Satisfies the Class Action Fairness Act's Requirements.

The Class Action Fairness Act ("CAFA") permits removal of (1) any "class action" for which (2) minimal diversity exists; (3) at least 100 class members are represented; and (4) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(1), (2), (5); *Bradford* v. *George Wash. Univ.*, 249 F. Supp. 3d 325, 332 (D.D.C. 2017); *see also* 28 U.S.C. § 1453(b).  All four elements are satisfied here.

The only element in dispute is the first—whether the Attorney General's suit on behalf of District of Columbia consumers is a "class action" within the meaning of CAFA.  28 U.S.C. § 1332(d)(1)(B).  CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or *similar state statute or rule* of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  *Id.* § 1332(d)(1)(B) (emphasis added).  The definition of a "class action," Congress explained, "is to be interpreted

54

liberally. Its application should not be confined solely to lawsuits that are labeled 'class actions.' Generally speaking, lawsuits that resemble a purported class action should be considered class actions for purposes of applying these provisions." S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered); *see also McMullen* v. *Synchrony Bank*, 82 F. Supp. 3d 133, 140 (D.D.C. 2015) (relying on CAFA's legislative history to interpret its scope). Put differently, CAFA permits removal of a suit that is "in substance a class action," notwithstanding a plaintiff's "attempt to disguise the true nature of the suit." *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Song* v. *Charter Commc'ns Inc.*, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

*Song* is instructive. There, plaintiff sued various cable companies, alleging that "defendants unlawfully charge[d] California customers a surcharge of $8.75 per customer per month." 2017 WL 1149286, at *1. "Though he did not style his complaint as a class action," Song asserted that he "brought the lawsuit to put an end to Charter's unlawful actions, not only for his benefit but also for the benefit of the millions of California consumers whom Charter continues to target with this illegal and fraudulent scheme." *Id.* On these facts, the court found CAFA jurisdiction satisfied. Lawsuits like Song's "that *resemble* a purported class action," the court held, "should be considered class actions" for purposes of CAFA. *Id.* at *1 n.1 (emphasis added).

So, too, here. The Attorney General sues various energy companies, alleging that they engaged in "unabated and expanded extraction, production, promotion, marketing and sale of . . . fossil fuel products, to the detriment of *DC consumers and the public generally*." Compl. ¶ 2 (emphasis added). The Complaint is replete with allegations concerning the efforts to mislead, and injuries suffered by, the class members on whose behalf this suit is brought: *Washington, D.C. consumers. See, e.g., id.* ¶¶ 8, 71, 110, 150, 163. The Complaint also requests relief on behalf of

the class members it represents, seeking "restitution or damages" to make certain *District of Columbia consumers* whole, and an injunction to protect *District of Columbia consumers* from future injuries. *See id.* § XII (Prayer for Relief); *see also id.* ¶ 3 ("The District seeks . . . restitution for DC consumers."). Thus, by suing in a representative capacity on behalf of "consumers in Washington, D.C.," *id.* ¶ 1, the Attorney General has chosen to bring what is in substance a putative class action: a "representative suit[] on behalf of [a] group of persons similarly situated." 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002).

Jurisdiction would not only satisfy CAFA, it would further CAFA's legislative purposes. CAFA's "primary objective" is to "ensure Federal court consideration of interstate cases of national importance." *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014); *accord* Pub. L. No. 109-02, § 2(b)(2), 119 Stat. 4, 5 (2005). The "Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce." S. Rep. No. 109-14, at 8; *see generally* John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3, 22-28 (1948).

Prior to CAFA's enactment, however, plaintiffs were able to "game the procedural rules and keep nationwide or multi-state class actions in state courts." S. Rep. No. 109-14, at 4. The state courts in which these nationwide cases were brought were effectively "invite[d]" to "dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." *Id.* at 24. To Congress, that was untenable. "[A] system that allows state court judges to dictate national policy" from the "local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism." *Id.* As Congress "firmly believe[d]" that such "interstate class actions . . . properly belong in federal court," it enacted CAFA "to ensure that

56

qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire." *Id.* at 5.

This is exactly the type of case Congress did not want to slip through the cracks—resulting in an outsized impact on all other states based on the dictates of a single municipal court judge. This suit is a thinly veiled assault on the national (and international) oil and gas industry, and directly implicates the entire patchwork of relevant federal legislation and regulation. It is merely one of many coordinated suits brought by attorneys general, municipalities, and climate activists, who have stated clearly that they intend to use targeted litigation, such as this suit, in a concerted effort to stymie the operation of the oil and gas industry. Such a backdoor attempt to affect and supplant federal regulation of the oil and gas industry deserves a federal forum.

The Attorney General's efforts to remove this action from CAFA's ambit are unavailing. To start, it attempts to constrict CAFA's coverage by narrowing the statute's intentionally broad definition of a "class action." It contends that an action not styled as a class action can satisfy CAFA only if it is subject to specific procedures "similar" to those of Federal Rule of Civil Procedure 23. *See* Br. 30; Fed. R. Civ. P. 23. But even assuming CAFA demands such similarity, this suit meets—and surpasses—any such requirement. Attorney general suits under the CPPA are governed by D.C. Superior Court Rule 23, which is not merely similar, but "identical," to Federal Rule 23 in all relevant respects.[59] *See* D.C. Super. Ct. R. Civ. P. 23 cmt.

In *Rotunda* v. *Marriott International, Inc.*, 123 A.3d 980, 989 (D.C. 2015), the District of Columbia Court of Appeals held that Superior Court Rule 23 "necessar[il]y" applies to attorney general claims under the CPPA. There, a private attorney general brought CPPA claims for

_____

[59] The Attorney General's reliance on *Massachusetts* is misplaced. The statute at issue there was merely "comparable to a class action," 2020 U.S. Dist. LEXIS 93153, at 36, rather than subject to procedures "identical" to Federal Rule of Civil Procedure 23, D.C. Super. Ct. R. Civ. P. 23 cmt.

damages on behalf of himself and the "general public," but expressly disclaimed "any intention to seek class certification" under Superior Court Rule 23.   123 A.3d at 982.   The Superior Court dismissed the representative portion of the suit, holding that a CPPA claim for money damages "brought by an individual on behalf of himself and other similarly situated members of the general public is *in essence a class action*, whether pled as such or not, and must satisfy the requirements of Rule 23."   *Id.* (emphasis added).   On appeal, the Court of Appeals affirmed.   *See id.* at 989.

The Court of Appeals held that Rule 23 was a necessary complement to CPPA suits brought on behalf of the "general public" because, without its application, those suits would raise "unique challenges to procedural fairness and administration."   *Id.* at 989.   The CPPA "says nothing on the critical issue of how absent members of the represented class are to be given notice so as to make their own decisions whether to be bound by the suit," thus requiring the application of Rule 23. *Id.* at 985.   Trial courts would also face "deep uncertainty" in their "effort[s] to regulate CPPA actions on behalf of the general public" without Rule 23's tools for managing suits "brought on behalf of a potentially vast number of plaintiffs."   *Id.* at 986.   The court concluded that Rule 23 must apply in the absence of "clear[]" and "explicit proof" "that the legislature has taken . . . into account" the "unique challenges . .  posed by a representative suit for damages."   *Id.* at 988-89. Finding the CPPA to be "virtually silent" on this issue, the Court of Appeals held that Rule 23 provided the "necessary vehicle" for representative suits under the CPPA.   *Id.* at 985, 988-89.

The Attorney General endeavors to distinguish *Rotunda* on the basis that that action was brought by a private, rather than public, attorney general.   *See* Br. 30-31.   Yet it offers no reason why the "unique challenges to procedural fairness and administration" facing private attorney general actions on behalf of the "general public," *Rotunda*, 123 A.3d at 989, are absent or attenuated in public attorney general actions on behalf of the "publicly generally," Compl. ¶ 2.

Nor could it.  Because private and public attorney general actions "have long been analogized," *Nat'l Consumers League* v. *Bimbo Bakers USA*, 46 F. Supp. 3d 64, 76 n.7 (D.D.C. 2014), courts have refused to draw any distinction between them in evaluating CAFA's applicability, *see Baumann* v. *Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014).[60]

The Attorney General also cites to a collection of cases standing for the proposition that *parens patriae* actions are categorically exempt from CAFA.  *See* Br. 29 & n.11 (collecting cases). Whether that is true is academic, however, because it did not—and could not—sue as *parens patriae*.  The doctrine of *parens patriae* is a "species of prudential standing," which in certain circumstances permits a sovereign to sue on behalf of its residents.  *SEIU Health & Welfare Fund* v. *Philip Morris, Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001).  Like any theory of prudential standing, it is forfeited if not adequately preserved.  *See Huron* v. *Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016).  That is what happened here.  Despite knowing full well how to do so, *see, e.g.*, Compl. at 29, *District of Columbia* v. *Beretta U.S.A. Corp.*, 2000 WL 34591622 (D.C. Super. Ct. Jan. 20, 2000), the Attorney General did not invoke *parens patriae* authority in its Complaint. Because "it is axiomatic that [p]laintiffs cannot amend their Complaint via their briefs," *Zaccari* v. *Apprio, Inc.*, 390 F. Supp. 3d 103, 110 n.6 (D.D.C. 2019), it is too late now.

The Attorney General's failure to invoke *parens patriae* authority is ultimately unsurprising, as it would have been in vain.[61]  To maintain a *parens patriae* action, the government

---

[60] The Attorney General contends *Rotunda* is irrelevant as it did not address whether the CPPA *itself* is "similar to [Federal] Rule 23."  Br. 31.  That the requirements governing representative CPPA claims are housed elsewhere within the D.C. Code is irrelevant.

[61] *Massachusetts* is not helpful to the Attorney General here either.  The *Massachusetts* court held that the Commonwealth acted "not as a representative of a class of injured citizens but in its own right as a sovereign" based partially on the relief it sought:  a civil penalty due to the Commonwealth, rather than damages due to consumers.  *See* 2020 U.S. Dist. LEXIS 93153, at *37.  Here, in contrast, the Attorney General also seeks "restitution or damages" to make District of Columbia consumers whole.  Compl. § XII (Prayer for Relief).

"must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Snapp*, 458 U.S. at 607. Specifically, the government "must express a quasi-sovereign interest," such as in "the health and well-being . . . of its residents in general." *Id.* The Attorney General cannot do so. As described in the context of diversity jurisdiction, it brought this action on behalf of a discrete group of District of Columbia consumers to remediate private harms, the antithesis of a quasi-sovereign interest. *See supra* § VI.

In sum, whether it is because this suit is "in substance" a class action, or because it is governed by procedures equivalent to Federal Rule of Civil Procedure 23, this action is a "class action" within the meaning of CAFA. Because minimal diversity exists, at least 100 class members are represented, and the amount-in-controversy exceeds $5,000,000, all of CAFA's jurisdictional requirements are satisfied. *See* 28 U.S.C. § 1332(d).

## CONCLUSION

For the foregoing reasons, this Court has subject matter jurisdiction, and the motion to remand should be denied.[62]

---

[62] In the final two sentences of the conclusion of its brief, the Attorney General requests attorneys' fees and costs under Section 1447(c). That argument is forfeited. *See, e.g.*, *Wehrs* v. *Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012). A party may not "mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Capitol Servs. Mgmt., Inc.* v. *Vesta Corp.*, 933 F.3d 784, 790 n.1 (D.C. Cir. 2019). In any event, a plaintiff opposing removal is entitled to attorneys' fees or costs under Section 1447(c) only if it can show that "the removing party lacked an objectively reasonable basis for seeking removal." *Martin* v. *Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). Conversely, "when an objectively reasonable basis exists, fees should be denied." *Id.* A defendant's basis for removal is "objectively reasonable" so long as there is "at least some logical and precedential force behind it . . . regardless of whether it is correct." *Knop* v. *Mackall*, 645 F.3d 381, 383-84 (D.C. Cir. 2011). Defendants' arguments—supported by evidence and persuasive, if not binding, authorities—are not merely objectively reasonable, they are correct. *See id.*

DATE:  October 15, 2020

Respectfully submitted,

By: */s/ Theodore V. Wells, Jr.*

Theodore V. Wells, Jr. (D.C. Bar
No. 468934)
Daniel J. Toal (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  twells@paulweiss.com
E-mail:  dtoal@paulweiss.com

Justin Anderson (D.C. Bar No. 1030572)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7321
Fax:  (202) 223-7420
E-mail:  janderson@paulweiss.com

Patrick J. Conlon, (D.C. Bar No. 414621)
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336
E-mail:  patrick.j.conlon@exxonmobil.com

*Attorneys for Defendants*
*EXXON MOBIL CORPORATION and*
*EXXONMOBIL OIL CORPORATION*

By: */s/ David C. Frederick*

David C. Frederick (D.C. Bar No. 431864)
Brendan J. Crimmins (D.C. Bar No. 497273)
Grace W. Knofczynski (D.C. Bar. No.
1500407)
Daniel S. Severson (D.C. Bar No. 208807)

By: */s/ Theodore J. Boutrous*

Theodore J. Boutrous, Jr. (D.C. Bar
No. 420440)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel:  (213) 229-7000
E-mail:  tboutrous@gibsondunn.com

Thomas G. Hungar (D.C. Bar No. 447783)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Tel:  (202) 955-8500
E-mail:  thungar@gibsondunn.com
E-mail:  jlipshutz@gibsondunn.com

*Attorneys for Defendants CHEVRON CORP.*
*and CHEVRON U.S.A., INC.*

By: */s/ James W. Cooper*

James W. Cooper (D.C. Bar.
No. 421169)
Ethan Shenkman (D.C. Bar No. 454971)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel:  (202) 942-5267
Fax:  (202) 942-5999
E-mail:  ethan.shenkman@arnoldporter.com
E-mail:  james.w.cooper@arnoldporter.com

Nancy G. Milbum (*pro hac vice*)
Diana E. Reiter (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710

61

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
E-mail:  dfrederick@kellogghansen.com
E-mail:  bcrimmins@kellogghansen.com

*Attorneys for Defendants ROYAL DUTCH SHELL PLC and SHELL OIL COMPANY*

Tel:  (212) 836-8383
Fax:  (212) 836-8689
E-mail:  nancy.milbum@arnoldporter.com
E-mail:  diana.reiter@arnoldporter.com

John D. Lombardo (*pro hac vice*)
Matthew T. Heartney (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel:  (213) 243-4120
Fax:  (213) 243-4199
E-mail:  john.lombardo@arnoldporter.com
E-mail:  matthew.heartney@arnoldporter.com

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Tel:  (415) 471-3156
Fax:  (415) 471-3400
E-mail:  jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP PLC and BP AMERICA INC*